Rosemary M. Rivas (State Bar No. 209147)
Email: rrivas@zlk.com
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

Eduard Korsinsky (to be admitted *pro hac vice*)
Email: ek@zlk.com
**LEVI & KORSINSKY, LLP**
30 Broad Street, 24th Floor
New York, New York 10004
Telephone: (212) 363-7500
Facsimile: (212) 636-7171

Donald J. Enright (admitted *pro hac vice*)
Email: denright@zlk.com
John A. Carriel (to be admitted *pro hac vice*)
Email: jcarriel@zlk.com
**LEVI & KORSINSKY, LLP**
1101 30th St., NW, Ste. 115
Washington, DC 20007
Telephone: (202) 524-4292
Facsimile: (202) 333-2121

*Attorneys for Lead Plaintiff Jon Holland
and Plaintiff Astley Davy*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| JON HOLLAND and ASTLEY DAVY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>PARAGON COIN, INC., JESSICA VERSTEEG, EGOR LAVROV, EUGENE "CHUCK" BOGORAD, ALEX EMELICHEV, GARETH RHODES, DAVID KALUSTOV, JAYCEON TERRELL TAYLOR A/K/A/ "THE GAME," JUSTIN HARKEMA, and CRYPTO MEDIA GROUP LLC,<br><br>Defendants. | Case No. 4:18-cv-00671-JSW<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(a)(1) AND 15(a) OF THE SECURITIES ACT OF 1933**<br><br>**DEMAND FOR JURY TRIAL**<br><br>REDACTED |

# TABLE OF CONTENTS

**Page**

NATURE AND SUMMARY OF THE ACTION ................................................................ 1

JURISDICTION AND VENUE ..................................................................................... 5

PARTIES .................................................................................................................... 6

    I.      Plaintiffs ...................................................................................................... 6

    II.     Defendants ................................................................................................... 7

          A.     The Founder Defendants ................................................................... 7

          B.     The Executive Defendants ................................................................ 8

          C.     The Promoter Defendants .................................................................. 9

    III.    Relevant Non-Party—ParagonCoin Ltd. (Gibraltar) .................................. 11

PLAINTIFFS' CLASS ACTION ALLEGATIONS ....................................................... 13

SUBSTANTIVE ALLEGATIONS .............................................................................. 14

    I.      Background on Blockchain Technology, ICOs, and Smart Contracts......................... 14

          A.     Blockchains .................................................................................... 14

          B.     ICOs ............................................................................................... 15

    II.     Paragon's Founding, Business Model, and ICO ........................................... 15

          A.     Paragon's Formation and Leadership Structure................................. 15

          B.     The Paragon Business Model............................................................ 16

    III.    The Paragon ICO ....................................................................................... 18

          A.     Marketing the Paragon ICO .............................................................. 18

          B.     Mechanics of the Paragon ICO ........................................................ 22

          C.     Silencing Paragon ICO Criticisms ................................................... 23

    IV.    PRG Tokens Are Investment Contract Securities.......................................... 24

          A.     The Terms of the Paragon ICO Presented an Investment Offer ...................... 24

          B.     Investing in the Paragon ICO Subjected Plaintiffs and the Class to Financial Loss ....................................................................... 25

          C.     The Economic Realities of Purchasing PRG Tokens ....................... 26

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933

D.      Purchasers Saw PRG Tokens as Investments ........................................ 29

V.     Each of the Defendants Were "Sellers" of PRG Tokens ................................ 31

      A.      Paragon and the Founder Defendants ................................ 32

      B.      The Executive Defendants ................................................ 35

      D.      The Promoter Defendants ................................................ 41

COUNT I ....................................................................................................... 43

COUNT II ...................................................................................................... 44

PRAYER FOR RELIEF ................................................................................. 44

DEMAND FOR TRIAL BY JURY ................................................................ 45

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

Lead Plaintiff Jon Holland ("Holland"), along with additional plaintiff Astley Davy ("Davy," together with Holland, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this First Amended Complaint for violations of the federal securities laws (the "Complaint"), the following based upon knowledge with respect to themselves and their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) documents and solicitation materials released by Defendants (defined below), in connection with the Paragon ICO (defined below); (b) public statements made by Defendants concerning Paragon Coin, Inc. ("Paragon," or the "Company") and the Paragon ICO; (c) media publications concerning Paragon and the Paragon ICO; and (d) certain limited expedited discovery Paragon provided to Plaintiff Davy (the "Limited Discovery") pursuant to an agreement set forth in the Joint Notice Withdrawing Plaintiff Davy's *Ex Parte* Application for Temporary Restraining Order filed in the above-captioned action (the "Action") on February 5, 2018 (Dkt. No. 16).

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE AND SUMMARY OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased ParagonCoins ("PRG Tokens") from approximately August 15, 2017, through October 16, 2017, inclusive (the "Class" who purchased PRG Tokens during the "Class Period"). This action seeks to recover rescissory or compensatory damages for violations of the federal securities laws under Sections 12(a)(1) and 15(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77l(a)(1) and 77o(a)] against Paragon, certain of its top officials, and certain influential promoters that received compensation in exchange for selling PRG Tokens or soliciting the general public to purchase PRG Tokens.

2.    This action alleges violations of Section 12(a)(1) of the Securities Act [15 U.S.C. § 77l(a)(1)] against Defendants Paragon, Jessica VerSteeg ("VerSteeg"), Egor Lavrov ("Lavrov," together with VerSteeg, the "Founder Defendants"), Eugene "Chuck" Bogorad ("Bogorad"), Alex Emelichev ("Emelichev"), Gareth Rhodes ("Rhodes"), David Kalustov ("Kalustov," and together with

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

Bogorad, Emelichev, and Rhodes, the "Executive Defendants"), Jayceon Terrell Taylor a/k/a "The Game" ("Taylor"), Justin Harkema ("Harkema"), and Crypto Media Group LLC ("Crypto Media Group," together with Taylor and Harkema, the "Promoter Defendants") (collectively, "Defendants"); and violations of Section 15(a) of the Securities Act [15 U.S.C. § 77o(a)] against the Founder Defendants

3.     From approximately August 15, 2017 through October 16, 2017, Paragon, the Founder Defendants, and the Executive Defendants ran the Paragon Initial Coin Offering (the "Paragon ICO") during which Paragon and the Founder Defendants claimed to have raised at least $70 million in virtual currencies.[1]

4.     From August 15, 2017 through September 15, 2017, the Company ran the Paragon ICO "presale" during which time it purportedly "sold out" of 70,000,000 PRG Tokens, priced between $0.75 and $0.90 per PRG Token.[2]  From September 15, 2017 through October 16, 2017, the Company ran the Paragon ICO "crowd sale," during which time PRG Tokens were offered and sold for $1 each on the first day and the price thereafter increased by $0.05 per day until the close of the Paragon ICO. Such price increases were clearly designed to entice early investments.[3]

5.     On November 2, 2017, Paragon emailed Paragon ICO investors an update which indicated that during the Paragon ICO "crowd sale" they had collected 533 BTC and 8,092 ETH.  In

---

[1] The Financial Action Task Force, an inter-governmental agency that promotes laws combating anti-money laundering, and in which the United States is a member, describes "virtual currency" as a "digital representation of value that can be digitally traded and functions as (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status . . . in any jurisdiction."  Importantly, virtual currencies do not have legal tender status like real currencies (*e.g.*, U.S. dollar and the Euro).  The most widely used virtual currencies are BTC and ETH.

[2] *See* JD Alois, *The Paragon ICO is Just Killing it as the Token Pre-Sale Sells Out*, Crowdfundinsider.com (Sept. 26, 2017, 10:30 p.m.), https://www.crowdfundinsider.com/2017/09/122405-paragon-ico-just-killing-token-pre-sale-sells/.

[3] Paragon also reduced the prices of PRG Tokens by offering "bonuses" as the Paragon ICO went on, resulting in a baiting of early investors, as well as late or repeat investors.  For example, Paragon emailed Plaintiff Davy on September 27, 2017, after he had already invested, a "promo code" offering a 25% bonus on his next purchase of PRG Tokens.  As the Paragon ICO neared its conclusion, the offered "bonus" percentages likewise increased.  For example, Paragon emailed Plaintiff promo codes on October 3, 2017, and October 12, 2017, offering 40% and 55%, respectively, in bonus PRG Tokens for any subsequent purchase.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933

this update, Paragon also stated that these amounts did not include any of the virtual currencies they collected during the Paragon ICO "presale."

6.     The Limited Discovery indicates that, in connection with the Paragon ICO, the Company received a total of at least ██████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████,[4] and potentially other virtual currency investments, in exchange for PRG Tokens.  Following the initiation of this Action, Paragon and the Founder Defendants have claimed that the Paragon ICO raised approximately ████████ in virtual currencies rather than the $70 million in virtual currencies the Company had previously claimed to receive.  More specifically, the Company previously represented that the Paragon ICO "presale" sold 70,000,000 PRG Tokens at a minimum price of $0.75,[5] and that the Paragon ICO "crowd sale" raised 533 BTC and 8,092 ETH.[6]  Absent comprehensive discovery or a full accounting of the amounts raised in connection with the Paragon ICO, there is no way to verify which of Paragon's statements accurately represent the amount raised.

7.     Paragon's purported goal, or "mission statement," in conducting the Paragon ICO was:

> Paragon seeks to pull the cannabis community from marginalized to mainstream by building blockchain into every step of the cannabis industry and by working toward full legalization. Our strength lies in the unique blockchain/cannabis connection that uses smart contracts. We believe in blockchain, and we believe in the benefits of cannabis. More uses of cannabis are coming to light, and we want to accelerate that process. We believe cannabis is good for individuals and good for countries. We are passionate about moving forward in an ethical, morally responsible, and legal way.

---

[4] As of May 31, 2018, the foregoing amounts of virtual currencies, collectively, were worth approximately ████████████.

[5] *Supra*, note 2.

[6] One website that tracks the amount of funds raised by initial coin offerings estimates that the Paragon ICO raised over $74 million.  *See* Top10BestUpComingICOS.com, https://top10bestupcomingicos.com/partners/paragon/ (last visited Jan. 30, 2018) (stating the Paragon ICO raised $74,647,589).

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

8.      In other words, the Paragon ICO was marketed as offering a path towards legalization of cannabis and a way to solve nearly every issue facing the cannabis industry.  As discussed herein, the Paragon ICO was in actuality a way for the Company to raise capital to purchase real estate.

9.      The Paragon ICO was an unlawful offering of unregistered securities, in the form of PRG Tokens, for which no exemption from registration was available under the federal securities laws.

10.      The Paragon ICO was a clear offer and sale of securities because, *inter alia*, Defendants touted, and Plaintiffs and other PRG Token purchasers were conditioned to expect, and did reasonably expect, that the PRG Tokens received would increase in value and become worth more than the virtual currencies invested.  Indeed, Paragon and the Founder Defendants have explicitly referred to Paragon ICO participants as "investors" and repeatedly stressed their intention to "keep the value of PRG strong and growing," and that PRG Tokens would be "long term growth assets."

11.      The Securities Act's registration requirements are designed to protect investors by ensuring they are provided adequate information upon which to base their investment decisions.  Absent registration, issuers of securities are able to market their securities with no disclosure requirements whatsoever.  For example, an issuer could omit any information that would make a potential investor think twice before investing (*e.g.*, conflicts of interest or major setbacks to core product lines), or peddle its securities using unbounded exaggerations regarding the progress of its products, business plan, business strategies, or even fabricate the existence of relationships with vendors or other business partners.

12.      Due to the varied and innumerable ways in which investors can be, and are likely to be, manipulated and harmed absent any of the protections under the federal securities laws, Sections 5 and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells an unregistered security.  As detailed herein, the Paragon ICO was, at all relevant times, an offer and sale of unregistered securities.  Accordingly, Defendants are strictly liable under Section 12(a)(1) of the Securities Act.

13.      Defendants are strictly liable for the offering and selling of unregistered securities in connection with the Paragon ICO.  Nevertheless, Defendants' deceptive activity is outlined herein to demonstrate the Founder Defendants' control over Paragon and Defendants' conditioning of the

marketplace to expect a profit from purchasing PRG Tokens, which is a characteristic of an investment contract security.

14.     The Paragon ICO's promotional materials appeared in press releases, Paragon's website, online chat rooms or forums located on websites such as Reddit.com ("Reddit"), white papers, presentations, postings on social media websites such as Twitter and Facebook, promotional videos posted on websites such as YouTube and social media platforms such as Instagram, interviews, and/or other materials relating to Paragon and the Paragon ICO, which were disseminated widely to the investing public.

15.     For these reasons, Plaintiffs on behalf of themselves, and all similarly situated Paragon ICO investors, seek compensatory, injunctive, and rescissory relief, providing rescission and repayment of all investments made to purchase PRG Tokens in connection with the Paragon ICO, and the right to secure and conserve such funds until repayment.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 22 of the Securities Act [15 U.S.C. § 77v] because Plaintiffs allege violations of Sections 12(a)(1) and 15(a) of the Securities Act [15 U.S.C. §§ 77l(a)(1) and 77o(a)].

17.     This Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this District under Section 22 of the Securities Act [15 U.S.C. § 77v], as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the corporate transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933

# PARTIES

## I.   Plaintiffs

19.   On May 10, 2018, this Court appointed Holland to serve as Lead Plaintiff for the Class in this class action pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").

20.   Each of the Plaintiffs actively researched Paragon and the Paragon ICO, prior to making their purchases of PRG Tokens in connection with the Paragon ICO.  Accordingly, each of the Plaintiffs were personally, and successfully, solicited by each of the Defendants in connection with Defendants' public representations and active solicitations to purchase PRG Tokens outlined herein.

### A.  Lead Plaintiff Jon Holland

21.   Holland invested in the Paragon ICO on September 10, 2017, by transmitting 34 ETH to Paragon to purchase 11,286.98 PRG Tokens.  Holland continues to hold these PRG Tokens which as of May 31, 2018, were worth approximately 3.22807 ETH.  In terms of USD, as of May 31, 2018, Holland's 11,286.98 PRG Tokens were worth approximately $1,805.92.  In contrast, as of this same date, the 34 ETH Holland expended to purchase these PRG Tokens were worth approximately $19,890.  Accordingly, as of May 31, 2018, Holland has suffered a loss of approximately 30.77 ETH—or in USD, approximately $18,084.08—as a result of Defendants' alleged sale of unregistered securities.

### B.  Plaintiff Astley Davy

22.   Plaintiff Davy invested in the Paragon ICO on September 21, 2017, September 23, 2017, September 28, 2017, September 30, 2017, October 3, 2017, and October 15, 2017 by transmitting 0.04095 BTC, 0.03975 BTC, 0.57855 ETH, 0.0231 BTC, 0.03495 BTC, and 0.04579484 BTC, respectively, to Paragon to purchase 577.973 PRG Tokens.  Plaintiff Davy continues to hold these PRG Tokens which as of May 31, 2018, were worth approximately 0.1653011 ETH.  In terms of USD, as of May 31, 2018, Davy's 577.973 PRG Tokens were worth approximately $92.48.  In contrast, the 0.18454484 BTC and 0.57855 ETH were worth $1,393.31 and $338.45, respectively.  Accordingly, as of May 31, 2018, Davy has suffered a loss of approximately 0.18454484 BTC and 0.4132489—or in USD, approximately, $1,639.28.

## II.     Defendants

23.     Paragon is a Delaware corporation that was incorporated on July 6, 2017.  Paragon is controlled by VerSteeg and Lavrov.  Paragon is the "operating entity" for the "PRG Token project."

### A.  The Founder Defendants

24.     VerSteeg is the Chief Executive Officer ("CEO") and founder of Paragon.  VerSteeg is a former Miss Iowa and Amazing Race participant.  In 2016, VerSteeg founded AuBox, a marijuana delivery service, that is "on pause" while VerSteeg focuses on Paragon's operations.  VerSteeg resides in the State of California, within this District.

25.     Lavrov is the "Chief Creative Officer" and founder of Paragon.  Lavrov describes himself as a "serial entrepreneur" who has had "multiple multimillion dollar exits."  Lavrov claims to have created numerous successful ventures.  Such ventures have included: two phone game app development companies, Zila Networks and Karma World LLC, and Pravda Sushi Bar & Lounge.  All three of these ventures are currently defunct.  Additionally, Lavrov founded tattolizator.com, a website launched to run an online contest for artists to submit work that Lavrov would then have tattooed on himself.  For this project, Lavrov issued a press release on Business Wire, in which he described himself as a "leading luxury life figure" that was a "cult figure" for a "new group of rich young Russians defined by their conspicuous consumption as well as their open disdain for poverty."  Currently, Lavrov holds himself out as a venture capitalist that runs "Zila Ventures," which has a team of one—Lavrov.  Zila Ventures claims to have three portfolio companies: AuBox (VerSteeg's company); Proffi, Inc. (a company that has no online presence other than a single sentence on the Zila Ventures' website); and Peak Mediation, Inc. (a marketing company that claims to "Guarantee to Double Your Profit").  Lavrov also holds himself out as the CEO of Peak Mediation, Inc.  Lavrov is believed to have residences in the State of California and the State of Florida.

26.     VerSteeg and Lavrov have been married to each other at all relevant times referred to herein.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

B.  The Executive Defendants

*1.  Eugene "Chuck" Bogorad*

27.    Bogorad is Paragon's Chief Strategy Officer.  Bogorad directly or indirectly, and successfully, solicited investments from potential and actual PRG Token purchasers during the Paragon ICO.  Further, Bogorad personally distributed PRG Tokens to investors during the Paragon ICO. Additionally, Bogorad was significantly involved in marketing the Paragon ICO by negotiating and purchasing ad placements for the Paragon ICO with/from companies that operate virtual currency related websites, including, *inter alia*: ████████  ████████  ████████

██████████████████████████████████████████████████████████

████████████████████████████████████    ████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████

*2.  Alex Emelichev*

28.    Emelichev is one of Paragon's Chief Business Officers for Europe, the Middle East, and Africa markets ("EMEA").  Emelichev directly or indirectly, and successfully, solicited investments from potential and actual PRG Token purchasers during the Paragon ICO.  Emelichev was involved in the decision-making process relating to, *inter alia,* ████████████████████████████████

████████████████████████████████████ and marketing partnerships Paragon considered or engaged in.  Additionally, as discussed below, upon information and belief, Emelichev participated in editing, and providing comments on, the White Paper (defined below) which was used to solicit investments in the Paragon ICO from the general public.  Prior to, and in conjunction with, his employment with Paragon, Emelichev worked with Lavrov on various unrelated business ventures.

*3.  Gareth Rhodes*

29.    Rhodes is Paragon's second Chief Business Officer for EMEA.  Rhodes directly or indirectly, and successfully, solicited investments from potential and actual PRG Token purchasers during the Paragon ICO.  Rhodes played a significant role in drafting, editing, and providing comments

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

to, the White Paper (defined below).  Additionally, Rhodes assisted the Company's web developers with the Paragon website's design and language contained therein.  Further, Rhodes was involved in marketing the Paragon ICO by negotiating and purchasing ad placements for the Paragon ICO with/from companies that operate virtual currency related websites.  For example, ███████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████Additionally, Rhodes personally communicated with prospective and actual PRG Token purchasers ██████████████████████████ ███████████████████████

### 4. David Kalustov

30.     Kalustov is Paragon's VP of Business Development.  The White Paper also states that Kalustov is also employed by Lavrov's company, Peak Mediation, Inc., as its "CRO."  Kalustov was significantly involved in responding to questions █████████████████████████████████████ During such communications, Kalustov aggressively solicited investments in the Paragon ICO by claiming that ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ██████████████████████████

### C. The Promoter Defendants

### 1. Jayceon Terrell Taylor a/k/a "The Game"

31.     Taylor is a member of Paragon's "advisory board."  He is a rapper and well-known celebrity.  Upon information and belief, Crypto Media Group recruited Taylor and structured a deal between the Company and Taylor pursuant to which Taylor would use his celebrity status to promote Paragon and the Paragon ICO.  Taylor promoted the Company and the Paragon ICO by encouraging the public to visit the Paragon website, join a "revolution" with Paragon, and purchase PRG Tokens in social media posts on Twitter and Instagram.  For example, in August 2017, Taylor and Paragon posted

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

a video of him and VerSteeg promoting Paragon.  In this video, Taylor states, "We are revolutionizing marijuana, cannabis, hey, the world!"  Similarly, in early-September 2017, Taylor posted a tweet from his Twitter account stating: "You see a correction,[7] me & @JessVerSteeg see a buying opportunity. Let me welcome you to #Crypto with ParagonCoin.com @ParagonCoin."

### 2.  Justin Harkema

32.    Harkema is one of Crypto Media Group's three principals on record. ██████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.[8]

### 3.  Crypto Media Group

33.    Crypto Media Group is a Nevada corporation, incorporated on August 21, 2017.  The company's registered agent is Harkema Consulting, LLC ("Harkema Consulting").  Crypto Media Group purports to be: "The Premier Fintech and Blockchain Marketing Agency."  The company also purports to operate out of Los Angeles, California, but does not have a readily available address for a California-based office.  Crypto Media Group was founded by Harkema, Jason Sparschu ("Sparschu"), and Logan Schauer ("Schauer").  Schauer is the most publicly active of the three and has described Crypto Media Group's "goal" as "to take [the ICO market] from this very small industry of cryptocurrency focused investors and take it to the masses . . . .  We want to help the market transition from where it is now—word-of-mouth spreading through the crypto community—and we want to bridge that gap to the mainstream world."  Essentially, Crypto Media Group is a company that focuses on getting celebrities to endorse various ICOs so as to solicit interest, and investments, from members of the general public that are fans of such celebrities and not experienced with virtual currency technologies.

---

[7] This is a reference to a general dip in the overall market for virtual currencies around this time-period.

[8] ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

**III.     Relevant Non-Party—ParagonCoin Ltd. (Gibraltar)**

34.     On April 24, 2017, Magen Secretaries Limited ("Magen Secretaries") filed an application with the Gibraltar Registrar of Companies to register a company named Nocturne Limited ("Nocturne").

35.     On April 26, 2017, Nocturne was incorporated in Gibraltar as a private company limited by shares.  Nocturne's initial sole shareholder was Mazal Nominees Limited ("Mazal").  Nocturne's Corporate Secretary was Magen Secretaries and its director was Magen Directors Limited ("Magen Directors").  Magen Secretaries, Mazal, and Magen Directors are subsidiaries or operating entities of RSM Gibraltar Limited and its related network of companies ("RSM").  RSM is a company that provides audit, tax, and consulting professional services.

36.     Nocturne appears to have been created to operate as a shell company that could be purchased and renamed/wound into, which is precisely what transpired.

37.     On January 30, 2018, Nocturne called and held an "extraordinary meeting" of the company's members (the "Extraordinary Meeting").  The Extraordinary Meeting was attended by representatives of Mazal and Magen Secretaries.  Nocturne's public filing describing this meeting states that:

> IT WAS NOTED That the Sole Shareholder of the Company requested to change the Company's name from Nocturne Limited to ParagonCoin Limited.
>
> IT WAS RESOLVED by Special Resolution that the name of the Company be changed to ParagonCoin Limited.
>
> IT WAS FURTHER RESOLVED by Special Resolution that the Memorandum and Articles of Association be amended to include the change of the Company's Name to ParagonCoin Limited and a new copy of the Memorandum and Articles of Association be filed in the Registry.

38.     That same day the newly renamed ParagonCoin Limited (Gibraltar) ("Paragon Gibraltar") filed its Amended Articles of Association.  Additionally the company filed the following updated Certificate of Incorporation:

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933



Company Number:   115681
REID Number:      GICO.115681-12

IT IS HEREBY CERTIFIED that

**ParagonCoin Limited**

(originally called Nocturne Limited which name was changed by Special Resolution dated the 30th day of January Two Thousand and Eighteen) was incorporated as a limited company on the 26th day of April Two Thousand and Seventeen.

Given at Gibraltar, this 30th day of January Two Thousand and Eighteen.

For and on behalf of the
Registrar of Companies

39.     Additionally, Paragon Gibraltar's sole shareholder, Mazal transferred all of its shares in the company to VerSteeg—who had no involvement with Nocturne prior to it being restructured and renamed, "ParagonCoin Limited."  Further, the Nocturne/Paragon Gibraltar terminated its sole director, Magen Directors, and appointed four new directors: (1) VerSteeg, (2) Lavrov, (3) Julian Zegelman (Paragon's in-house counsel) ("Zegelman"), and (4) Giovanti Humphries (Paragon's Chief Financial Officer) ("Humphries").

40.     In short, prior to January 30, 2018 **Paragon Gibraltar did not exist in any form**.  It was not until January 30, 2018—**the day this Action was initiated**—that Nocturne took the following actions after having been inactive since its incorporation:

- renamed itself ParagonCoin Limited (Gibraltar);
- filed an amended articles of association;
- filed an updated certificate of incorporation;
- had its sole shareholder, Mazel, transfer all of its ownership in Nocturne/Paragon Gibraltar to VerSteeg;

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

- terminated its sole director; and

- appointed four new directors: (1) VerSteeg, (2) Lavrov, (3) Zegelman, and (4) Humphries.

### PLAINTIFFS' CLASS ACTION ALLEGATIONS

41.   Plaintiffs bring this action individually and as a class action on behalf of all investors in the Paragon ICO from August 15, 2017 through October 16, 2017, who have been, are being, and/or will be harmed by Defendants' actions described herein.   Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the individual Defendants.

42.   This action is properly maintainable as a class action under the Federal Rules of Civil Procedure 23.

43.   While the exact number of Class members is presently unknown to Plaintiffs and can only be ascertained through discovery, Plaintiffs believe that there are thousands of members in this Class.   All members of the Class may be identified by records maintained by Defendants and/or virtual currency exchanges and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

44.   There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.   The common questions include, *inter alia*, the following: (i) whether Defendants offered and sold unregistered securities, in violation of the federal securities laws, to the Class during the Paragon ICO; (ii) whether Defendants successfully solicited the purchase of unregistered securities from the Class during the Paragon ICO; (iii) whether Plaintiffs and other Class members will suffer irreparable harm if such securities laws violations are not remedied; and (iv) whether the Class is entitled to injunctive, compensatory, and/or rescissory relief as a result of Defendants' wrongful conduct as alleged herein.

45.   Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interests adverse to the Class.   Plaintiffs and the other members of the Class have all sustained harm in a substantially identical manner as a result of Defendants' wrongful conduct as alleged herein.

46.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained competent counsel experienced in litigation of this nature.

47.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

48.     Plaintiffs anticipate that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

49.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

50.     Accordingly, Plaintiffs seek injunctive and other equitable relief on behalf of themselves and the Class to prevent the irreparable injury they will continue to suffer absent judicial intervention.

## SUBSTANTIVE ALLEGATIONS

**I.      Background on Blockchain Technology, ICOs, and Smart Contracts**

A. Blockchains

51.     A "blockchain" is essentially a digitized, decentralized, public ledger that cryptographically records, preserves, and presents information.  The general idea is that each "block" contains information, such as details on transactions that are made.  After a "block" is created (with cryptography so as to verify its contents), the information inside of it cannot be changed.  The "block" then becomes part of the "blockchain" and an encrypted version of the information contained therein becomes publicly available along with all the previous "blocks" in the chain.  After this process is complete, another block is created with additional information and so on and so forth.

52.     To date, most "blockchains" are used to record transactions involving virtual currencies, *e.g.*, BTC and ETH.  However, a "blockchain" could be used to record all types of information.  For example, a blockchain could be used for deed recordation/transfers or even transfers of stock certificates.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

B.  ICOs

53.     An ICO is a capital raising event in which an entity offers investors a unique "coin" or "token" in exchange for consideration—most commonly in the form of established virtual currencies (typically BTC and ETH) or fiat currency.  These tokens are issued on a blockchain and are oftentimes listed on online platforms, called virtual currency exchanges, where they are tradable for virtual or fiat currencies.

54.     To participate in an ICO, investors are typically required to transfer virtual currencies to the issuer's address, online wallet, or other account.  During an ICO, or after its completion, the issuer will typically distribute its unique "tokens" to the participants' unique address on the blockchain. Similar to stockholders in an initial public offering ("IPO"), holders of these tokens are then entitled to certain rights related to a venture underlying the ICO, such as profits, shares of assets, use of certain services provided by the issuer, and/or voting rights.

## II.     Paragon's Founding, Business Model, and ICO

A.  Paragon's Formation and Leadership Structure

55.     The Founder Defendants created Paragon in July 2017.  VerSteeg and Lavrov have had full control over Paragon at all relevant times.

56.     The Founder Defendants were heavily involved in all aspects of Paragon's operations during the Paragon ICO, including managing all of the Company's day-to-day activities and marketing.

57.     VerSteeg was the face of the Company in most interviews and media publications, and she focused largely on marketing the Paragon ICO and creating Paragon's "brand."

58.     Lavrov focused largely on managing Paragon's funds, entering the Company into various marketing arrangements and partnerships, and managing, among others, Bogorad, Emelichev, Rhodes, and Kalustov.

59.     Throughout the Paragon ICO, Bogorad was heavily involved in developing relationships, and negotiating contracts, with companies that could market the Paragon ICO via online advertisement banners on their websites.  Additionally, Bogorad was significantly involved with structuring deals with companies that ███████████████████████████████████████ ████████████████████████████████████████████████████████████

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933

60. Emelichev was involved in the decision-making process relating to marketing decisions, editing, ████████████████████████████████ ████ drafting the White Paper, and dispute resolution involving Paragon ICO investors.

61. Similarly, Rhodes was also involved with developing such relationships. In addition to his general role with respect to marketing, Rhodes frequently communicated directly with prospective, and actual, Paragon ICO investors via ████████████████████

62. Based on the Limited Discovery received, ████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████

B. The Paragon Business Model

63. On August 15, 2017, the Company released the *Paragon White Paper Version 1.0* (the "White Paper"). The White Paper described Paragon as providing solutions for essentially every issue facing the cannabis industry. The "business model" and White Paper—which is replete with buzz-words relating to virtual currency technology—can best be described as overly ambitious, vague, and impractical.

64. The White Paper described Paragon as having five separate business segments: "ParagonChain," "ParagonCoin," "ParagonSpace," "ParagonOnline," and "ParagonAccelerator." As detailed below, even individually, each of these segments claims to accomplish fantastic feats and unrealistically address major issues.

65. "ParagonChain" was described as an "immutable ledger for all industry related data." The White Paper continues by explaining that the new "ParagonChain" and its use of "smart contracts" would "save companies hundreds of thousands in reduced paperwork" and provide a "modular toolset to build applications that can track shipments, verify potency, identify medical patients and their prescriptions, and a host of applications not yet imagined."

66. "ParagonCoin" was described as "offer[ing] payment for industry related services and supplies." The White Paper further describes "ParagonCoin" as being able to "create a global ecosystem where businesses and consumers can quickly and easily verifiably transfer funds—business

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933

to business, business to consumer, and/or consumer to consumer." Additionally, the Company stressed: "[w]e want to keep the value of PRG strong and growing."

67.    "ParagonSpace" was described as "establish[ing] niche co-working spaces." The White Paper added: "Our mission is to create a safe physical space where advocates can push to repeal current regulatory restrictions and present information on the benefits of marijuana use for medical conditions, recreational use, and general well being."

68.    "ParagonOnline" was described as "organiz[ing] and unit[ing] global legalization efforts." The White Paper described this segment as "ParagonOnline will act as a one-stop service and platform for cannabis and alternative payment-related scientists, journalists, investors, marketers, doctors, developers, fintech specialists, entrepreneurs, startups, and lawyers. Because every business is a human venture, the professional networking potential will be highly beneficial. It will give the cannabis industry a whole new dimension."

69.    "ParagonAccelerator" was described as "bring[ing] standardization of licensing, lab testing, transactions, supply chain and ID verification through apps built" in the accelerator. The White Paper further stated: "The ParagonAccelerator is uniquely linked to the growth of the legal cannabis industry. Our model grows and develops with the industry autonomously, responding to the demand for new businesses with revolutionary ideas."

70.    While the White Paper claimed that there would be five business segments, it is apparent that Paragon's actual business model was primarily focused on investing in real estate. Specifically, the White Paper stated, in part, "[t]he lion's share of the token crowdsale [sic] proceeds will be spent on real-estate acquisition." ████████████████████      ███████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

Similarly, the White Paper used to solicit investment from the general public explicitly stated: "The lion's share of the token crowdsale [sic] proceeds will be spent on real-estate acquisition."

71.     Evidently, the Paragon ICO was little more than a method for Paragon, the Founder Defendants and the Executive Defendants to raise capital in order to purchase real estate investments.

**III.     The Paragon ICO**

A.  Marketing the Paragon ICO

72.     The Company, the Founder Defendants, and certain Executive Defendants began exchanging drafts of, and making edits to, the initial Paragon White Paper ███████████ .

73.     The White Paper explained that "[a] total of 200,000 PRG will be generated" and that "[t]here will be no further production of tokens so, over time, the tokens in circulation shall reduce in number and increase in demand."

74.     The Paragon ICO was marketed as an investment opportunity for persons interested in the cannabis industry.  For example, the White Paper stated, "the token crowdsale [sic] will favor smaller investors who are committed to the cannabis cause and plan on participating in the community."

75.     Paragon explained that their organization and plans would "quickly strengthen the legalization movement and [was] expected to positively influence the demand for and respectively value of Paragon's cryptocurrency, PRG."

76.     Similarly, on September 3, 2017, a publication named "NowThis Weed" published a video interview with VerSteeg on Facebook, which Paragon subsequently reposted on the Company's Facebook page that same day.  Following are five screens captures from this video—each which stated "SOURCE: Paragon"—that clearly exhibit Paragon's intention to market the Paragon ICO and PRG Tokens as investment opportunities:

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933





FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20
21
22
23
24
25



26
27
28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

1
2
3
4
5
6
7
8
9
10
11
12



13   77.   Similarly, Paragon also released a "PRG One Pager" which summarized the Paragon

14 ICO's investment opportunity.  This "One Pager" and the White Paper both included the following

15 language stressing the profit potential from purchasing PRG Tokens:

16       A gradual reduction in circulating supply is part of Paragon's plan to encourage
        PRG price stability and growth, but above all, a solid price development over
17       time. This ensures a growth of PRG purchasing power over time. While 1,000
        PRG may pay for a month's rent now, in the future, it might pay for a year's
18       rent.

19   78.   In short, as stated in a review of the Paragon ICO conducted by Picolo Research:

20   1.   The token sale structure is extremely complicated

21   2.   A significant amount of funds are used to 'control the token price'

22   3.   There is no detailed 'use of proceeds' or budget

23   4.   The team have not communicated a clear commercial strategy as there are
         5 completely different segments

24
25   5.   We believe the use of blockchain within the ecosystem (in this venture) will
         be limited

26   6.   There is a strong focus on the establishment of Accelerators and Co-
27       working spaces as opposed to the blockchain initiative

28   7.   The management team appear to be using the current market liquidity as a
         method of financing for something other than the actual concept

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

8.  It is unknown as to what portion of the funds will be held by management, promoters, etc. . . . .

For the reasons listed above, we **believe there is a significant risk associated with this token sale**.  If the same structure and offering were presented by a company that did not put such high profile names to it, we would be on the verge of labeling such a token sale as 0 stars.

B.  Mechanics of the Paragon ICO

79.    In order to invest in the Paragon ICO, participants were required to register for an account ("Paragon Account") on Paragon's website.  After this account was created, users could deposit their virtual currencies into their Paragon Account.  The Paragon Account could then be used to purchase PRG Tokens in connection with the Paragon ICO.

80.    Paragon and the Founder Defendants claim that in the process of creating Paragon Account, investors were required to agree to a the "Token Crowdsale Terms"—which were purportedly entirely different terms than those contained in the White Paper, "RISK FACTORS" or "TERMS OF USE" sections of the Paragon Website.

81.    The Token Crowdsale Terms purportedly established a contract between Paragon ICO investors and "ParagonCoin Ltd. (Gibraltar), a private limited company organized under the laws of Gibraltar acting as the issuer of PRG Tokens."  The terms also purportedly included a "BINDING ARBITRATION CLAUSE AND CLASS ACTION WAIVER."

82.    However, if the Token Crowdsale Terms did exist during the Paragon ICO, they still could not have constituted a binding agreement given the fact that "ParagonCoin Ltd. (Gibraltar)" did not exist until January 30, 2018—the day this Action was initiated.

83.    As discussed *supra*, on January 30, 2018, a company named Nocturne, whose owners were entirely unrelated to Paragon, and which had been inactive since its incorporation in April 2017, suddenly:

- was renamed "ParagonCoin Limited (Gibraltar)";

- filed an amended articles of association;

- filed an updated certificate of incorporation;

- had its sole shareholder, Mazel, transfer all of its ownership in Nocturne/Paragon Gibraltar to VerSteeg;

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933

- terminated its sole director; and

- appointed four new directors: (1) VerSteeg, (2) Lavrov, (3) Zegelman, and (4) Humphries.

84.     As seen, "ParagonCoin Ltd. (Gibraltar)" simply did not exist during the Paragon ICO, and thus, the so-called: "PARAGONCOIN, LTD TOKEN CROWDSALE TERMS" either (a) did not itself exist or (b) did not constitute a valid contract as "ParagonCoin, Ltd. (Gibraltar)" did not exist and thus, it would be have been impossible for any investor to have entered into a contract with it.

85.     Furthermore, per the plain language reading of the purported Token Crowdsale Terms, the agreement explicitly states that it only applied to Paragon ICO investors who participated from September 15, 2017 through October 15, 2017:

> 1. **Commencement and Duration of the Crowdsale.**  The Company will conduct a public crowdsale of Tokens (the "Crowdsale"), which will begin at 11 am Pacific Standard Time on September 15, 2017 (the "**Launch Date**") and end at 11:59 pm Pacific Standard Time on October 15, 2017(the "**Crowdsale End Date**").

86.     As noted *supra*, Lead Plaintiff Holland invested in the Paragon ICO on September 10, 2017, and thus, even if ParagonCoin, Ltd. (Gibraltar) had existed during the Paragon ICO, which it did not, by the plain language of the purported Token Crowdsale Terms, Holland's investment would not have been covered by the terms.

C.   Silencing Paragon ICO Criticisms

87.     As part of Paragon, the Founder Defendants' and the Executive Defendants' efforts to generate interest in the Paragon ICO and the purchase of PRG Tokens, they ██████████████████ ███████████████████████████████████████████████████████

88.   ██  ████████  ████  ██████  ████  ████  ███  █  ████  █████  ████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████

89.   █████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933

90.

91.     While the foregoing actions were arguable deceptive in nature, such actions were certainly taken in furtherance of soliciting investments in the Paragon ICO and ensuring that potential PRG Token purchasers believed the claims regarding the profit potential from purchasing and owning PRG Tokens.

**IV.   PRG Tokens Are Investment Contract Securities**

92.     This Action alleges claims under Sections 12(a)(1) and 15(a) of the Securities Act [15 U.S.C. §§ 77l(a)(1) and 77o(a)], and are based solely on allegations of strict liability.

93.     It is indisputable that Defendants offered and sold PRG Tokens.  For example, as stated in the White Paper, during the Paragon ICO, the Company was offering "100,000,000 tokens **for sale** valued at $1.00 each at stage one."  (Emphasis added.)

A.  The Terms of the Paragon ICO Presented an Investment Offer

94.     The Paragon ICO was obviously an offer and sale of securities.  Indeed, it is clear that investors were purchasing PRG Tokens with the expectation that PRG Tokens received would subsequently be worth more than virtual currency invested.

95.     While the White Paper claims that PRG Tokens were sold based on a value relative to USD, as noted, investors could only invest in the Paragon ICO using virtual currencies.  Furthermore,

contrary to the White Paper's claims, PRG Tokens were not sold for a consistent $1 for 1 PRG Token throughout the Paragon ICO.  Rather, in order to entice early investments, dependent on the date in which the investment was made, the Paragon ICO involved the offer and sale of 1 PRG Token for $0.75–$2.50, payable in BTC, ETH, LTC, DASH, ZEC, XRP, XMR, ETC, WAVES, and other virtual currencies.

96.    In short, the terms of the Paragon ICO clearly evidence that Defendants' offer and sale of PRG Tokens was the offer and sale of unregistered securities in violation of the federal securities laws.

B.  Investing in the Paragon ICO Subjected Plaintiffs and the Class to Financial Loss

97.    In the Ninth Circuit, the *Howey* test's "'investment of money' requires only that the investor must commit his assets to the enterprise in such a manner as to subject himself to financial loss." *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976) (citation omitted).  Such was plainly the case in the Paragon ICO.  As stated in the White Paper's "RISKS" section:

- "You should carefully consider and evaluate each of the following risk factors . . . the trading price of PRG Tokens (in the case where they are listed on a cryptocurrency exchange) could decline due to any of these considerations, uncertainties or material risks, and you may lose all or part of your PRG Tokens."

- "[T]he Company cannot ensure that there will be any demand or market for PRG Tokens, or that the Purchase Price is indicative of the market price of PRG Tokens after they have been made available for trading on a cryptocurrency exchange."

- "Further sales or issuance of the PRG Tokens could materially and adversely affect the market price of the PRG Tokens."

- "[T]he development of the PARAGONCOIN platform and launch of the anticipated PARAGONCOIN future business lines may not be completed and there is no assurance that it will be launched at all.  As such, distributed PRG Tokens may hold little worth or value."

- "Any events or circumstances which adversely affect ParagonCoin, Inc. . . . would correspondingly have an impact on the utility, liquidity, and the trading price of the PRG Tokens."

98.    As is obvious, the "RISKS" were primarily tailored to discussing numerous ways in which Plaintiffs and the proposed Class could lose their investments due to the PRG Token's loss in value or lack of liquidity.  Thus, an investment of BTC or ETH in purchasing PRG Tokens clearly

satisfies the requirement of potential financial loss, and thus the investment of money requirement, in the Ninth Circuit.

99.     In short, to participate in the Paragon ICO and receive PRG Tokens, participants were required to invest financial assets in the form of BTC, ETH, or other virtual currencies, and such investments subjected investors to the risk of financial loss.  Thus, the first element of the *Howey* test is plainly met.

C.  The Economic Realities of Purchasing PRG Tokens

100.     When determining whether a security has been offered and sold, the focus must be on the economic realities underlying the transaction.  Here, the economic realities are that Plaintiffs and the Class invested ETH, BTC, and various other virtual currencies in order to receive PRG Tokens, which they were conditioned to expect would be worth more than their initial virtual currency investments.  Indeed, the White Paper is replete with statements that the PRG Tokens were expected to appreciate in value and were an investment opportunity.  For example, the White Paper stated that their organization and plans would "quickly strengthen the legalization movement and [was] expected to positively influence the demand for and respectively value of Paragon's cryptocurrency, PRG."

101.     Plaintiffs' and the Class' investments of ETH, BTC, LTC, and other virtual or fiat currencies constitute an investment of money in an investment contract.

102.     Plaintiffs and the Class were investing in a common enterprise with Defendants, as the Paragon ICO investments were pooled under the control of Paragon, the Founder Defendants, and the Executive Defendants.

103.     As explicitly provided in the White Paper:

The PARAGONCOIN platform is developed, operated, and maintained by ParagonCoin, Inc. Any events or circumstances which adversely affect ParagonCoin, Inc. or any of its successor operating entities (collectively referred to herein as "ParagonCoin, Inc.") may have a corresponding adverse effect on the PARAGONCOIN platform and any future business lines.  Such adverse effects would correspondingly have an impact on the utility, liquidity, and the trading price of the PRG Tokens.

104.     Additionally, the White Paper stated:

ParagonCoin, Inc. may be materially and adversely affected if it fails to effectively manage its business operations as its business develops and evolves, which would have a direct impact on its ability to maintain the PARAGONCOIN platform and/or

launch any future business lines.

105.    Additionally, according to the White Paper, Paragon's "Founders and team members" would be prohibited from "liquidating" more than 20% of their PRG Tokens in the first calendar year, as this would "keep a stable token price" and "**keep[] their interests aligned** with the Paragon community." (Emphasis added.)  Each of the Founder Defendants, Executive Defendants, and Taylor would qualify as Paragon's "Founders" or "team members."  Further, based on the Limited Discovery

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

106.    Accordingly, it is obvious that any success from creating the PRG Token and future potential increases to the PRG Token's value was, and continues to be, entirely dependent on Defendants' actions.

107.    The value, and existence, of the PRG Tokens and the "PARAGON platform" have been at all times entirely dependent on Paragon's actions.  In fact, the White Paper explicitly stated:

> The PARAGONCOIN platform is developed, operated, and maintained by ParagonCoin, Inc.  Any events or circumstances which adversely affect ParagonCoin, Inc. or any of its successor operating entities (collectively referred to herein as "ParagonCoin, Inc.") may have a corresponding adverse effect on the PARAGONCOIN platform and any future business lines.  Such adverse effects would correspondingly have an impact on the utility, liquidity, and the trading price of the PRG Tokens.

108.    Similarly, the White Paper also stated, "Any events or circumstances which adversely affect ParagonCoin, Inc. . . . would correspondingly have an impact on the utility, liquidity, and the trading price of the PRG Tokens."  Accordingly, it is abundantly clear that the success of the Paragon platform tied the interests of the investors to those of the Paragon, the Founder Defendants, and the Executive Defendants, and was entirely reliant on their actions.

109.    Moreover, the success of Paragon's "business model"—and thus the value and profits stemming from the future valuation of PRG Tokens—aligned the interests of Paragon ICO investors and Defendants.  For example, as stated by Lavrov when discussing Paragon's intention to purchase real estate with the ICO Proceeds, "we are hoping to profit on the value of PRG and not on the rent."

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933

110.    With respect to the Promoter Defendants, their anticipated success at soliciting additional purchases of PRG Tokens was expected to increase PRG Token's value.

111.    In short, the anticipated value of PRG Tokens was explicitly tied to, and dependent upon, the success of the Paragon business segments/platform, and thus the future potential increases to the PRG Token's value was at all times dependent on Defendants' actions.

112.    Additionally, Paragon routinely led Plaintiffs and the Class to expect profit from their purchase of PRG Tokens.  Indeed, the White Paper repeatedly stressed the profit potential from purchasing and owning PRG Tokens.  For example: "PRG is designed to appreciate in value as our solutions are adopted throughout the cannabis industry and around the world.  Our model incentivizes PRG owners to hold their tokens as long term [sic] growth assets . . . ."

113.    Furthermore, Paragon even stated they would create a separate fund of PRG Tokens that would be specifically earmarked for manipulating and artificially controlling the price of PRG Tokens. Specifically, the White Paper stated that "40,000,000 [PRG] tokens [would be] allotted for Paragon controlled reserve to maintain price support of the PRG Tokens."

114.    The "Controlled Reserve Fund" would have "two core functions to keep PRG stable." The "Controlled Reserve Fund" would be used to "Release PRG to the markets if PRG deflates too fast and pushes token prices up too rapidly" or "[b]uy PRG from the market if PRG price devalues too much."  Paragon elaborated on the second "core function" by explaining that "PRG may become subject to excessive sell volume resulting in a significant drop in price.  To counter this, the Reserve Fund can intervene by buying back PRG in an effort to stabilize the market price."

115.    Putting aside the illegality of a scheme to blatantly manipulate the market price of a security trading in the marketplace, this intention clearly exhibits Paragon, the Founder Defendants, and the Executive Defendants' message to prospective Paragon ICO investors that PRG Tokens would be appreciating in value—even if they had to manipulate its price upwards—and thus, represented an investment opportunity.   In sum, the PRG Tokens are undoubtedly securities—specifically, "investment contracts"—under the *Howey* test, and the Paragon ICO thus constituted a sale of unregistered securities.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

D.  Purchasers Saw PRG Tokens as Investments

116.   It is abundantly clear that PRG Token purchasers were conditioned to view their purchases as investments.  For example, ███████████████████████████████████████████ ████████████████████████████████████

████████████ ███████████████████████████████
██████████████████████████████
██ ████████████████████████████████████
██████████████████████████
██ ████████████████████████████████████
██████████████████████████
██████████
████

117.   ████████████████████████████████████████
████████████████████████████████
████████████████████████████████████
████████████████████████████████████

118|   ████████████████████████████████ plainly evince the fact that prospective and actual participants in the Paragon ICO viewed the opportunity as an investment.  Following are a few examples ████████████████████████████████

• ████████████████████████████████████
• ████████████████████████████████████
  ████████████████████████████████████
  ████████████████████████████████████
  ████████████████████████████████████
• ████████████████████████████████████
• ████████████████████████████████████
  ████████████████████

119.   As noted, Plaintiffs' claims provide for strict liability and thus there is no scienter requirement.  However, it should be noted that Paragon, the Founder Defendants, and the Executive Defendants have been fully aware that they have been selling investments since Paragon's inception.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

For example, ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████

      120.   ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

      121.   ███████████████████████████████████

█████████████████████████████████████████

      122.   ██████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████

      123.   ███████████████████████████████████

██████████████████

      124.   Paragon and the Founder Defendants were fully aware of the fact that the Paragon ICO was a straightforward capital raise to fund the Company's operations (*i.e.*, the solicitation of investment in a common enterprise).  For example, ███████████████████████

- ███████████████████████████████████████
  ████████████████████████

- ███████████████████████████████████████
  ███████████████████████████

- ███████████████████████████████████████
  ███████████████████████████████████████
  ██████████████████████████████████

- ███████████████████████████████████████
  ████████████████████████████████

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

125.   Perhaps most tellingly, ████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

126.   Additionally, with respect to what Paragon's plan to actively manipulate the market price of PRG Tokens, ████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████

127.   In light of such issues, ████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████

128.   In short, there is no question that all parties selling PRG Tokens and all parties purchasing PRG Tokens have at all times been fully aware that they were selling or purchasing investment opportunities.

## V.   Each of the Defendants Were "Sellers" of PRG Tokens

129.   Liability for selling unregistered securities extends to "the person who successfully solicits the purchase [of an unregistered security], motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 643 (1988).

130.   As noted, each of the Plaintiffs were actively involved in researching Paragon and the Paragon ICO prior to purchasing their PRG Tokens.  Such research included reviewing virtual currency online forums, reading Paragon's publications, and viewing the Company's promotional videos.  Accordingly, each of the solicitations outlined below were successful in soliciting Plaintiffs to purchase PRG Tokens.

131.   Each of the Defendants are considered "sellers" as each successfully solicited the purchase of PRG Tokens for their own or Paragon's financial benefit.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

A.  Paragon and the Founder Defendants

132.    It is indisputable that Paragon offered and sold PRG Tokens.  For example, as stated in the White Paper, during the Paragon ICO, the Company was offering "100,000,000 tokens **for sale** valued at $1.00 each at stage one." (Emphasis added.)

133.    The facts are similarly indisputable that Paragon and the Founder Defendants participated in the offer and sale of PRG Tokens.  Specifically, the Founder Defendants created Paragon for the purpose of conducting the Paragon ICO and creating the "PARAGONCOIN platform."  "The PARAGONCOIN platform is developed, operated, and maintained by" Paragon.  Given that the Paragon ICO was conducted by Paragon, through its website, it is indisputable that the Founder Defendants, through Paragon, controlled and orchestrated Paragon's actions in conducting the Paragon ICO.

   *1.  Jessica VerSteeg*

134.    VerSteeg was a key factor throughout Paragon's ICO, as she was the public face of the Company.  Additionally, VerSteeg was involved in every aspect of editing and revising the White Paper and oversaw most of the revisions to Paragon website.

135.    Indeed, VerSteeg was significantly involved in directing the design and content of Paragon's website and promotional materials.  For example, ███████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████ ███████████ ███████████████████████████████████████████████

[9] ████████████████████████████████████████████

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933



136.     As discussed *supra*, PRG Tokens are obviously securities under the *Howey* test, despite

137.

138.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

139.    Given the fact that VerSteeg was intimately involved with drafting/editing the content in Paragon's promotional materials, Paragon's countless statements that PRG Token purchasers could expect profit from increases in value to their PRG Tokens are equally attributable to her.

140.    Additionally, VerSteeg also actively solicited investments in PRG Tokens from her personal Twitter Account.

### 2. Egor Lavrov

141.    Similarly, Lavrov also solicited investments in the Paragon ICO by drafting/editing Paragon's promotional materials and communicating directly with prospective, and actual, Paragon ICO investors.

142.    For example, █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

143.    Clearly, Lavrov was instrumentally involved in drafting the Paragon ICO's promotional materials and determining the contents of such.

144.    Lavrov communicated directly with prospective, and actual, Paragon ICO investors.  For example, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

145.    Similarly, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933

[REDACTED]

[REDACTED]

[REDACTED]

146.   Furthermore, [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] In short, Lavrov was plainly a "seller" of PRG Tokens.

147.   Based on the foregoing, it is indisputable that Paragon and the Founder Defendants were each "sellers" of unregistered securities (in the form of PRG Tokens) under the federal securities laws.

B.   The Executive Defendants

1.   *Eugene "Chuck" Bogorad*

148.   Bogorad is Paragon's Chief Strategy Officer.   Bogorad directly or indirectly, and successfully, solicited investments from potential and actual PRG Token purchasers during the Paragon ICO.  Further, Bogorad personally distributed PRG Tokens to [REDACTED]

[REDACTED]

[REDACTED]

149.   Additionally, Bogorad was significantly involved in marketing the Paragon ICO by negotiating and purchasing ad placements for the Paragon ICO with/from companies that operate virtual   currency   related   websites,   including,   *inter   alia*: [REDACTED]

[REDACTED]

[REDACTED]

150.   For example, [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

151.    Similarly, Bograd ████████████████████████████

"Revolutionizing the Cannabis Industry: The Paragon Way" and published on icowatchlist.com.  This article concluded with: "Investors will be able to purchase ParagonCoin by exchanging various cryptocurrencies such as BTC, ETH, LTC, IOTA and a few others for it."

152.    Additionally, ██████████████████████████████

153.    For example, ███████████████████████████████

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

1

2



3

4

5

6

7

8

9

10

11

12

13

14

\*\*\*

15

16

17

18

19

20

21 154.

155.    In short, Bogorad was plainly a "seller" of unregistered securities (in the form of PRG

22 Tokens) under the federal securities laws.

23

24          *2. Alex Emelichev*

25 156.    Emelichev is one of Paragon's Chief Business Officer's for EMEA.  Emelichev directly

26 or indirectly, and successfully, solicited investments from potential and actual PRG Token purchasers

27 during the Paragon ICO.

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

157.     Emelichev was involved in the decision-making process relating to, *inter alia*, Paragon's

█████████████████████████████████████████████████████████████ and

partnerships Paragon considered and/or engaged in.  Additionally, Emelichev participated in editing,

and providing comments on, the White Paper and related promotional materials.  For example,

█████████████████████████████████████████████████████████████

████████████████

158.     Additionally, Emelichev communicated directly with prospective and actual investors

in the Paragon ICO.  For example, █████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████   ███████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████

159.     ████████████████████████████████████████████████

██████████████████████████████

████████████████████████████████

██ ████████████████████████████████████████████████████████

████████████████████████████████████████   ███████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████

██ ███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██ ███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

160.

In short, Emelichev was plainly a "seller" of unregistered securities (in the form of PRG Tokens) under the federal securities laws.

### 3. Gareth Rhodes

161.    Rhodes is Paragon's second Chief Business Officer for EMEA.  Rhodes directly or indirectly, and successfully, solicited investments from potential and actual PRG Token purchasers during the Paragon ICO.  Rhodes played a significant role in drafting, editing, and providing comments to the White Paper.  Additionally, Rhodes

Further, Rhodes was involved in marketing the Paragon ICO by negotiating and purchasing ad placements for the Paragon ICO with/from companies that operate virtual currency related websites.  For example,

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

162.   Additionally, Rhodes was significantly involved in drafting an editing the White Paper and content contained on Paragon's website.

163.   Further, ███████████████████████████████████████████████████████████ ███████████████████████████   For example, ███████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████

164.   In short, Rhodes was plainly a "seller" of unregistered securities (in the form of PRG Tokens) under the federal securities laws.

    *4.   David Kalustov*

165.   Kalustov is Paragon's VP of Business Development.  The White Paper also states that he is employed by Lavrov's company, Peak Mediation, Inc., as its "CRO."  Kalustov was significantly involved in responding to questions submitted ██████████████████████████   During such communications, Kalustov aggressively solicited investments in the Paragon ICO by claiming that ████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████

166.   Similarly, ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933

167. ███████████████████████████████████████████
███████████████████████████████████████████████

168.    In short, Kalustov was plainly a "seller" of unregistered securities (in the form of PRG Tokens) under the federal securities laws.

D.  The Promoter Defendants

1.  *Jayceon Terrell Taylor a/k/a "The Game"*

169.    Taylor is a rapper; a well-known celebrity.  Upon information and belief, Crypto Media Group recruited Taylor and structured a deal between the Company and Taylor pursuant to which Taylor would use his celebrity status to promote Paragon and the Paragon ICO.  Taylor promoted the Company and the Paragon ICO by encouraging the public to visit the Paragon website, join a "revolution" with paragon, and purchase PRG Tokens in social media posts on Twitter and Instagram.

170.    For example, in August 2017, Taylor and Paragon posted a video of him and VerSteeg promoting Paragon.  In this video, Taylor states, "We are revolutionizing marijuana, cannabis, hey, the world!"  Similarly, in early-September 2017, Taylor posted a tweet from his Twitter account stating: "You see a correction,[10] me & @JessVerSteeg see a buying opportunity.  Let me welcome you to #Crypto with ParagonCoin.com @ParagonCoin."

171.    Further, Taylor's endorsement was used to solicit the purchase of PRG Tokens in dozens of banner advertisements placed on various websites, such as the following:

---

[10] This is a reference to a general dip in the overall market for virtual currencies around this time-period.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933



172.    As seen, Taylor clearly solicited investments in the Paragon ICO from the general public.  Based on the foregoing, it is clear that Taylor was a "seller" of unregistered securities (in the form of PRG Tokens) under the federal securities laws.

         2.   *Justin Harkema and the Crypto Media Group*

173.    Crypto Media Group purports to be: "The Premier Fintech and Blockchain Marketing Agency."   Schauer, one of Crypto Media Group's founders, has described Crypto Media Group's "goal" as "to take [the ICO market] from this very small industry of cryptocurrency focused investors and take it to the masses . . . .  We want to help the market transition from where it is now—word-of-mouth spreading through the crypto community—and we want to bridge that gap to the mainstream world."   Essentially, Crypto Media Group is a company that focuses on getting celebrities to endorse various ICOs so as to solicit interest, and investments, from members of the general public that are fans of such celebrities but may not be overly experienced with virtual currency technologies.

174.    Harkema is one of Crypto Media Group's three principals.   ██████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933

██████████████████████████████████████████

██████████████████████████████████████████

Upon information and belief, Harkema structured a deal between Taylor and Paragon pursuant to which Taylor used his celebrity status and endorsement to solicit investments in the Paragon ICO. ██████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████ thus, Harkema and the Crypto Media Group were each "sellers" of unregistered securities (in the form of PRG Tokens) under the federal securities laws.

## COUNT I

**Claim for Violation of Section 12(a)(1) of the Securities Act**
**Against All Defendants**

175.    Section 12(a)(1) grants Plaintiffs a private right of action against any person who offers or sells a security in violation of Section 5, and states that such person,

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

176.    From approximately August 15, 2017 through October 16, 2017, in connection with the Paragon ICO, Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered securities in direct violation of the Securities Act.  Among other things, Defendants used the Internet for these purposes.

177.    The Paragon ICO was a sale of unregistered securities under controlling federal law. PRG Tokens exhibit the following particular hallmarks of a security under the *Howey* test: (a) in order to receive any PRG Tokens an investment of money, in the form of ETH, BTC, and/or other virtual currencies, was required; (b) the investment of money was made into the common enterprise that is Paragon and its potential future "business lines"; and (c) the success of the investment and any potential returns stemming from the potential future increase in PRG Token's value was entirely reliant on

1  Defendants' ability to create and launch the "PARAGONCOIN platform" and related business lines

2  and/or successfully solicit investments in PRG Tokens from the general public.

3       178.    As such, Defendants have participated in an unregistered sale of securities in violation

4  of the Securities Act and are therefore, liable to Plaintiffs and the Class for rescission and/or

5  compensatory damages.

6                                  **COUNT II**

7              **Claim for Violation of Section 15(a) of the Securities Act**
                           **Against the Founder Defendants**
8

9       179.    Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

10      180.    Due to their ownership interest in and/or role in managing Paragon and conducting its

11 functions, the Founder Defendants acted as controlling persons of Paragon within the meaning of

12 Section 15(a) of the Securities Act as alleged herein.  By virtue of their positions as officers and/or

13 directors and participation in and/or awareness of Paragon's operations, they had the power to influence

14 and control, and did influence and control, directly or indirectly, the decision making relating to the

15 Paragon ICO, including the decision to engage in the sale of unregistered securities via the Paragon

16 ICO.

17      181.    By virtue of the foregoing, the Founder Defendants are liable to Plaintiffs and the Class

18 as control persons of Paragon under Section 15(a) of the Securities Act.

19                              **PRAYER FOR RELIEF**

20      **WHEREFORE**, Plaintiffs pray for judgment and relief as follows:

21      A.      Declaring that this action is properly maintainable as a class action and certifying

22 Plaintiffs as the Class' representatives and their counsel as Class counsel;

23      B.      Declaring that Defendants offered and sold unregistered securities in violation of the

24 federal securities laws;

25      C.      Declaring Defendants are liable to Plaintiffs and the Class under Sections 12(a)(1)

26 and/or 15(a) of the Securities Act;

27      D.      Enjoining Defendants from making further transfers or dissipations of the investments

28 raised in connection with the Paragon ICO, or using such funds in any further purchases or transactions;

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)**
**AND 15(A) OF THE SECURITIES ACT OF 1933**

E.      Requiring an accounting of the remaining funds and assets raised from Plaintiffs and the Class in connection with the Paragon ICO;

F.      Imposing a constructive trust over the funds and assets rightfully belonging to Plaintiffs and the Class;

G.      Ordering rescission of the investments made by Plaintiffs and the Class relating to the Paragon ICO and/or rescissory damages;

H.      Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest;

I.      Awarding Plaintiffs the costs of this action, including reasonable allowance for Plaintiffs' attorneys' and experts' fees; and

J.      Granting such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs respectfully request a trial by jury on all issues so triable

Dated: June 22, 2018                          **LEVI & KORSINSKY, LLP**

By: _/s/ Donald J. Enright_____
Donald J. Enright (admitted *pro hac vice*)

John A. Carriel (to be admitted *pro hac vice*)
1101 30th St., NW, Ste. 115
Washington, DC 20007
Telephone: (202) 524-4292
Facsimile: (202) 333-2121

Rosemary M. Rivas
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

Eduard Korsinsky (to be admitted *pro hac vice*)
**LEVI & KORSINSKY, LLP**
30 Broad Street, 24th Floor
New York, New York 10004
Telephone: (212) 363-7500
Facsimile: (212) 636-7171

*Attorneys for Lead Plaintiff Jon Holland and Plaintiff Astley Davy*

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1)
AND 15(A) OF THE SECURITIES ACT OF 1933