Rosemary M. Rivas (State Bar No. 209147)
Email: rrivas@zlk.com
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

Eduard Korsinsky (to be admitted *pro hac vice*)
Email: ek@zlk.com
**LEVI & KORSINSKY, LLP**
30 Broad Street, 24th Floor
New York, New York 10004
Telephone: (212) 363-7500
Facsimile: (212) 636-7171

Donald J. Enright (admitted *pro hac vice*)
Email: denright@zlk.com
John A. Carriel (admitted *pro hac vice*)
Email: jcarriel@zlk.com
**LEVI & KORSINSKY, LLP**
1101 30th St., NW, Ste. 115
Washington, DC 20007
Telephone: (202) 524-4292
Facsimile: (202) 333-2121

*Attorneys for Lead Plaintiff Jon Holland
and Plaintiff Astley Davy*

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| JON HOLLAND and ASTLEY DAVY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>PARAGON COIN, INC., JESSICA VERSTEEG, EGOR LAVROV, EUGENE "CHUCK" BOGORAD, ALEX EMELICHEV, GARETH RHODES, DAVID KALUSTOV, and JAYCEON TERRELL TAYLOR A/K/A/ "THE GAME,"<br><br>Defendants. | Case No. 4:18-cv-00671-JSW<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><u>**CLASS ACTION**</u><br><br><u>**DEMAND FOR JURY TRIAL**</u> |

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................................ 1

JURISDICTION AND VENUE ........................................................................................... 7

PARTIES .............................................................................................................................. 8

    I.       PLAINTIFFS ...................................................................................................... 8

    II.      DEFENDANTS .................................................................................................. 8

          A.      The Founder Defendants ...................................................................... 9

          B.      Black Rabbit Holdings / The Holding Company / Third Founder ...................... 9

          C.      The Executive Defendants .................................................................. 11

          D.      "Advisory Board" Defendant ............................................................. 13

    III.     RELEVANT NON-PARTY—PARAGONCOIN LTD. (GIBRALTAR) ................... 14

PLAINTIFFS' CLASS ACTION ALLEGATIONS ........................................................ 16

SUBSTANTIVE ALLEGATIONS .................................................................................... 17

    I.       BLOCKCHAINS, WALLETS, AND ICOS .................................................. 17

          A.      Blockchain Technology ...................................................................... 17

          B.      Public Digital Currency Wallet Address ............................................. 19

          C.      Initial Coin Offerings ("ICO") .......................................................... 19

          D.      Smart Contracts .................................................................................. 19

    II.      PARAGON'S FOUNDING, BUSINESS MODEL, AND ICO .................................. 20

          A.      Paragon's Formation and Leadership Structure ................................. 20

          B.      The Paragon Business Model ............................................................. 21

    III.     THE PARAGON ICO .......................................................................................... 23

          A.      Marketing the Paragon ICO as an Investment Opportunity ............... 23

          B.      Mechanics of the Paragon ICO ......................................................... 27

          C.      Egregious Untrue Statements of Fact in the Paragon ICO Prospectus/White Paper ................................................................... 28

Investments in the Paragon ICO were Not Maintained by a Third-Party Escrow Agent ........................................................................................... 29

Paragon Knew PRG Token Would Not be Worth $2.50 at the Conclusion of the Paragon ICO .................................................................................... 33

D.    Paragon and the Founder Defendants Intentionally Created the False Impression that the SEC Had Approved of the Paragon ICO .......................... 38

E.    Silencing Criticisms ................................................................................ 39

IV.    FRAUDULENT CONDUCT DURING AND FOLLOWING THE PARAGON ICO 40

A.    Fraudulent Claims Regarding the ICO Proceeds ............................................ 40

B.    January 30, 2018-Plaintiff Davy Files this Action and Paragon and the Founder Defendants Create ParagonCoin Ltd. (Gibraltar) ............................. 44

C.    January-March, 2018: Paragon Uses Cryptocurrency to Purchase the Tamarind Property ....................................................................................................... 45

D.    The Limited Discovery's Estimated Financials vs. the Form 10's Financials . 48

E.    Market Manipulation ............................................................................... 53

V.    PRG TOKENS ARE INVESTMENT CONTRACT SECURITIES ........................... 56

A.    The Terms of the Paragon ICO Presented an Investment Offer ....................... 56

B.    Investing in the Paragon ICO Subjected Plaintiffs and the Class to Financial Loss ........................................................................................................... 57

C.    The Economic Realities of Purchasing PRG Tokens ..................................... 57

D.    Purchasers Saw PRG Tokens as Investments ............................................... 60

VI.    EACH OF THE DEFENDANTS WERE "SELLERS" OF PRG TOKENS ............... 63

A.    Paragon, the Founder Defendants and Black Rabbit ..................................... 63

Jessica VerSteeg ..................................................................................... 63

Egor Lavrov ........................................................................................... 65

B.    The Executive Defendants ........................................................................ 66

Eugene "Chuck" Bogorad ........................................................................ 66

Alex Emelichev ...................................................................................... 68

Gareth Rhodes ........................................................................................ 70

David Kalustov ....................................................................................... 71

C.    Jayceon Terrell Taylor a/k/a "The Game" ................................................. 72

COUNT I ................................................................................................................... 73

COUNT II .................................................................................................................. 74

COUNT III ................................................................................................................ 75

COUNT IV ................................................................................................................ 75

COUNT V .................................................................................................................. 76

COUNT VI ................................................................................................................ 76

COUNT VII ............................................................................................................... 77

COUNT VIII .............................................................................................................. 78

PRAYER FOR RELIEF ............................................................................................ 78

DEMAND FOR TRIAL BY JURY ........................................................................... 79

Lead Plaintiff Jon Holland ("Holland"), along with additional Plaintiff Astley Davy ("Davy," together with Holland, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Second Amended Complaint for violations of the federal securities laws (the "Complaint"), the following based upon knowledge with respect to themselves and their own acts, and upon information and belief premised upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) documents and solicitation materials released by Defendants (defined below), in connection with the Paragon initial coin offering ("Paragon ICO"); (b) public statements made by Defendants concerning Paragon Coin, Inc. ("Paragon," or the "Company"), the Paragon ICO, Paragon Coins ("PRG Tokens" or "PRG"), and the PRG Offering (defined below); (c) media publications, web blogs and other web sources concerning Paragon, the Paragon ICO, PRG, and the PRG Offering; (d) analyses of public blockchain records relating to PRG; (e) findings set forth in the Securities and Exchange Commission's ("SEC") Order Instituting Cease-and-Desist Proceedings against Defendant Paragon in *In the Matter of Paragon Coin, Inc.*, Release No. 33-1057; File No. 3-18897 issued on November 16, 2018; and (f) certain limited expedited discovery Paragon provided to Plaintiff Davy (the "Limited Discovery") pursuant to an agreement set forth in the Joint Notice (Dkt. No. 16) Withdrawing Plaintiff Davy's *Ex Parte* Application for Temporary Restraining Order filed in the above-captioned action (the "Action") on February 5, 2018.

## <u>NATURE OF THE ACTION</u>

1.      This is a class action on behalf of all individuals and entities who transferred to Defendants (defined below) any fiat currency or digital currency to acquire PRG Tokens during the time period from July 6, 2017 through, and including, the date of this Complaint (the "Class" who acquired PRG Tokens during the "Class Period") and who suffered financial injury as a result thereof. The Class is comprised of two subclasses: (1) all persons and entities who purchased PRG Tokens directly from Defendants (defined below) during the "official" Paragon ICO from approximately August 15, 2017 through October 15, 2017; (2) all persons and entities who purchased PRG Tokens

SECOND AMENDED CLASS ACTION COMPLAINT

directly from Defendants outside of the "official" Paragon ICO from approximately July 6, 2017, through March 27, 2019, inclusive (the "Open Market PRG Sales").[1]

2.      This action alleges violations of Sections 12(a)(1), 12(a)(2) and 15(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77l(a)(1)–(2) and 77o(a)]; violations of Sections 9(a)(1)–(5) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78i(a)(1)–(5), and 78t(a)]; violations of Section 25110 of the California securities laws (the "CSL") [Cal. Corp. Code § 25110], and the California False Advertising Law ("CFAL") [Cal. Bus. & Prof. Code § 17200 *et seq.*], and brings a quasi-contract [unjust enrichment] claim seeking restitution against Paragon, certain of its top officials, and certain influential promoters that received compensation in exchange for selling PRG Tokens or soliciting the general public to purchase PRG Tokens.

3.      By virtue of the conduct alleged herein, Defendants Paragon, Jessica VerSteeg ("VerSteeg"), Egor Lavrov ("Lavrov," and, together with VerSteeg, the "Founder Defendants"), Black Rabbit Holdings ("Black Rabbit"), Eugene "Chuck" Bogorad ("Bogorad"), Alex Emelichev ("Emelichev"), Gareth Rhodes ("Rhodes"), David Kalustov ("Kalustov") and Vadym Kurylovich ("Kurylovich," and together with Bogorad, Emelichev, Rhodes, and Kalustov, the "Executive Defendants") (collectively, the "Paragon Defendants"), directly or indirectly, singly or in concert, violated, or are otherwise liable to Plaintiffs and the Class for violation of, the federal securities laws, California state law, and/or well-established common law principles.

4.      Additionally, Plaintiffs bring a claim under Section 12(a)(1) against Defendant Jayceon Terrell Taylor a/k/a "The Game."

5.      From approximately July 6, 2017 through approximately October 15, 2017, the Paragon Defendants ran the Paragon ICO during which they received at least $70 million worth of virtual

---

[1] The term "PRG Offering" includes the period covering: (i) the period of time, starting on July 6, 2017, prior to the "official launch of the "Paragon ICO"; (ii) the "presale" or "first stage" of the Paragon ICO that took place between August 15, 2017 and September 15, 2017; (iii) the "crowdsale" or "second stage" of the Paragon ICO that took place from approximately September 15, 2017 through October 15, 2017, inclusive; and (iv) Defendants' continuing offer and sale of PRG Tokens and successful solicitations for the purchase of PRG Tokens from early July 2017 through to and including the date of this Complaint.

currencies.[2]  From August 15, 2017 through September 15, 2017, the Company ran the Paragon ICO "presale" during which time it purportedly "sold out" of 70,000,000 PRG Tokens, priced between $0.75 and $0.90 per PRG Token.  From September 15, 2017 through October 16, 2017, the Company ran the PRG Crowdsale during which time PRG Tokens were offered and sold for $1 each on the first day and the price thereafter increased by $0.05 per day until the close of the Paragon ICO. Such price increases were clearly designed to entice early investments.

6.      However, Paragon abandoned the price increases set forth in its terms as new investments slowed to a crawl during the PRG Crowdsale, opting instead to offer those who invested in the latter portions of the PRG Crowdsale discounts on of PRG Tokens by providing "bonuses" as the Paragon ICO went on, resulting in a baiting of early investors, as well as late or repeat investors. For example, Paragon emailed Plaintiff Davy on September 27, 2017, after he had already invested, with a "promo code" offering a 25% bonus on his next purchase of PRG Tokens. As the Paragon ICO neared its conclusion, the offered "bonus" percentages likewise increased. For example, Paragon again emailed Plaintiff Davy promo codes on October 1 and October 3, 2017.

7.      Paragon's purported goal, or "mission statement," in conducting the Paragon ICO was:

> Paragon seeks to pull the cannabis community from marginalized to mainstream by building blockchain into every step of the cannabis industry and by working toward full legalization. Our strength lies in the unique blockchain/cannabis connection that uses smart contracts. We believe in blockchain, and we believe in the benefits of cannabis. More uses of cannabis are coming to light, and we want to accelerate that process. We believe cannabis is good for individuals and good for countries. We are passionate about moving forward in an ethical, morally responsible, and legal way.

8.      In other words, the Paragon ICO was marketed as offering a path towards legalization of cannabis and a way to solve nearly every issue facing the cannabis industry. As discussed herein, the Paragon ICO was, in actuality, a way for the Company to raise capital to purchase real estate.

9.      Paragon was never permitted to solicit investments from the general public. The Company was created to serve as a fraudulent vehicle for the sole purpose of selling worthless

---

[2] For example, during the Paragon ICO, one of the Company's "Partners"—an initial coin offering website located at top10bestupcoming icos.com—issued an article which stated that, as of October 14, 2017, Paragon had raised $74,647,589.  *See* Dkt. No. 7-2 at 58.

unregistered securities (PRG Tokens) solely to enrich Paragon's executives, directors, founders, and affiliates. As detailed *infra*, a vast panoply of Paragon's public statements regarding the PRG Offering, the value of PRG Tokens and even its descriptions of its purported business model were false and/or misleading at the time that they were made.

10.     This Action's claims under Sections 12(a)(1) and 15(a) of the Securities Act and Section 25110 of the CSL [Cal. Corp. Code § 25110][3] are premised upon Defendants' unlawful solicitation, offer and sale of unregistered securities in violation of Section 5 of the Securities Act and solicitation, offer and sale of unqualified securities from within California in violation of Section 25510 of the CSL. The PRG Offering has at all times been an unlawful offering of unregistered/unqualified securities, in the form of PRG Tokens.  Throughout the PRG Offering, there has been no exemptions to registration available to PRG Tokens under the federal securities laws nor exemptions to qualification under California state law.

11.     The Paragon Offering was a clear offer and sale of securities because, *inter alia*, Defendants touted, and Plaintiffs and other PRG Token purchasers were conditioned to expect, and did reasonably expect, that the PRG Tokens received would increase in value and become worth more than the virtual currencies invested. Indeed, Paragon and the Founder Defendants have explicitly referred to Paragon ICO participants as "investors" and repeatedly stressed their intention to "keep the value of PRG strong and growing," and that PRG Tokens would be "long term growth assets."

12.     The registration requirements under the federal securities laws and California state law are designed to protect investors by ensuring they are provided adequate information upon which to base their investment decisions. Absent registration or qualification, issuers of securities are able to market their securities with no disclosure requirements whatsoever.  For example, an issuer could omit any information that might make a potential investor think twice before investing (e.g., conflicts of interest or major setbacks to core product lines), peddle its securities using unbounded exaggerations regarding the progress of its products, business plan, business strategies, or even fabricate the existence of relationships with vendors or other business partners.

---

[3] Plaintiffs' claims under Sections 12(a)(1) and 15(a) of the Securities Act and Section 25110 of the CSL are hereinafter jointly referred to as the "Registration Claims."

13.     Due to the varied and innumerable ways in which investors can be, and are likely to be, manipulated and harmed absent any of the protections under the federal securities laws, Sections 5 and 12(a)(1) of the Securities Act and Section 25110 of the CSL provide for strict liability against any person who offers or sells an unregistered/unqualified security. As detailed herein, the Paragon ICO was, at all relevant times, an offer and sale of unregistered securities. Accordingly, Defendants are strictly liable under Section 12(a)(1) of the Securities Act. Defendants are strictly liable for the offering and selling of unregistered securities in connection with the Paragon ICO. Nevertheless, with respect to Plaintiffs' Registration Claims, Defendants' deceptive activity is outlined herein to demonstrate the Founder Defendants' control over Paragon and Defendants' conditioning of the marketplace to expect a profit from purchasing PRG Tokens -- a characteristic of an investment contract security.

14.     The Paragon Defendants have made a feeble attempt to portray the offer and sale of PRG Token as a sale of a "utility-based token" that was "SEC Compliant" because, purportedly, under the "Howey test" Paragon's "ICO [sic] is NOT a security."  As demonstrated herein, such claims were false and also made in direct violation of Section 17533.6(a) of the CFAL.

15.     Plaintiffs' claims under Section 12(a)(2) of the Securities Act are premised on the Paragon Defendants' offer to sell and sale of PRG Tokens and offer to purchase and purchase of PRG Tokens through written and oral communications, including false or misleading statements of material fact or omitting materials statements of fact from communications relating to, *inter alia*, (1) the pricing of PRG Tokens and the amount of PRG Tokens to be issued; (2) the value of PRG Tokens and the Paragon Defendants' plans to stabilize PRG Tokens' trading price; (3) its commitment to "transparency" and pledge to retain "one of the "'Big Four'" accounting companies" for an audit; (4) the existence of a "[t]hird party recognized escrow agent" to ensure that funds deposited are "kept secure until the token crowdsale is finalized and the tokens generated"; (5) various claims included within the Company's "roadmap"; and (6) the location of Paragon's first so-called "ParagonSpace."

16.     The Paragon Defendants' false and misleading statements of material fact appeared in press releases, Paragon's website, online chat rooms or forums located on websites such as Reddit.com ("Reddit"), white papers, postings on social media websites such as Twitter and Facebook, promotional

videos posted on websites such as YouTube, internet podcast interviews and/or other materials relating to Paragon and PRG Tokens, which were disseminated widely to the investing public.

17. Each of the Paragon Defendants' misrepresentations and omissions were material because they were designed to, and did, entice the public into purchasing unregistered securities (PRG Tokens) for the Founder Defendants' and Executive Defendants' personal enrichment.

18. Plaintiffs allege that Defendants acted with scienter in connection with their claims under Section 12(a)(2) of the Exchange Act. Proof of Defendants' scienter comes, in part, from emails and message logs contained in the Limited Discovery. These messages show, among other things, that Paragon and the PRG Offering were a fraudulent scheme since the Company's inception, PRG Tokens have at all times been patently worthless, and that reasonable investors would not have purchased PRG Tokens absent the Paragon Defendants' fraudulent acts.

19. Plaintiffs assert claims under Section 17533.6(a) of the CFAL and under the UCL as a consequence of the Paragon Defendants' solicitation of investments of $100 million in the Paragon ICO with the use of statements falsely asserting, or at minimum, strongly inviting the inference, that the Securities and Exchange Commission had approved of, or somehow endorsed, the sale of PRG Tokens and the Paragon ICO. For example, statements such as those set forth in the Paragon slideshow presentation (the "Paragon Presentation") publicly released on the Internet in early-August 2017 which included a slide bearing the title "SEC Compliant" containing claims that under the "Howey test" the Company's "ICO [sic] is NOT a security."

20. This Action's claims under Sections 9(a) and 20(a) of the Exchange Act are alleged herein to seek a remedy for the Paragon Defendants' fraudulent and manipulative scheme to enrich themselves by, *inter alia*, suppressing negative, but truthful, information regarding Paragon and the Founder Defendants posted on public forums and engaging in open market purchases and sales of PRG to both manipulate and prop up the market price of PRG and further enrich themselves by selling PRG at favorable prices.

21. In light of Defendants having unjustly received significant financial benefits through fraudulent means, Plaintiffs also assert a quasi-contract claim seeking restitution for unjust enrichment. Plaintiffs seek an order requiring Defendants to return any benefits received in connection with their

offer and sale of PRG Tokens.  To permit Defendants to retain tens of millions of dollars in financial benefits that they acquired through their knowing fraudulent scheme would be manifestly unjust.

22.     Today, investors in the PRG Offering have little to show for their investments other than broken promises.  For these reasons, Plaintiffs on behalf of themselves, and all similarly situated PRG investors, seeks restitution, compensatory, injunctive, and rescissory relief, providing rescission and repayment of all investments made to purchase PRG Tokens during the PRG Offering, and the right to secure and conserve such funds until repayment.

23.     Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), Section 22 of the Securities Act [15 U.S.C. § 77v] because Plaintiffs allege violations of Sections 12(a)(1) and 15(a) of the Securities Act [15 U.S.C. §§ 77l(a)(1) and 77o(a) and Section 27 of the Exchange Act [15 U.S.C. § 77v] because Plaintiffs allege Sections 9(a) and 20(a) of the Exchange Act [15 U.S. Code §§ 78i and 78t].

25.     This Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

26.     Venue is proper in this District under Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 77v], and 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the corporate transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money by doing business here and engaging in activities having an effect in this District.

SECOND AMENDED CLASS ACTION COMPLAINT

**PARTIES**

**I.   PLAINTIFFS**

27.   On May 10, 2018, this Court appointed Holland to serve as Lead Plaintiff for the Class in this class action pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").

28.   Each of the Plaintiffs actively researched Paragon and the Paragon ICO, prior to making their purchases of PRG Tokens in connection with the Paragon ICO. Accordingly, each of the Plaintiffs were personally, and successfully, solicited by each of the Defendants in connection with Defendants' public representations and active solicitations to purchase PRG Tokens outlined herein.

### A.   Lead Plaintiff Jon Holland

29.   Holland invested in the Paragon ICO on September 10, 2017, by transmitting 34 ETH to Paragon to purchase 11,286.98 PRG Tokens. Holland continues to hold these PRG Tokens. Holland's initial 34 ETH investment was worth approximately $10,000.  As of April 18, 2019, PRG has no legitimate market for trading and thus, Holland's investment in PRG has caused him a financial injury of, at minimum, 34 ETH / $10,000 plus interest and any financial benefits unjustly received by Defendants as a consequence of obtaining his investment through fraudulent means.

### B.   Plaintiff Astley Davy

30.   Plaintiff Davy invested in the Paragon ICO on September 21, 2017, September 23, 2017, September 28, 2017, September 30, 2017, October 3, 2017, and October 15, 2017 by transmitting 0.04095 BTC, 0.03975 BTC, 0.57855 ETH, 0.0231 BTC, 0.03495 BTC, and 0.04579484 BTC, respectively, to Paragon to purchase 577.973 PRG Tokens.  On January 30, 2018, the date this Action commenced, Plaintiff Davy's 0.57855 ETH and .18454484 BTC were worth approximately $2,500. Plaintiff Davy continues to hold his PRG Token purchases which, as of April 18, 2019, have no value whatsoever.  Accordingly, Plaintiff Davy has suffered a loss of at minimum .57855 ETH and .18454484 BTC or $2,500 plus interest and any financial benefits unjustly received by Defendants as a consequence of obtaining his investment through fraudulent means.

**II.   DEFENDANTS**

31.   Paragon is a Delaware corporation that was incorporated on July 6, 2017.  Paragon is controlled by VerSteeg and Lavrov.  Paragon is the "operating entity" for the "PRG Token project."

The Company maintains its headquarters at the first "ParagonSpace" which was purchased using the ICO Proceeds and is located at 1463 Tamarind Avenue, Hollywood, CA (the "Tamarind Property" or the "First ParagonSpace").

### A.    The Founder Defendants

32.    VerSteeg is the Chief Executive Officer ("CEO") and founder of Paragon.  VerSteeg is a former Miss Iowa and Amazing Race participant.  In 2016, VerSteeg founded AuBox, a marijuana delivery service, that is "on pause" while VerSteeg focuses on Paragon's operations.  VerSteeg resides in the State of California, within this District.

33.    Lavrov is the "Chief Creative Officer" and founder of Paragon.  Lavrov describes himself as a "serial entrepreneur" who has had "multiple multimillion dollar exits."  Lavrov claims to have created numerous successful ventures.  Such ventures have included: two phone game app development companies, Zila Networks and Karma World LLC, and Pravda Sushi Bar & Lounge.  All three of these ventures are currently defunct.  Additionally, Lavrov founded tattolizator.com, a website launched to run an online contest for artists to submit work that Lavrov would then have tattooed on himself.  For this project, Lavrov issued a press release on Business Wire, in which he described himself as a "leading luxury life figure" that was a "cult figure" for a "new group of rich young Russians defined by their conspicuous consumption as well as their open disdain for poverty."  Currently, Lavrov holds himself out as a venture capitalist that runs "Zila Ventures," which has a team of one—Lavrov.  Zila Ventures claims to have three portfolio companies: AuBox (VerSteeg's company); Proffi, Inc. (a company that has no online presence other than a single sentence on the Zila Ventures' website); and Peak Mediation, Inc. (a marketing company that claims to "Guarantee to Double Your Profit").  Lavrov also holds himself out as the CEO of Peak Mediation, Inc.  Lavrov is believed to have residences in the State of California and the State of Florida.

34.    VerSteeg and Lavrov have been married to each other at all relevant times referred to herein.

### B.    Black Rabbit Holdings / The Holding Company / Third Founder

35.    Continued investigation has revealed that Defendants VerSteeg and Lavrov had a third, silent, partner that funded Paragon, established its organizational structure and implemented the

SECOND AMENDED CLASS ACTION COMPLAINT

unlawful scheme to defraud public investors by unloading worthless tokens and purchasing real estate for their own benefits.  The silent investor is, or was, Black Rabbit Holdings ("Black Rabbit" or the "Holding Company").  Black Rabbit describes itself as a "vertically integrated digital asset holding company [p]roviding the following services:

> (a) Broker Dealer / Clearing
> (b) Crypto Exchange
> (c) Crypto Hedge Fund
> (d) Asset Management
> (e) Retail Financial Services
> (f) Blockchain Technology Advisory Services

*See* Black Rabbit Holdings, *Overview*, LINKEDIN, https://in.linkedin.com/company/black-rabbit-holdings (last visited June 7, 2019).

36.     In June 2017, Black Rabbit published a job listing on AngelList (angel.co)[4] soliciting resumes from those interested in a role as Defendant VerSteeg's Executive Assistant.  This job listing, presently available at https://angel.co/paragon-8/jobs, was titled "Jobs at Paragon" "DLAO" and begins with "Black Rabbit is a rapidly expanding blockchain holding company that is looking for an Executive Assistant to the CEO."  Black Rabbit's involvement in Paragon also comports with Paragon's earlier solicitation materials that stated 2 million PRG would be paid out to, and an additional 3.8 million PRG reserved for, "institutional investors."

37.     Black Rabbit's Chief Executive Officer and Chief Investment Officer is Steven McClurg ("McClurg").  At the time of Paragon's public launch, McClurg was also the President and Chief Operating Officer of Crowdfunder, an equity crowdfunding platform, and founding partner and Chief Investment Officer of Arca Funds, a "crypto asset management firm."  Currently, McClurg is the Chief Investment Officer of Theseus Capital Management, another crypto asset management firm.

38.     Black Rabbit's ceased issuing statements linking it to Paragon in or around July 2017.  On July 25, 2017, the SEC releasing the "DAO Report" in which it put all parties on notice that, if they were considering launching an ICO and the token or "coin" was offered as an investment opportunity, the offering must be registered with the SEC.  Shortly following this event McClurg and his various

---

[4] Angel.co is a website connecting early start ups with venture capital funds and/or employees.

crypto funds ceased posting on social media about crowdfunding through initial coin offerings with hashtags such as "#TokenizeTheWorld."   In light of the foregoing, it is reasonable to infer that following the SEC's DAO Report, Black Rabbit became aware that the Paragon ICO was an unregistered securities offering and thus sought to take a more silent investor approach to minimize potential liability.   Throughout the Paragon Offering, McClurg has frequently taken part in panels discussing ICOs, so-called "utility token" and most recently, "STOs"— so-called "security token offerings".

39.     As of the date of this complaint, Black Rabbit Holdings maintains a profile on a website entitled "cryptostar.money" which states that, like Paragon, its office is located at the Tamarind Property:



C.     **The Executive Defendants**

40.     Defendant Kurylovich is Paragon's Chief Technology Officer and the founder and Chief Executive Officer of STEX, a little-known unlicensed digital currency exchange.   Due to PRG tokens having no actual value, it is not listed on most cryptocurrency exchanges and STEX is one of the only

exchanges that PRG trades on.  STEX accounted for over 98% PRG's 24-Hr trading volume on April 18, 2019 and, STEX is responsible for 93% of all PRG volume traded since its creation.  As detailed *infra*, the foregoing coupled with analyses of the ETH blockchain supports a strong inference that Defendant Kurylovich, through his ownership of STEX, substantially aided the Founder Defendants in propping up the price of PRG with unlawful and manipulative trading designed to secure additional profit for Defendants and circumvent, or reduce, Paragon's obligations pursuant to the SEC Order.

41.     Eugene "Chuck" Bogorad is Paragon's Chief Strategy Officer.  Bogorad directly or indirectly, and successfully, solicited investments from potential and actual PRG Token purchasers during the Paragon ICO.  Further, Bogorad personally distributed PRG Tokens to investors during the Paragon ICO.  Additionally, Bogorad was significantly involved in marketing the Paragon ICO by negotiating and purchasing ad placements for the Paragon ICO with/from companies that operate virtual currency related websites, including, *inter alia*: coinschedule.com; foundico.com; ICOWatchList.com; ICOchecker.com; ico-list.com; icobazaar.com; whitenoise.ai; coindesk.com; cryptocompare.com; cointelegraph.com; cointraffic.com; coinmarketcap.com; and Bitcoinprbuzz.com. For example, on August 17, 2017, Bogorad sent an email to a representative from ico-list.com with the subject line "ads" and the message "we want to buy ads!"  The representative did not reply promptly and Bogorad sent a follow-up email stating: "Hello! We're ready to pay!  Please respond!"

42.     Alex Emelichev is one of Paragon's Chief Business Officers for Europe, the Middle East, and Africa markets ("EMEA").  Emelichev directly or indirectly, and successfully, solicited investments from potential and actual PRG Token purchasers during the Paragon ICO.  Emelichev was involved in the decision-making process relating to, *inter alia*, Paragon's decision to employ Taylor as a celebrity endorser (discussed in detail below) and marketing partnerships Paragon considered or engaged in.  Additionally, as discussed below, Emelichev participated in editing, and providing comments on, the White Paper (defined below) which was used to solicit investments in the Paragon ICO from the general public.  Prior to, and in conjunction with, his employment with Paragon, Emelichev worked with Lavrov on various unrelated business ventures.

43.     Gareth Rhodes is Paragon's second Chief Business Officer for EMEA.  Rhodes directly or indirectly, and successfully, solicited investments from potential and actual PRG Token purchasers

during the Paragon ICO.  Rhodes played a significant role in drafting, editing, and providing comments to, the White Paper (defined below).  Additionally, Rhodes assisted the Company's web developers with the Paragon website's design and language contained therein.  Further, Rhodes was involved in marketing the Paragon ICO by negotiating and purchasing ad placements for the Paragon ICO with/from companies that operate virtual currency related websites.  For example, on August 18, 2017, Rhodes emailed Lavrov to request that he pay Coinschedule.com's owners so that Paragon could obtain a "gold listing" which would be "top row of gold vs. middle."  Additionally, Rhodes personally communicated with prospective and actual PRG Token purchasers that used the chat function on the Paragon website (the "Chat Function").

44.     David Kalustov is Paragon's VP of Business Development.  The White Paper also states that Kalustov is also employed by Lavrov's company, Peak Mediation, Inc., as its "CRO."  Kalustov was significantly involved in responding to questions submitted via the Paragon website's Chat Function.  During such communications, Kalustov aggressively solicited investments in the Paragon ICO by claiming that PRG Tokens would be listed on large virtual currency exchanges (thereby increasing its daily volume and thus value) and stressing PRG Token's profit potential.  For example, on August 19, 2017, a prospective Paragon ICO investor used the Chat Function to ask the following question: "[W]hat are the projections on price per token after ICO?"  In response, Kalustov stated, "We are not sure if we will have tokens left by the beginning of the actual crowdsale . . . Regarding value, our coins are designed to appreciate in value to reward our early adopters.  We're expecting demand for the coins to grow and supply to decrease . . . ."

### D.     "Advisory Board" Defendant

45.     Jayceon Terrell Taylor, also known as "The Game," is a member of Paragon's "advisory board."  He is a rapper and well-known celebrity.  Taylor was employed to use his celebrity status to promote Paragon and the Paragon ICO.  Taylor promoted the Company and the Paragon ICO by encouraging the public to visit the Paragon website, join a "revolution" with Paragon, and purchase PRG Tokens in social media posts on Twitter and Instagram.  For example, in August 2017, Taylor and Paragon posted a video of him and VerSteeg promoting Paragon.  In this video, Taylor states, "We are revolutionizing marijuana, cannabis, hey, the world!"  Similarly, in early-September 2017, Taylor

SECOND AMENDED CLASS ACTION COMPLAINT

posted a tweet from his Twitter account stating: "You see a correction,[5] me & @JessVerSteeg see a buying opportunity.  Let me welcome you to #Crypto with ParagonCoin.com @ParagonCoin."

### III.    RELEVANT NON-PARTY—PARAGONCOIN LTD. (GIBRALTAR)

46.    On April 24, 2017, Magen Secretaries Limited ("Magen Secretaries") filed an application with the Gibraltar Registrar of Companies to register a company named Nocturne Limited ("Nocturne").

47.    On April 26, 2017, Nocturne was incorporated in Gibraltar as a private company limited by shares.  Nocturne's initial sole shareholder was Mazal Nominees Limited ("Mazal").  Nocturne's Corporate Secretary was Magen Secretaries and its director was Magen Directors Limited ("Magen Directors").  Magen Secretaries, Mazal, and Magen Directors are subsidiaries or operating entities of RSM Gibraltar Limited and its related network of companies ("RSM").  RSM is a company that provides audit, tax, and consulting professional services.

48.    Nocturne appears to have been created to operate as a shell company that could be purchased and renamed/wound into, which is precisely what transpired.

49.    On January 30, 2018, Nocturne called and held an "extraordinary meeting" of the company's members (the "Extraordinary Meeting").  The Extraordinary Meeting was attended by representatives of Mazal and Magen Secretaries.  Nocturne's public filing describing this meeting states that:

(A) IT WAS NOTED That the Sole Shareholder of the Company requested to change the Company's name from Nocturne Limited to ParagonCoin Limited.

(B) IT WAS RESOLVED by Special Resolution that the name of the Company be changed to ParagonCoin Limited.

(C) IT WAS FURTHER RESOLVED by Special Resolution that the Memorandum and Articles of Association be amended to include the change of the Company's Name to ParagonCoin Limited and a new copy of the Memorandum and Articles of Association be filed in the Registry.

---

[5] This is a reference to a general dip in the overall market for virtual currencies around this time-period.

50.     That same day the newly renamed ParagonCoin Limited (Gibraltar) ("Paragon Gibraltar") filed its Amended Articles of Association.  Additionally, this entity filed the following updated Certificate of Incorporation:



Company Number:   115681
REID Number:      GICO.115681-12

IT IS HEREBY CERTIFIED that

**ParagonCoin Limited**

(originally called Nocturne Limited which name was changed by Special
Resolution dated the 30th day of January Two Thousand and Eighteen)
was incorporated as a limited company on the 26th day of April Two
Thousand and Seventeen.

Given at Gibraltar, this 30th day of January Two Thousand and
Eighteen.

For and on behalf of the
Registrar of Companies

51.     Additionally, Paragon Gibraltar's sole shareholder, Mazal transferred all of its shares in the company to VerSteeg—who had no involvement with Nocturne prior to it being restructured and renamed, "ParagonCoin Limited."  Further, the Nocturne/Paragon Gibraltar terminated its sole director, Magen Directors, and appointed four new directors: (1) VerSteeg, (2) Lavrov, (3) Julian Zegelman (Paragon's in-house counsel) ("Zegelman"), and (4) Giovanti Humphries (Paragon's Chief Financial Officer) ("Humphries").

52.     In short, prior to January 30, 2018, **Paragon Gibraltar did not exist in any form**.  It was not until January 30, 2018—**the day this Action was initiated**—that Nocturne took the following actions after having been inactive since its incorporation:

- renamed itself ParagonCoin Limited (Gibraltar);

- filed an amended articles of association;

- filed an updated certificate of incorporation;

- had its sole shareholder, Mazel, transfer all of its ownership in Nocturne/Paragon Gibraltar to VerSteeg;

- terminated its sole director; and

- appointed four new directors: (1) VerSteeg, (2) Lavrov, (3) Zegelman, and (4) Humphries.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

53.      Plaintiffs bring this action individually and as a class action on behalf of all investors in the PRG Offering from July 6, 2017 through April 5, 2019, who have been, are being, and/or will be harmed by Defendants' actions described herein.  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the individual Defendants.

54.      This action is properly maintainable as a class action under the Federal Rules of Civil Procedure 23.

55.      While the exact number of Class members is presently unknown to Plaintiffs and can only be ascertained through discovery, Plaintiffs believe that there are thousands of members in this Class.  All members of the Class may be identified by records maintained by Defendants and/or virtual currency exchanges and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

56.      There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following: (i) whether Defendants offered and sold unregistered or unqualified securities, in violation of the federal securities laws or California state law, to the Class during the Paragon Offering; (ii) whether Defendants successfully solicited the purchase of unregistered or unqualified securities from the Class during the Paragon Offering; (iii) whether the Paragon Defendants engaged in unlawful business practices in violation of California's Securities Laws, False Advertising Laws or Unfair Competition Law; (iv) whether the Paragon Defendants engaged in manipulative conduct in violation of Section 9 of the Exchange Act; (v) whether the Founder Defendants are liable as control

SECOND AMENDED CLASS ACTION COMPLAINT

persons for the federal securities violations asserted herein; (vi) whether the Paragon Defendants fraudulently solicited investments from Plaintiffs and the Class; (vii) whether the Paragon Defendants have been unjustly enriched by the unlawful conduct alleged herein; (viii) whether Plaintiffs and other Class members will suffer irreparable harm if such unlawful activities are not remedied; and (ix) whether the Class is entitled to restitution, injunctive, compensatory, and/or rescissory relief as a result of Defendants' wrongful conduct as alleged herein, and the measure of such damages.

57.     Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interests adverse to the Class.  Plaintiffs and the other members of the Class have all sustained harm in a substantially identical manner as a result of Defendants' wrongful conduct as alleged herein.

58.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained competent counsel experienced in litigation of this nature.

59.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

60.     Plaintiffs anticipate that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

61.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

62.     Accordingly, Plaintiffs seek injunctive and other equitable relief on behalf of themselves and the Class to prevent the irreparable injury they will continue to suffer absent judicial intervention

## SUBSTANTIVE ALLEGATIONS

## I.    BLOCKCHAINS, WALLETS, AND ICOS

### A.    Blockchain Technology

63.     At its heart, a "blockchain" is a decentralized and public ledger comprised of validated and virtually permanent transactional records.  The immutable nature of such records has the ability to

prevent certain fraudulent transactions from occurring, eliminate the need for third-party services which are typically required in certain transactions, and significantly reduce costs attendant to various transactions.

64.     For example, a blockchain could eliminate the need for title insurance against potential defects concerning chain of custody.  With respect to reductions in transactional costs, a blockchain enables parties to enter into a transaction without the need for third party intermediaries such as banks to transfer funds.

65.     A blockchain is comprised of "blocks" linked together by cryptography so as to validate the transactional information therein.   Each new block in the chain contains a "cryptographic hash function" mapping the information contained in the previous block.

66.     A "cryptographic hash function" is, to simplify, a one-way encryption of information. That is, when information is encrypted, it is transformed into a puzzle, so to speak, that was meant to be solved—*i.e.*, decrypted into its original text with a, for example, a key or password. A cryptographic hash function, however, transforms information into a sufficiently complex puzzle such that there is no logical key or "password" to decrypt the information.  Rather, the only way to "solve" the puzzle is by trial and error—*i.e.*, submitting each of the trillions of possible solutions until the correct solution is found.

67.     This process of attempting to solve the puzzle, or "hash", requires the use of high-powered computers competing by trial and error to solve the hash and win the "reward" (*e.g.*, a portion of bitcoin).  This process is known as "mining" for cryptocurrency.

68.     After the hash is solved, its contents are deemed verified and the block becomes part of a string of previous blocks containing all prior transactional information (a "blockchain").

69.     The first use of blockchain technology was to record bitcoin ("BTC") transactions and, to date, blockchains have largely been associated with digital currencies, *e.g.*, BTC and ETH. However, a "blockchain" could be used to record all types of information.  For example, a blockchain could be used for deed recordation/transfers or even transfers of stock certificates.

**B.      Public Digital Currency Wallet Address**

70.      A "digital currency wallet" is used to hold and engage in transactions involving digital currencies.  A digital currency wallet *address* is a cryptographic representation of a "digital currency wallet" that is used to record digital currency transactions on a "blockchain."

71.      In order for a "blockchain" to accurately record and publicly represent transaction information, it requires public wallet addresses because these addresses represent the parties to transactions that are being recorded.

**C.      Initial Coin Offerings ("ICO")**

72.      An ICO is a capital raising event in which an entity offers investors a unique "coin" or "token" in exchange for consideration—most commonly in the form of established virtual currencies (typically BTC and ETH) or fiat currency.  These tokens are issued on a blockchain and are oftentimes listed on online platforms, called virtual currency exchanges, where they are tradable for virtual or fiat currencies.

73.      To participate in an ICO, investors are typically required to transfer virtual currencies to the issuer's address, online wallet, or other account.  During an ICO, or after its completion, the issuer will typically distribute its unique "tokens" to the participants' unique address on the blockchain.  Similar to stockholders in an initial public offering ("IPO"), holders of these tokens are then entitled to certain rights related to a venture underlying the ICO, such as profits, shares of assets, use of certain services provided by the issuer, and/or voting rights.

**D.      Smart Contracts**

74.      A "smart contract" is a system running on a "blockchain" that enables transactions to automatically execute according to pre-specified rules.  In other words, a "smart contract" performs one or more functions automatically when initiated by a certain event.  Importantly, "smart contracts" run on "blockchains" and thus, the execution of "smart contracts" and transactions accomplished thereby, are also recorded in the public ledgers that "blockchains" create.  Currently, the Ethereum Blockchain is the most popular "blockchain" that enables "smart contracts."  In contrast, the Bitcoin Blockchain does not enable "smart contracts" to operate on it.  This is one of the primary differences between BTC and ETH.

75.    To date, most "smart contracts" are used in connection with tokens existing on the Ethereum Blockchain (*e.g.*, the PRG Token).  That is, they are primarily used to record holdings and transfers of custom "tokens" (*e.g.*, PRG Tokens) among "public wallet address".

## II.    PARAGON'S FOUNDING, BUSINESS MODEL, AND ICO

### A.    Paragon's Formation and Leadership Structure

76.    The Founder Defendants and Defendant Black Rabbit created Paragon in July 2017. VerSteeg and Lavrov have had full control over Paragon at all relevant times.  It is presently unknown if or when Defendant Black Rabbit ceased its control over Paragon.  However, given Black Rabbit received PRG for its investment, it is reasonable to conclude that Black Rabbit, at minimum, continued its control over Paragon until after PRG had been issued to investors and was available for trading.

77.    As noted, Black Rabbit's involvement with Paragon has been almost entirely erased from public online databases. Moreover, the Limited Discovery included no references to an institutional investor.  Accordingly, absent full discovery, Plaintiffs are unable to determine the full extent of Black Rabbit's involvement in managing Paragon.  That being said, in light of the fact that significant efforts were undertaken to erase its involvement from public records, the fact that it was responsible for soliciting and reviewing resumes the Executive Assistant to the Company's CEO, and the fact it and Paragon are both headquartered at the First ParagonSpace/the Tamarind Property, Plaintiff alleges upon information and belief that Black Rabbit was, at minimum, involved in Paragon's decision to conduct an unlawful offering of unregistered securities.

78.    The Founder Defendants were heavily involved in all aspects of Paragon's operations during the Paragon ICO, including managing all of the Company's day-to-day activities and marketing.

79.    VerSteeg was the face of the Company in most interviews and media publications, and she focused largely on marketing the Paragon ICO and creating Paragon's "brand."

80.    Lavrov, and potentially Black Rabbit, focused largely on managing Paragon's funds, entering the Company into various marketing arrangements and partnerships, and managing, among others, Bogorad, Emelichev, Rhodes, and Kalustov.

81.    Throughout the Paragon ICO, Bogorad was heavily involved in developing relationships, and negotiating contracts, with companies that could market the Paragon ICO via online

advertisement banners on their websites.  Additionally, Bogorad was significantly involved with structuring deals with companies that provided mobile applications for virtual currency related services wherein the applications would have integrated advertisements for the Paragon ICO.

82.     Emelichev was involved in the decision-making process relating to marketing decisions, editing the Company's marketing materials, Paragon's decision to employ Taylor as a celebrity endorser, drafting the White Paper, and resolving disputes with PRG investors.

83.     Similarly, Rhodes was also involved with developing such marketing relationships.  In addition to his general role with respect to marketing, Rhodes frequently communicated directly with prospective, and actual, PRG investors via the Paragon website's Chat Function.

84.     Based on the Limited Discovery received, Kalustov appears to have been primarily responsible for oversight of the customer service team and responding to questions received via the Chat Function.  Kalustov would typically forward questions he had difficulty answering to Rhodes, Emelichev or Lavrov.

### B. The Paragon Business Model

85.     On August 15, 2017, the Company released the *Paragon White Paper Version 1.0* (the "White Paper").  The White Paper described Paragon as providing solutions for essentially every issue facing the cannabis industry.  The "business model" and White Paper—which is replete with buzz-words relating to virtual currency technology—can best be described as overly ambitious, vague, and impractical.

86.     The White Paper described Paragon as having five separate business segments: "ParagonChain," "ParagonCoin," "ParagonSpace," "ParagonOnline," and "ParagonAccelerator."  As detailed below, even individually, each of these segments claims to accomplish fantastic feats and unrealistically address major issues.

87.     "ParagonChain" was described as an "immutable ledger for all industry related data." The White Paper continues by explaining that the new "ParagonChain" and its use of "smart contracts" would "save companies hundreds of thousands in reduced paperwork" and provide a "modular toolset to build applications that can track shipments, verify potency, identify medical patients and their prescriptions, and a host of applications not yet imagined."

88.   "ParagonCoin" was described as "offer[ing] payment for industry related services and supplies."   The White Paper further describes "ParagonCoin" as being able to "create a global ecosystem where businesses and consumers can quickly and easily verifiably transfer funds—business to business, business to consumer, and/or consumer to consumer."   Additionally, the Company stressed: "[w]e want to keep the value of PRG strong and growing."

89.   "ParagonSpace" was described as "establish[ing] niche co-working spaces."   The White Paper added: "Our mission is to create a safe physical space where advocates can push to repeal current regulatory restrictions and present information on the benefits of marijuana use for medical conditions, recreational use, and general well being."

90.   "ParagonOnline" was described as "organiz[ing] and unit[ing] global legalization efforts."   The White Paper described this segment as "ParagonOnline will act as a one-stop service and platform for cannabis and alternative payment-related scientists, journalists, investors, marketers, doctors, developers, fintech specialists, entrepreneurs, startups, and lawyers.   Because every business is a human venture, the professional networking potential will be highly beneficial.   It will give the cannabis industry a whole new dimension."

91.   "ParagonAccelerator" was described as "bring[ing] standardization of licensing, lab testing, transactions, supply chain and ID verification through apps built" in the accelerator.   The White Paper further stated: "The ParagonAccelerator is uniquely linked to the growth of the legal cannabis industry.   Our model grows and develops with the industry autonomously, responding to the demand for new businesses with revolutionary ideas."

92.   While the White Paper claimed that there would be five business segments, it is apparent that Paragon's actual business model was primarily focused on investing in real estate.   Specifically, the White Paper stated, in part, "[t]he lion's share of the token crowdsale [sic] proceeds will be spent on real-estate acquisition." █████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

93.     Similarly, the White Paper used to solicit investment from the general public explicitly stated: "The lion's share of the token crowdsale [sic] proceeds will be spent on real-estate acquisition."

94.     Similarly, Defendant VerSteeg responded to a question on an Internet forum regarding how Paragon would use the ICO Proceeds by stating that "most of the funds will go to purchase real estate for PARAGON co-working spaces."

95.     Evidently, the Paragon ICO was little more than a method for Paragon, the Founder Defendants and the Executive Defendants to raise capital in order to purchase real estate investments.

## III.    THE PARAGON ICO

### A.    Marketing the Paragon ICO as an Investment Opportunity

96.     The Company, the Founder Defendants, and certain Executive Defendants began exchanging drafts of, and making edits to, the initial Paragon White Paper in early-July 2017.

97.     The White Paper explained that "[a] total of 200,000 PRG will be generated" and that "[t]here will be no further production of tokens so, over time, the tokens in circulation shall reduce in number and increase in demand."

98.     The Paragon ICO was marketed as an investment opportunity for persons interested in the cannabis industry.  For example, the White Paper stated, "the token crowdsale [sic] will favor smaller investors who are committed to the cannabis cause and plan on participating in the community."

99.     Paragon explained that their organization and plans would "quickly strengthen the legalization movement and [was] expected to positively influence the demand for and respectively value of Paragon's cryptocurrency, PRG."

100.    Similarly, on September 3, 2017, a publication named "NowThis Weed" published a video interview with VerSteeg on Facebook, which Paragon subsequently reposted on the Company's Facebook page that same day.  Following are five screens captures from this video—each which stated "SOURCE: Paragon"—that clearly exhibit Paragon's intention to market the Paragon ICO and PRG Tokens as investment opportunities:









SECOND AMENDED CLASS ACTION COMPLAINT

101.    Similarly, Paragon also released a "PRG One Pager" which summarized the Paragon ICO's investment opportunity.  This "One Pager" and the White Paper both included the following language stressing the profit potential from purchasing PRG Tokens:

> A gradual reduction in circulating supply is part of Paragon's plan to encourage PRG price stability and growth, but above all, a solid price development over time. This ensures a growth of PRG purchasing power over time. While 1,000 PRG may pay for a month's rent now, in the future, it might pay for a year's rent.

102.    In short, as stated in a review of the Paragon ICO conducted by Picolo Research:

1.  The token sale structure is extremely complicated

2.  A significant amount of funds are used to 'control the token price'

3.  There is no detailed 'use of proceeds' or budget

4.  The team have not communicated a clear commercial strategy as there are 5 completely different segments

5.  We believe the use of blockchain within the ecosystem (in this venture) will be limited

6.  There is a strong focus on the establishment of Accelerators and Co-working spaces as opposed to the blockchain initiative

7.  The management team appear to be using the current market liquidity as a method of financing for something other than the actual concept

8.   It is unknown as to what portion of the funds will be held by management, promoters, etc. . . . .

For the reasons listed above, we **believe there is a significant risk associated with this token sale**.  If the same structure and offering were presented by a company that did not put such high profile names to it, we would be on the verge of labeling such a token sale as 0 stars.

### B.   Mechanics of the Paragon ICO

103.   The *unofficial* **PRG Offering** began on approximately July 6, 2017 and has continued until the present day.  Throughout this period, the Paragon Defendants have continuously offered and sold PRG to investors through multiple online secondary market trading platforms for digital currency assets such as HitBTC.com ("HitBTC"), EtherDelta.com ("EtherDelta"), Bittrex.com ("Bittrex"), and YoBit.net ("YoBit").  It is presently unknown how much PRG the Paragon Defendants sold through these online trading platforms, nor the amount of profit they have obtained through such sales.

104.   The *official* Paragon ICO ran from August 15, 2017 through October 15, 2017 and was composed of two aspects: (1) the "PRG Presale" and (2) the "PRG Crowdsale.

105.   The **"PRG Presale"** ran from August 15, 2017 through September 15, 2017.  During the PRG Presale, Defendants raised at least 11,002.1 ETH and 950 BTC.

106.   The "**PRG Crowdsale**" ran from August 15, 2017 through October 15, 2017.  During the PRG Crowdsale, Defendants raised at least 533 BTC, 8,092 ETH, 6,422.61142 LTC; 724,593.9682 Digibyte ("DGB"), 372,413.9693l Ripple ("XRP"), 4,809.907181 Ethereum Classic ("ETC"),148.2579515 ZCash ("ZEC"), 8,637.574063 Waves Coin ("WAVES"), 2,804.0426 USDT, 49.48765809 Dash ("DASH"), 18.89065626 Bitcoin Cash ("BCH"), 1.92 Monero ("XMR"), and 1,707.699983 Nxt ("NXT").

107.   To participate in the *official* Paragon ICO, participants were required to register for an account of Paragon's website.  ("Paragon Account") on Paragon's website.  After this account was created, users could deposit their virtual currencies into their Paragon Account.  The Paragon Account could then be used to purchase PRG Tokens in connection with the Paragon ICO.

**C.    Egregious Untrue Statements of Fact in the Paragon ICO Prospectus/White Paper**

108.    Every publication or press release issued by Paragon regarding its business model and solicitation for purchases of PRG contained almost entirely false or misleading representations of fact concerning Paragon's business plan, the true motives behind the offering, and Defendants understanding of blockchain technology, or lack thereof.   The fraudulent scheme in this case is straightforward—the Paragon Defendants solicited investments by fraudulently: (1) guaranteeing investors substantial profits; (2) claiming Paragon was an innovative technology company with a viable business model—when in reality, Defendants sought funds to buy property and live lavish lifestyles; (3) creating an air of legitimacy in its investment by claiming it was "SEC Compliant" and would have Paragon's accounts "audited by reputable companies, such as Deloitte, Grant Thornton," and others; and (4) manipulating the trading price of PRG to secure profit for themselves as well as to prop up PRG's trading price to deceive the market into believing that PRG carried some value when in fact, it has never had any.

109.    From January 1, 2017 through mid-June of 2017, Bitcoin's trading price had already surged 300%.  Similarly, during that same period, ETH's trading price skyrocketed 4,000%+ from just under $10/ETH to $350/ETH.  Needless to say, but the investing public became interested in learning about potential blockchain related investments.  Unfortunately, Defendants capitalized on the public's interest by conducting the PRG ICO and Offering.  Stated otherwise, Paragon has never been anything other than an opportunity for Defendants to defraud tens of millions of dollars from public investor by, as the White Paper explains, "tak[ing] advantage of the media's interest in the hot topics of cannabis and cryptocurrencies."

110.    While most of Paragon's marketing materials contained material misrepresentations of fact, the Paragon White Paper in particular included egregiously false statements which the Paragon Defendants indisputably knew were untrue when made.  Importantly, the White Paper was the primary document through which the Paragon Defendants solicited public investments in the Paragon ICO was the White Paper.  The White Paper sets forth the terms and conditions of a public offering of securities (PRG Tokens) by an issuer (Paragon).  Accordingly, the White Paper falls squarely within the definition of a "prospectus" set forth in Section 12(a)(2) of the Securities Act.

111.     Each of the Individual Defendants either personally drafted/edited the White Paper or distributed it to potential and actual investors in the Paragon ICO.  Additionally, as detailed *infra*, each of the Individual Paragon Defendants is a "seller" of PRG Token securities under Section 12 of the Securities Act.

112.     The White Paper contained the following material misrepresentations of fact, and each of the Paragon Defendants knew that such statements were false at the time they were disseminated:

**Investments in the Paragon ICO were Not Maintained by a Third-Party Escrow Agent**

113.     The White Paper stated the following:

> We are transparent. Funds will be escrowed and our books will be audited by reputable companies, such as Deloitte, Grant Thornton, or other well-recognized, international accounting firms experienced with the nascent blockchain industry.

White Paper at 7.

> Paragon is committed to a fully transparent process even beyond the open source coding. Here are other ways we will work for transparency and community control. . . . Engage one of the "Big Four" accounting companies for annual third-party audits. . . .
>
> \*\*\*
>
> Third-party recognized escrow agent will ensure tokens deposited for a token crowdsale are kept secure until the token crowdsale is finalized and the tokens generated.

*Id*. at 14.

> Paragon seeks to be fully transparent in all its financial dealings. A measured release of tokens will give Paragon projects and ParagonCoin the opportunity to grow and increase in influence. Escrowed funds and planned purchases of physical property are what sets Paragon above other token crowdsales.

*Id*. at 29.

114.     Indeed, the White Paper even identified its purported escrow agent as being "Clayton Goree at Wells Fargo VP Business Development, https://www.linkedin.com/in/claytongoree/ and Julian Zegelman at Velton Zegelman Law Firm, https://www.linkedin.com/in/jzegelman."

115.     The foregoing statements were false and misleading at the time that they were made because investments in the Paragon ICO were, in fact, never maintained by a third party escrow agent.

Rather, much of Plaintiffs' and the Class' investments were used immediately by the Paragon Defendants for various marketing and personal expenditures.

116.   Indeed, the Paragon Defendants concealed the material fact that it would also be using a significant portion of the ICO proceeds on marketing efforts to solicit additional investor funds. Indeed, Paragon used various cryptocurrency wallets to consolidate, and expend, investor funds throughout the Paragon ICO. One such wallet's public address is: ████████████████ (the "*Presale* BTC Wallet"). The *Presale* BTC Wallet is known to belong to Paragon based on the following demonstrable facts.

117.   On August 18, 2017, an ICO marketing website provider—ico-list.com—requested █ BTC in payment to BTC address ████████████████ (the "ICO-list.com Wallet" in exchange for "ads" promoting the Paragon ICO. That same day, the *Presale* BTC Wallet sent █ BTC to the ICO-list.com Wallet.[6] Additionally, On August 18, 2017, Coinmedia OÜ provided Defendant Bogorad with an invoice listing "Paragon Coin, Inc." as the "Client" and the service provided as "Paragon Coin: 50% advertising package" with a price of "████" or "███ BTC" to be paid to the BTC Wallet "████████████████" (the "Coinmedia Wallet").

118.   Shortly thereafter, that same day, the *Presale* BTC Wallet sent ████ BTC to the Coinmedia Wallet.[7] Similarly, on August 26, 2018, Coinmedia provided Defendant Bogorad with another invoice for its "[f]ull advertising package for September" and requested payment of "████" or "███" BTC. That same day, the *Presale* BTC Wallet sent ██ BTC to the Coinmedia

---

[6] For more information on this transaction, *see* Blockchain Luxembourg S.A., *Transaction* ██████████████████, BLOCKCHAIN, ████████████████████████ (last visited June 7, 2019).

[7] This transaction is recorded on the BTC blockchain and may be viewed at: Blockchain Luxembourg S.A., *Transaction* █████████████████, BLOCKCHAIN, ████████████████████████ last visited June 7, 2019).

1   Wallet with the remaining ████ BTC being sent on September 2, 2017.[8]  The *Presale* BTC Wallet

2   collected and expended ██████ BTC from August 16, 2017, through September 15, 2017 – prior

3   to the official Crowdsale even beginning.

4         119.    Similarly, Paragon used at least two separate ETH addresses to ultimately received ETH

5   investments during the official Paragon ICO.  From August 15, 2017 through September 15, 2017,

6   Paragon used the following smart contract address:

7   ████████████████████████ (the "PreSale Smart Contract").  For example,

8   on September 6, 2017, a PRG investor messaged Paragon stating:

9         Hello, I wanted to invest in your ICO.  I sent some ether to my account via my

10        etherwallet (████████████████████) and I still have
      not seen my account credit yet.  Can you take a look for me please. My account

11        login is . . . I sent some Ether to ██████████████.

12        120.    Ethereum's public blockchain confirms that this investor sent ████ ETH to the address

13  beginning in ██████ on September 6, 2017.   Shortly thereafter, that ETH was forwarded onto the

14  Presale Wallet.  The Paragon Defendants also used the Presale Wallet to pay certain marketing vendors.

15  For example, on August 22, 2017, a representative from "icobazaar.com" emailed Defendant Bogorad

16  instructing him that to retain their services he would have to "[t]ransfer the agreed amount [██ ETH] to

17  this wallet ██████████████████████" (the "ICOBazaar Wallet").  Shortly

18  thereafter, Defendant Bogorad replied with an email stating "payment sent" along with the following

19  hyperlink:

20  ████████████████████████████████████████

21  ██.

22        121.    This link leads to a transaction on the Ethereum blockchain showing that on August 22,

23  2017, Paragon sent ██ ETH from the ICO PreSale Wallet to the ICOBazaar Wallet.

----

[8] These transactions are available at Blockchain Luxembourg S.A., *Transaction*
████████████████████████████████████, BLOCKCHAIN,
████████████████████████████████ (last visited June 7, 2019) and Blockchain Luxembourg S.A.,
*Transaction* ████████████████████████████████████████,
BLOCKCHAIN,
████████████████████████████████████████ (last visited June 7, 2019), respectively.

122.    The ICO PreSale Wallet received a total of ▬▬▬▬▬▬ ETH from July 27, 2017 through September 15, 2017 –prior to the official Crowdsale even beginning.

123.    The Limited Discovery contains communications from investors showing that the foregoing wallets were used to receive investor funds and expend those funds throughout the Paragon ICO.  The foregoing reality is in stark contrast to Paragon's claims that it would maintain all investor funds in an escrow account and subsequently obtain an audit from a large accounting firm.

124.    In addition to the foregoing, the Limited Discovery contained a document purporting to set forth details as to the dates and amounts of their conversions of the ICO Proceeds to fiat currency from August 2017 through April 2018.  This document contains the following dates and conversions of the ICO Proceeds:

SECOND AMENDED CLASS ACTION COMPLAINT

125.    Thus, it is evident that the Paragon Defendants began converting and expending investor funds as early as August 21, 2017—just days after the Paragon ICO launched.  Given that the Paragon Defendants were each involved in spending these funds for Paragon's marketing efforts or their own personal gain, it is indisputable that they knew the White Paper's claims as to having investments escrowed until the ICO's conclusion were blatantly false.

**Paragon Knew PRG Token Would Not be Worth $2.50 at the Conclusion of the Paragon ICO**

126.    The White Paper contained material misrepresentations that PRG would be worth $2.50 on October 15, 2018 and that Paragon would ensure that PRG's price would not fall below that price point.  More specifically, the White Paper stated:

> The **Token Crowdsale launch** begins September 15.  The initial token price will be set at $1 for this launch.  During the first 5 hours of the token crowdsale we will offer an early bird 5% discount.  Following that, the price will remain at $1 for the remaining of the first 24 hours.  Then it will increase $0.05 each 24 hours for 30 days or until all tokens sold

White Paper at 29.

127.    Stated otherwise, the Paragon Defendants, through the Paragon ICO's prospectus/White Paper, claimed that by October 15, 2017, one PRG would be worth $2.50.  Paragon released the following image on its public Facebook page illustrating this phenomenon:



128.    The Paragon Defendants used this price point to convince investors that so long as they purchased PRG for less than $2.50, they were guaranteed to profit when PRG was issued.  However, PRG Tokens have never been worth $2.50.  Moreover, as set forth below, there has never been actual demand for PRG Tokens for their purported purpose, and they are worthless.

129.    The White Paper states that from August 15, 2017 through to, and including, August 25, 2017, a minimum investment of $25,000 – payable in various virtual currencies or fiat currency – would yield a 25% discount on the anticipated $1 PRG pricing on September 15, 2017, when the "PRG Crowdsale" began (the "25% Discount Offer").  Stated otherwise, the 25% Discount Offer offered 1 PRG for $0.75.

130.    The Paragon Defendants uniformly described this particular offer as the "best" discount or deal on PRG Tokens.  For example, on August 19, 2017, a potential investor used the Chat Function on Paragon's website resulting in the following exchange with Defendant Kalustov:

| | | |
|---|---|---|
| 1 | **Investor**: | Hi, when is the pre-sale[?] |
| 2 | **Kalustov**: | Hello, it is going on right now |
| 3 | **Investor:** | What is the best bonus? |
| 4 | **Kalustov:** | 25% off |
| 5 | | How much are you looking to buy? |
| 6 | **Investor**: | I see a minimum of $25,000? |
| 7 | | can I still get it if i buy less? |
| 8 | **Kalustov**: | How much less? |
| 9 | **Investor**: | I can safely do $10,000 |
| 10 | **Kalustov**: | Then you can secure a 10% discount |
| 11 | **Investor**: | What if i do $15,000? |
| 12 / 13 | **Kalustov**: | I'll apply 15% off manually for you. . . . If you do 15,000 now I will apply 15% off so you will get ~17,250  PRG |
| 14 | **Investor**: | Wait a second |
| 15 | **Kalustov**: | Crowdsale ends at $2.50 so it's good deal |
| 16 | **Investor**: | I can get 33,333 PRG for $25,000? |
| 17 | **Kalustov**: | Yes. . . .  Now, 25K gets you PRG 33,333 |
| 18 | *** | |
| 19 / 20 | **Investor**: | How much are the founders / advisors holding? |
| 21 | **Kalustov**: | Our early investors, founders, advisors altogether have around 10% combined. |
| 22 / 23 / 24 | **Investor**: | nice thats good! How confident are you that the ICO will raise and complete the round? Also, what are projections on price per token after ICO? |
| 25 / 26 / 27 | **Kalustov**: | Regarding value, our coins are designed to appreciate in value to reward our early adopters.  We're expecting demand for the coins to grow and supply to decrease, one   of the mechanisms to ensure deflation is an algorithm on our blockchain with a dynamic transaction fee where half of the fee is burned. |
| 28 | | |

We are not sure if we will have tokens left by the beginning of the actual crowdsale as I told you we are 25% in a We are not sure if we will have tokens left by the beginning of the actual crowdsale as I told you we are 25% in and we are still 27 days away from the actual crowdsale. And we are still 27 days away from the actual crowdsale

131.   The White Paper further stated that from August 25, 2017, through September 5, 2017, the 25% Discount Offer was replaced with an investment opportunity whereby an investment of $15,000 or more would yield a 15% on the $1.00 PRG Crowdsale price ($0.85 / 1 PRG) (the "15% Discount Offer").   The last of the so-called deals set forth in the White Paper required a $10,000 minimum investment or a 10% discount on PRG ($0.90 / 1 PRG) and was described as being available from September 5, 2017 through to the start of the PRG Crowdsale on September 15, 2017 (the "10% Discount Offer").

132.   The White Paper stated that PRG would cost $1.00 on the first day of the PRG Crowdsale and that its cost would increase by $0.05 every 24 hours for 30-days or until all PRG Tokens were sold

133.   The White Paper clearly stated that Paragon would control the market price of PRG Tokens to "maintain price support of the PRG Tokens," conveying the unmistakable message to prospective PRG investors that PRG Tokens could not lose value and would certainly appreciate in value—even if Paragon had to manipulate PRG's price upwards.   More specifically, the White Paper stated that Paragon's "Controlled Reserve Fund" would be used to:

***Release PRG to the markets if PRG deflates too fast and pushes token prices up rapidly.***

The total PRG in circulation will gradually decrease – tokens will leave circulation and return to Paragon as payment for services – as well as tokens lost as a transaction burn.  As a result, the market free float of PRG will decrease over time.  However, in the event that PRG displays sever price volatility as a result of scarcity: the Reserve Fund may gradually sell PRG to the market in line with our minimum deflationary target of 2%.

***Buy PRG from the market if PRG price devalues too much.***

Despite our expectations for the value of PRG to increase as we receive payment in PRG for our services (blockchain and smart contract solutions, ParagonSpace, etc.), the cryptocurrency markets are inherently volatile.  As a result, PRG may become subject to excessive sell volume resulting in a significant drop in price.  To counter this, the Reserve Fund can intervene by buying back PRG in an effort to

stabilize the market price.

PRG is designed to appreciate in value as our solutions are adopted throughout the cannabis industry and around the world.  Our model incentivizes PRG owners to hold their tokens as long term growth assets, in addition to spending PRG on any of our platforms.

The Controlled Reserve Fund is the sole property of Paragon, and funds cannot be accessed and distributed to employees or investors.  Additionally, executives and employees are prohibited from trading PRG for a 48-hour period following a buy-back or sale from the Reserve Fund.

134.    Had any of the foregoing claims been true, an investment in the 25% Discount Offer would have guaranteed a tremendous return on investment.  Each PRG Token purchased for $0.75 purportedly would have been worth $2.50 just weeks later.

135.    In reality, and in direct contradiction to the White Paper's claims, as the Paragon ICO progressed, instead of pushing PRG's price upwards to $2.50, Defendants offered even greater discounts for late investments – thereby driving the price downward.  For example, on October 3, 2017, Paragon circulated a mass email to potential and actual investors with the subject line "40% Bonus for your next PRG purchase!" which stated:

Paragonians!

Our crowd-sale is still ongoing and there are only 12 days left for you to participate!

Currently, our roadshow is underway - so feel free to come visit our expo in Barcelona at   the Blockchain Solutions Forum. We will be in Barcelona from today until Thursday, so come visit Jessica's speeches and talk to the team!

Last week, we successfully completed our event at the World Blockchain Forum in London as one of the largest event sponsors. Our CEO, Jessica, gave an outstanding speech and the executive team were able to meet a lot of our supporters, fans and industry professionals.

 We have been dropping promo codes in our telegram chat, however, we now want to reward all of you with one! In order to celebrate our successful event and growing buzz,   we are giving you a 40% bonus on your next PRG purchase! This is part of our Barcelona event give away!

Here is your promo code!

EML-824663ET9532

136.    For these reasons, Defendants' claims regarding the value of PRG Tokens and their upward priced trajectory were unequivocally false at the time that they were made.  The truth is, PRG Tokens have never been worth more than what investors paid for them.

### D.    Paragon and the Founder Defendants Intentionally Created the False Impression that the SEC Had Approved of the Paragon ICO

137.    In late August 2017, the Founder Defendants completed and published a slideshow presentation containing a summary of the Paragon ICO's investment offering.  This presentation was available on Paragon's website, social media platforms and various Internet forums relating to cryptocurrencies.  This presentation included a slide that expressly claimed that Paragon's ICO was "SEC Complaint."  More specifically, it included the following slide:

## SEC Compliant

 SEC ruling on TheDAO reaffirmed the Howey test

According to this test our ICO is NOT a security

We have legal opinions by two different US legal counsels confirming our compliance

We passed the test by Coinbase, also NOT a security

 coinbase   USV   COIN CENTER   CONSENSYS

138.    Indeed, Paragon's overall marketing strategy involved frequently claiming that PRG Tokens were not securities and thus, its offering was either compliant with or not subject to SEC regulation.  For example, on August 20, 2017, Defendant VerSteeg responded to a question on an Internet forum regarding whether Paragon had conducted a legal review as to whether PRG constituted

SECOND AMENDED CLASS ACTION COMPLAINT

a security by stating "Our tokens (product) passes the Howey Test, we have confirmed it with a few established US law firms.  Meaning it's not a security."[9]

139.    Similarly, on August 25, 2017, Defendant VerSteeg was quoted in an article stating that Paragon was "fully compliant with all regulations and aiming to become the golden standard for the industry in terms of the trust, verification, compliance, etc."[10]

140.    In reality, the Paragon ICO was never "SEC Compliant" and was never approved or even evaluated by the SEC until well after the ICO concluded.  Paragon's and the Founder Defendants' claims to the contrary strongly invited the inference that the SEC had actually somehow approved of the Paragon ICO.  To the contrary, as discussed below, in November 2018, the SEC found that the Paragon ICO was an unlawful unregistered offering.  Regardless, the Limited Discovery contains internal communications which undoubtedly evidence that the Founder Defendants were fully aware that the SEC had not approved of or otherwise given the nod to the Paragon ICO.  For example, on September 2, 2017, a potential investor used the Chat Function on Paragon's website to ask, *inter alia*, whether the Paragon ICO was compliant with SEC rules and regulations. ██████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████

**E.    Silencing Criticisms**

141.    As part of Paragon, the Founder Defendants' and the Executive Defendants' efforts to generate interest in the Paragon ICO and the purchase of PRG Tokens, they enlisted the services of a company operating out of Hong Kong named I AM MARKETING ("IAM").

142.    ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

---

[9] David Sonstebo (u/DavidSonstebo), REDDIT (Aug. 20, 2017, 2:54 PM), https://www.reddit.com/r/Iota/comments/6uxipy/iota_paragoncoin_david_s%C3%B8n steb%C3%B8_jessica_versteeg/ (last visited June 7, 2019).

[10] Avi Gable, *Interview with Jessica Versteeg – Founder of ParagonCoin*, URBAN CRYPTO (Aug. 25, 2017),  https://urbancrypto.com/interview-jessica-versteeg-founder-paragoncoin/.



145.   In addition to the foregoing evidencing the deceptive methods Paragon used in conducting the PRG Offering, such actions also evidence that Paragon solicited investments in the Paragon ICO by ensuring that potential PRG Token purchasers believed Paragon's claims regarding the profit potential from purchasing and owning PRG Tokens.

## IV.   FRAUDULENT CONDUCT DURING AND FOLLOWING THE PARAGON ICO

### A.   Fraudulent Claims Regarding the ICO Proceeds

146.   On August 16, 2017, just two days into the so-called *Presale* PRG Offering, Defendant VerSteeg uploaded a video, *available at* https://www.youtube.com/watch?v=9C6M9QJlcJI, in which she proclaimed:

Hi guys, so just a quick update on our token presale.  It's only been live for two

days and we've already allocated 22 million out of 100 million tokens. Also, a huge P.R. campaign is going to be rolling out soon with a 2 million dollar marketing budget.

147.    If Defendant VerSteeg's claim that Paragon "allocated 22 million out of 100 million tokens" was truthful, then as of August 17, 2017, the ICO Proceeds had already raked in approximately $16.5 million.   However, this claim is belied by the SEC Order's findings of fact, which stated that, by October 15, 2017—two months after VerSteeg's video—Paragon had only raised $12.6 million from its sale of PRG Tokens.

148.    If the SEC findings are true, then VerSteeg's August 2017 representations were clearly false.  Moreover, the Limited Discovery provided to Plaintiff Davy represents that, at most, as of October 15, 2017, Paragon had collected a mere ██ million from its sale of PRG Tokens.  Clearly, the foregoing representations regarding the dollar value of the ICO Proceeds were mutually contradictory and cannot all be true.  Thus, Paragon either issued numerous fraudulent statements regarding the success of its sale of PRG Tokens, produced false evidence in connection with this Action, or fabricated evidence in connection with the SEC's investigation into the Paragon ICO and subsequent Form 10 Filing.

149.    Like Defendant VerSteeg, Defendant Lavrov issued similar claims regarding the value of the ICO Proceeds.  For example, on August 25, 2018, Defendant Lavrov was quoted in an article entitled "ParagonCoin ICO – The $100 Mln Blockchain Run By a Model, A Rapper and the Father of the Russian Internet" as having stated, "[w]e've raised $25 out of the $100 million already.  Of that $22 million is friends and family and only $3 million is outsiders, we just announced a few days ago."

150.    Paragon circulated the following email to all former and prospective investors subscribed to the Company's email list:

Subject : SOLD OUT

WOW!

We didn't expect such a demand! All of the tokens with a fixed rate and the 15% bonus have sold out.

We're moving onto Stage 3 a bit ahead of time.

The minimum purchase has dropped to $10,000. Current bonus - 10%. Only

25,000,000 tokens are available for presale. We will sell out earlier. Get an extra 5% with a referral link, ask for the link in our Telegram chat

10k minimum, 15% maximum bonus[11]

the Company "SOLD OUT" of 70,000,000 PRG Tokens, priced between $0.75 and $0.90[12].

151.    In stark contrast to these prior claims of success, shortly following the initiation of this Action, Paragon and the Founder Defendants began claiming that the ICO Proceeds were actually worth significantly less than the $60-70 million implied by their prior statements.  For example, the Limited Discovery contains a document in which Paragon and the Founder Defendants claim that the ICO Proceeds were comprised of *precisely*: ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.  Based on the foregoing representations and each of these virtual currencies' respective valuations relative to USD on October 15, 2017, the ICO Proceeds carried a valuation of approximately ████████.[13]  More specifically, the following chart conveys the dollar value of the ICO Proceeds based on the prevailing market price for each of the foregoing digital currency assets on October 15, 2017.

| Digital Currency | Exchange Rate as of October 15, 2017 | Amount Raised (Per Limited Discovery) | Approximate dollar value of ICO Proceeds Per the Limited Discovery |
|---|---|---|---|
| 1 BTC | $5,678.19 | ████ | ████ |
| 1 ETH | $342.72 | ████ | ████ |
| 1 LTC | $65.47 | ████ | ████ |

---

[11] *See also* JD Alois, *The Paragon ICO is Just Killing it as the Token Pre-Sale Sells Out*, CROWDFUNDINSIDER.COM (Sept. 26, 2017, 10:30 p.m.), https://www.crowdfundinsider.com/2017/09/122405-paragon-ico-just-killing-token-pre-sale-sells/.

[12] *See id.*

[13] On January 30, 2018, the date on which this action was initiated, the foregoing assets were worth approximately ████.

| | | | |
|---|---|---|---|
| 1 DGB | $0.0092 | ███ | ███ |
| 1 XRP | $0.26 | ███ | ███ |
| 1 ETC | $11.95 | ███ | ███ |
| 1 ZEC | $232.63 | ███ | ███ |
| 1 WAVES | $3.80 | ███ | ███ |
| 1 USDT | $1.00 | ███ | ███ |
| 1 DASH | $309.51 | ███ | ███ |
| 1 BCH | $314.95 | ███ | ███ |
| 1 XMR | $94.87 | █ | ███ |
| 1 NXT | $0.067413 | ███ | ███ |
| **ICO Proceeds (per Limited Discovery) USD Valuation** | ███ | | |

152.     The foregoing does not comport with the SEC Order's findings of fact which state that "[t]hrough the offering, Paragon raised a total of $12,066,000, as measured in the U.S. dollar equivalent of these various digital assets at the close of the offering."  Similarly, as discussed *infra*, such is also in stark contrast to Paragon's "audited" financials from its belated Form 10 filing.

153.     Indeed, an analysis of the bitcoin blockchain and ethereum blockchain indicates Paragon and the Founder Defendants collected least 23,462 ethereum ("ETH") and 1,530 BTC as of October 15, 2017 – which, based on the same exchange rates above, was worth at least $16,728,527.34.

154.     In short, absent comprehensive discovery or a full accounting of the amounts raised in connection with the Paragon ICO, there is no way to verify which of Paragon's statements accurately represent the amount raised.  However, what can be stated with certainty is that Paragon's statements to investors about having sold out were materially false and misleading at the time that they were made.  Moreover, given that the Paragon Defendants were fully in control of the distribution of PRG Tokens and the disposition of their proceeds, they absolutely, unavoidably knew that these statements were false when made.

**B.      January 30, 2018-Plaintiff Davy Files this Action and Paragon and the Founder Defendants Create ParagonCoin Ltd. (Gibraltar)**

155.    Paragon and the Founder Defendants claim that in the process of creating Paragon Account, investors were required to agree to the "Token Crowdsale Terms"—which were purportedly entirely different terms than those contained in the White Paper, "RISK FACTORS" or "TERMS OF USE" sections of the Paragon Website.

156.    Paragon and the Founder Defendants claim that the Token Crowdsale Terms purportedly established a contract between Paragon ICO investors and "ParagonCoin Ltd. (Gibraltar)," a private limited company organized under the laws of Gibraltar acting as the issuer of PRG Tokens." They also claim that the terms also purportedly included a "BINDING ARBITRATION CLAUSE AND CLASS ACTION WAIVER."

157.    However, if the Token Crowdsale Terms did exist during the Paragon ICO – a claim that Paragon and the Founder Defendants have made that appears dubious on its face – such terms still could not have constituted a binding agreement given the fact that "ParagonCoin, Ltd. (Gibraltar)" **did not exist** until January 30, 2018—the day this Action was initiated.

158.    As discussed *supra*, on January 30, 2018, a company named Nocturne, whose owners were entirely unrelated to Paragon, and which had been inactive since its incorporation in April 2017, suddenly:

- was renamed "ParagonCoin, Ltd. (Gibraltar)";
- filed an amended articles of association;
- filed an updated certificate of incorporation;
- had its sole shareholder, Mazel, transfer all of its ownership in Nocturne/ParagonCoin, Ltd. (Gibraltar) to VerSteeg;
- terminated its sole director; and
- appointed four new directors: (1) VerSteeg, (2) Lavrov, (3) Zegelman, and (4) Humphries.

159.    Accordingly, "ParagonCoin Ltd. (Gibraltar)" simply **did not exist** during the Paragon ICO, and thus, the so-called: "PARAGONCOIN, LTD TOKEN CROWDSALE TERMS" either (a) did not itself exist or (b) did not constitute a valid contract as "ParagonCoin, Ltd. (Gibraltar)" did not exist and thus, it would be have been impossible for any investor to have entered into a contract with it.

160.     Furthermore, per the plain language reading of the purported Token Crowdsale Terms, the agreement explicitly states that it only applied to Paragon ICO investors who participated from September 15, 2017 through October 15, 2017:

> 1. **Commencement and Duration of the Crowdsale.**  The Company will conduct a public crowdsale of Tokens (the "Crowdsale"), which will begin at 11 am Pacific Standard Time on September 15, 2017 (the "**Launch Date**") and end at 11:59 pm Pacific Standard Time on October 15, 2017(the "**Crowdsale End Date**").

161.     As noted *supra*, Lead Plaintiff Holland invested in the Paragon ICO on September 10, 2017, and thus, even if ParagonCoin, Ltd. (Gibraltar) had existed during the Paragon ICO, which it did not, by the plain language of the purported Token Crowdsale Terms, Holland's investment would not have been covered by the terms.

**C.     January-March, 2018: Paragon Uses Cryptocurrency to Purchase the Tamarind Property**

162.     Defendant Paragon purchased the commercial property located at the Tamarind Property with cryptocurrency in January 2018.   On January 17, 2018, Defendant VerSteeg incorporated "ParagonSpaces, LLC" in as a California limited liability company.   This initial filing listed the Tamarind Property as ParagonSpaces' "Business Address":



**2 0 1 8 0 1 8 1 0 3 2 2**

**Secretary of State**
**Articles of Organization**
Limited Liability Company (LLC)

LLC-1

**FILED**
Secretary of State
State of California

JAN 1 7 2018

IMPORTANT — Read Instructions before completing this form.

**Filing Fee   –   $70.00**

Copy Fees   –   First page $1.00; each attachment page $0.50;
                        Certification Fee - $5.00

*Note:*  LLCs may have to pay minimum $800 tax to the California Franchise Tax Board each year.  For more information, go to *https://www.ftb.ca.gov.*

This Space For Office Use Only

1.  **Limited Liability Company Name** (See Instructions – Must contain an LLC ending such as LLC or L.L.C.  "LLC" will be added, if not included.)

ParagonSpaces LLC

2.  **Business Addresses**

| a. Initial Street Address of Designated Office in California - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 1463 Tamarind Ave. | Hollywood | CA | 90028 |
| b. Initial Mailing Address of LLC, if different than item 2a | City (no abbreviations) | State | Zip Code |

SECOND AMENDED CLASS ACTION COMPLAINT

1

2    163.    On January 30, 2018, Paragonspaces, LLC was granted the deed to the Tamarind

3    Property:

## PROVIDENT TITLE COMPANY

**RECORDING REQUESTED BY:**
7 Star Escrow, Inc.
Order No. 10392390
Escrow No. 2288-ES
Parcel No. 5545-014-005, 5545-014-006

**AND WHEN RECORDED MAIL TO:**

PARAGON SPACES, LLC OR
AFFILIATED ENTITY
1461 Tamarind Avenue
Hollywood, CA 90028

                                        SPACE ABOVE THIS LINE FOR RECORDER'S USE

### GRANT DEED                    4,125.⁰⁰    16,875.⁰⁰

THE UNDERSIGNED GRANTOR(S) DECLARE(S) THAT DOCUMENTARY TRANSFER TAX IS $4,070.00 and CITY $16,650.00
☒  computed on full value of property conveyed, or
☐  computed on full value less liens or encumbrances remaining at the time of sale.
☐  unincorporated area:                ☒  Los Angeles, and

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, **1461 Tamarind, LLC a California Limited Liability Company**

hereby GRANT(S) to . Paragonspaces, LLC, a California Limited Liability Company

the following described real property in the County of **Los Angeles**, State of California:
See attached 'Exhibit A'
More commonly known as: **1459 And 1463 Tamarind Avenue, Hollywood Area, Los Angeles, CA 90028**

Date    January 30, 2018

1461 Tamarind, LLC a California Limited Liability
Company

By: Neil D Gitnick, Authorized Signer

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document
to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

STATE OF CALIFORNIA
COUNTY OF Los Angeles        } S.S.

On February 2, 2018 , before me, Jackie Impellizzeri Lowry, Notary Public
personally appeared **Neil D Gitnick**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and
correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

**JACKIE IMPELLIZZERI LOWRY**
Notary Public - California
Los Angeles County
Commission # 2156270
My Comm. Expires Jul 9, 2020

SECOND AMENDED CLASS ACTION COMPLAINT

164.     The foregoing timeline also corresponds with Paragon's public announcement regarding the acquisition, which took place on March 12, 2018, and read, in relevant part:

ParagonSpace Announcement

Paragonians! We promised you big news this month, and the big news has arrived. We have secured the location for the first ever ParagonSpace in Los Angeles and will be **paying exclusively in cryptocurrency**. The purchase of this building represents one of the first all crypto real estate deals of its kind! On top of all that - our first building will be in the heart of Hollywood!

Our planned opening date is the **1st of July** - so get your PRG wallets ready! Sign-ups for the space will be up and running on the **20th of April**, so be sure to apply for space before it's all gone. Don't worry though, we will send you a reminder in advance!

ParagonCoin, *Paragon has a big update!,* Paragoncoin.com (Mar. 12, 2018), https://paragoncoin.com/paragon-has-a-big-update (emphasis in original).

165.     Similarly, on March 12, 2018, Paragon published the following image on its Facebook account:



166.     Additionally, on March 12, 2018, Paragon issued a press release on *PR Newswire* entitled "Leading Cannabis Blockchain Platform Paragon To Open Co-Working Space For Cannabis Companies in Los Angeles," which stated, in relevant part:

Paragon, the leading blockchain technology platform for the cannabis industry, has secured their first co-working space located in Los Angeles (Hollywood).  The building is in escrow and is being fully paid in crypto.

167.     In short, public records clearly show that Paragon obtained ownership and took title to the Tamarind Property free and clear of any mortgage on January 30, 2018 and was certainly already in possession of the space by March 2018.  Accordingly, it is bizarre that Paragon's Form 10 which was filed with the SEC on March 29, 2019 states that the Tamarind Property was "acquired by our affiliate ParagonSpaces LLC ("ParagonSpaces") on May 1, 2018."  The Form 10 continues to state:

> The purchase price was $3,750,000. A third-party loan of $2,450,000 was obtained from the Keystone Real Estate Lending Fund, L.P. with the interest rate of 7.99% per annum, and the maturity date on May 1, 2019. The total amount of down payment of $1,565,624.76 was paid by ParagonCoin. The total amount paid for the property at closing on May 1, 2018 was $4,015,624.76

168.     While the Form 10 may include purported mortgage documents, the reality is, ParagonSpaces received the deed to the Tamarind Property well in advance of the May 1, 2018 purported closing date.

**D.     The Limited Discovery's Estimated Financials vs. the Form 10's Financials**

169.     Paragon's Form 10 filing contains audited financials that are dramatically different from the estimated financials Paragon and the Founder Defendants provided via the Limited Discovery.  For example, the Limited Discovery includes the following chart detailing Paragon's assets as of December 31, 2017:

## Assets

| Asset Type | Description | 12/31/17 Prior Year |
|---|---|---|
| Current Assets | Cash | |
| Current Assets | Crypto | |
| Current Assets | Inventories | |
| Current Assets | Accounts receivable | |
| Current Assets | Pre-paid expenses | |
| Fixed Assets | Property and equipment | |
| Fixed Assets | Leasehold improvements | |
| Fixed Assets | Equity and other investments | |
| Fixed Assets | Less accumulated depreciation (Negative Value) | |
| Other Assets | | |
| **Total Assets** | | |

SECOND AMENDED CLASS ACTION COMPLAINT

170.   In contrast, Paragon's Form 10 filing contains the following:

**ParagonCoin Limited**
**Combined Balance Sheets**
**December 31, 2018 and 2017**

| | 2018 | 2017 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $        36,559 | $    1,141,010 |
| Other current assets | 4,994 | - |
| Digital assets - cryptocurrency | 54,106 | 10,609,910 |
| Total Current Assets | 95,659 | 11,750,920 |
| | | |
| Non-Current Assets: | | |
| Building, property, and equipment, net | 3,915,384 | 39,343 |
| Digital assets - PRG tokens | 54 | - |
| Total Non-Current Assets | 3,915,438 | 39,343 |
| | | |
| TOTAL ASSETS | $    4,011,097 | $   11,790,262 |

171.   The Form 10 audited financials states that "[c]ash and cash equivalents" as of December 31, 2017 were $1,141,010—nearly identical to Paragon's estimated "[c]ash" as of December 31, 2017 set forth in the Limited Discovery, ███████. The same cannot be said for the "[d]igital assets - cryptocurrency" categories in the two financial statements. The Limited Discovery estimated the value of Paragon's cryptocurrency holdings as of December 31, 2017 at approximately ███████ whereas the Form 10 audited financials valued these same assets as just $10,609,910—████████████ ███ than the estimated financials contained in the Limited Discovery.

172.   The vast difference in Paragon' estimated assets as of December 31, 2017 compared to those set forth in the Form 10 is so great that it cannot reasonably be considered the result of mere human error. In addition to the foregoing, the Form 10 includes the following:

**ParagonCoin Limited**
**Combined Statements of Operations**
**For the periods ended December 31, 2018 and 2017**

| | 2018 | 2017 |
|---|---|---|
| Net revenues | $        4,353 | $            - |
| | | |
| Operating Expenses: | | |
| General and administrative | 4,262,112 | 904,516 |
| Sales and marketing | 1,444,964 | 2,097,797 |
| Impairment loss on cryptocurrency | 17,832 | 81,180 |
| Depreciation - building | 94,895 | - |
| Depreciation - other | 16,883 | 2,230 |
| Total Operating Expenses | 5,836,687 | 3,085,722 |
| | | |
| Loss from operations | (5,832,334) | (3,085,722) |
| | | |
| Other Income/(Expense): | | |
| Net realized gains/(losses) on cryptocurrency holdings | (4,141,987) | 4,336,187 |
| Cost of PRG offering | - | (2,040,880) |
| Interest expense | (185,467) | (16) |
| Total Other Income/(Expenses) | (4,327,454) | 2,295,291 |
| | | |
| Net loss before income taxes | (10,159,787) | (790,431) |
| | | |
| Provision for income taxes | - | - |
| | | |
| Net Loss | $(10,159,787) | $    (790,431) |

See accompanying notes to combined financial statements.

SECOND AMENDED CLASS ACTION COMPLAINT

173.    Evidently, Defendants claim to have had a net operating loss of $10,159,787 for 2018, resulting in its current total assets as of December 31, 2018, being just $95,659.  According to the Form 10, Paragon expended $3,002,313 and $5,707,077 on "general and administrative" expenses in 2017 and 2018, respectively.  The Form 10's financials essentially paint a picture in which Paragon—a company whose only business plan was to buy real estate—began 2018 with over $11 million in cash and cryptocurrency and concluded 2018 with approximately $50,000 in cash and the Tamarind Property, which Paragon is now selling to pay off a mortgage loan of $2.5 million and, of course, pay off a "bridge loan" of $250,000 that the Founder Defendants purportedly loaned to the Company.

174.    With respect to intended sale of the Tamarind Property, the Form 10 states:

We currently own a property located 1463 Tamarind Ave, Los Angeles, CA 90028, acquired by our affiliate ParagonSpaces on May 1, 2018.

The property is located on a lot with a size of 8,405 square feet (0.19 Acres). The property consists of 3 detached buildings and a garage, 1 story high, with a total of 4,364 square feet.

The terms of the purchase of the property were as follows: The purchase price was $3,750,000. A third-party loan of $2,450,000 was obtained from the Keystone Real Estate Lending Fund, L.P. with the interest rate of 7.99% per annum, and the maturity date on May 1, 2019. The total amount of cash down payment of $1,565,624.76 was paid by ParagonCoin. The total amount paid for the property at closing on May 1, 2018 was $4,015,624.76.

We have standard property insurance policies that were obtained through Sentinel Insurance Company, Limited.

This property is now under contract for sale at a price of $4,200,000 as we have determined not to pursue this aspect of our initial business plan at this time.

We currently do not intend to renovate, improve, or develop other properties. We currently do not intend to make further investments in real estate or acquire any interests in real estate and do not intend to make investments in real estate mortgages.  Further, we do not intend to make investments in securities of or interests in persons primarily engaged in real estate activities.

175.    The Form 10 further states that rather than invest in real estate, the Company intends on "[c]ontinuing and finishing development of our computer software to drive revenues."  However, Paragon has not worked on development of its "computer software" since at March 2018.[14]

176.    In other words, Paragon and the Founder Defendants are in the closing stages of their scheme in which Paragon sells the only asset it has, promises not to invest in real estate or the idea of ParagonSpaces,[15] and then blames SEC regulations for its failure.[16]

177.    As set forth above, there are various reasons for which the Form 10 financials cannot be relied upon.  However, even if one were to give them the benefit of the doubt, these financial statements reveal inappropriate related party transactions—such as $461,788 in payments to Defendant Lavrov's company in 2017 for marketing services—and confirms the fact that Paragon expended millions of investor funds on soliciting more funds from investors—an expenditure that was certainly not disclosed or described in any respect in the Paragon ICO's prospectus/White Paper.

178.    Furthermore, there are indications that the Paragon Defendants may have purchased additional real estate—however, such properties were purchased through intermediaries and shell corporations to conceal the identities of their ultimate owners.  For example, in late-2017 or early-2018, the Founder Defendants moved into the multi-million dollar property located at 8448 Harold Way Los Angeles, CA 90069.  This property was sold for $3,500,000 to a high-end real estate broker on October

---

[14] See ParagonCoin, *Repositories*, REDDIT, https://github.com/paragon-coin?tab=repositories (last visited June 7, 2019) (the public workspace where Paragon managed its programming projects which shows that Paragon made two contributions to its projects throughout its existence, the first on September 15, 2017 and the second on March 10, 2018).

[15] According to the Form 10, ParagonSpaces was, by far, the Company's largest source of revenue for 2018 ($4,300), the second largest source of revenue was PRG transaction fees ($54).  Form 10 at F-10.

[16] See Guillermo Jimenez, *SEC enforcement has decimated ICO-funded startup ParagonCoin*, DECRYPT (Apr. 24, 2019), https://decryptmedia.com/6688/sec-enforcement-decimated-ico-paragoncoin (while this article is not expressly sponsored by Paragon, the article's spin on the story stands in stark contrast to the overwhelming majority of articles and unaffiliated posters on Internet cryptocurrency forums. *See, e.g.*, Cali Haan, *SEC-Sanctioned Paragon Crypto Project Selling its Cannabis Co-Working Space*, CROWDFUNDINSIDER.COM (Apr. 25, 2019, 1:41 AM), https://www.crowdfundinsider.com/2019/04/146763-sec-sanctioned-paragon-crypto-project-selling-its-cannabis-co-working-space/

17, 2017, just two days following the conclusion of the official Paragon ICO, renovated throughout much of 2018, and then sold to Golden Rock, LLC, a recently incorporated Delaware Limited Liability Company, in March 2019. Records from public databases indicate that as of April 2019, the Founder Defendants still reside in this property.

179.   In fact, the 8448 Harold Way property was managed and "sold" by The Crypto Realty Group[17]–which describes itself as "a Los Angeles–based firm specializing in conducting real estate transactions with cryptocurrency."

180.   It is important to note that Paragon has yet to fully pay the civil fines the SEC issued against it nor provide rescission of any investments to Paragon ICO investors.  In fact, there have been numerous reports from PRG investors on cryptocurrency-focused Internet forums expressing extreme dissatisfaction with Paragon's actions since the SEC Order was issued.  For example, on April 21, 2019, a user on the ParagonCoin forum on Reddit.com posted a comment on a Paragon related thread stating the following:

> Paragon Coin stole 10's of millions of dollars through an illegal coin offering –
> they promised to be transparent about everything but haven't been transparent
> about anything.

181.   Similarly, that same day, a different user explained their frustrations regarding the Form 10 filing and Paragon's evasiveness regarding the claims procedure:

> Truth is, they are upside down in both coins, and having to make investors whole
> at face value (when Bitcoin was approx 4500 and ETH was over 250) will cause
> them to lose even more money so they are trying to play a waiting game with
> investors in the ICO who want their money (with interest) back and make it difficult
> or nearly impossible to get the money they rightly deserve paid back to them in
> some kind or organized, straightforward fashion.
>
> Here   is   the   DRAFT   version   from   their
> website. https://paragoncoin.com/Claim_Form.pdf and the referred to site within
> the form https://claims.paragoncoin.com/ remains "under construction".
>
> To make matters worse, Paragon Coin shut down their telegram channel and have
> become extremely evasive about what this claim form is, where it is located on the

---

[17] *See* Piper Moretti, *8448 Harold Way, Los Angeles, CA 90069*, THE CRYPTO REALTY GROUP, https://www.thecryptorealtygroup.com/homes-for-sale-sold-details/8448-HAROLD-WAY-LOS-ANGELES-CA-90069/18415334/306/ (last visited June 7, 2019).

site, what the active dates are in time for filing the claim, et al, all in the name of getting around trying to provide the lawful and correct information that has been demanded by the SEC in the timeframe they agreed to.

If you are an investor, REPORT THIS!

Screwing around and not being transparent will cause many more problems for them.

Since neither Lavrov, Versteeg nor Paragon Coin don't seem to want to be in compliance, I would suggest you contact Pamela Sawhney at the SEC in NYC or Robert A. Cohen with the SEC who were responsible for leading and supervising the investigations against Paragon Coin so that they step up the pressure to get everyone paid back and made whole, immediately.

182.    In short, and as set forth herein, the Founder Defendants have consistently engaged in deception and manipulation throughout the entirety of the PRG Offering and the pendency of this action.  Based on the ongoing fraud, Paragon and each of the Paragon Defendants responsible for Paragon's fraudulent scheme have been unjustly enriched, and should be compelled to disgorge the financial benefits that each obtained as a result of their fraudulent and manipulative acts.

E.    **Market Manipulation**

183.    As set forth *supra*, PRG Tokens have never had any actual value.  Accordingly, immediately after PRG was listed on cryptocurrency trading platforms, its trading price plummeted. For example, following is a chart showing PRG's trading price over its first few days of trading:



SECOND AMENDED CLASS ACTION COMPLAINT

184.    In fact, PRG Token has never traded on public markets for greater than $2.50—the price the Paragon Defendants state it would not fall below.  Moreover, the overwhelming majority of trading that has occurred in PRG has taken place on STEX, a virtual currency exchange owned by Defendant Kurylovych.  For example, on June 10, 2019, 100% of all PRG trades executed within the preceding 24 hours took place on STEX.[18]  Similarly, an estimated 93% of all PRG trades since its creation took place on STEX.[19]  Because this trading takes place on an exchange, details on these trades are not publicly available and thus, there is no way to ascertain whether such trades are legitimate.  However, the mere fact that there is little to no trading of PRG taking place on the public blockchain or any other digital exchange other than the sole exchange owned and operated by defendants is highly suspect.

185.    Moreover, there are significant indications that the few trades that do involve different exchanges are wash trades designed to simulate trading where there is none.  Indeed, analysis of publicly available trading data for PRG indicates that much, if not most, of the trading in PRG since at least December 2017 has been wash trades.  For example, on February 22, 2018, an account beginning with 0xe12a89 withdrew 7,393 PRG from a third-party exchange named Tidex.[20]  In less than 3 days, that account transferred 7,393 PRG to an account beginning in 0x79de35 which immediately transferred 7,393 PRG back onto the Tidex exchange.[21]  The foregoing transactions accomplished no purpose whatsoever other than to simulate trading activity in PRG.

186.    In addition to the foregoing, there have been multiple extreme surges to PRG's trading price in the absence of any news that would cause increased investor activity.  For example, between December 31, 2018 and January 1, 2019, PRG's trading price inexplicably surged 10,280% from $0.10

---

[18] *See* CoinMarketCap, *Paragon*, COINMARKETCAP.COM, https://coinmarketcap.com/currencies/paragon/#markets (last visited June 7, 2019).

[19] *Id.*

[20] Etherscan, *Paragon Token Holder 0xe12a89296797a1b6ae7cd30d1f11518952140b10*, ETHERSCAN.IO, https://etherscan.io/token/0x7728dfef5abd468669eb7f9b48a7f70a501ed29d?a=0xe12a 89296797a1b6ae7cd30d1f11518952140b10 (last visited June 7, 2019).

[21] Etherscan, *Paragon Token Holder 0x7de35df54c506acc27c0550c36ceab0fec9fe2bc*, ETHERSCAN.IO, https://etherscan.io/token/0x7728dfef5abd468669eb7f9b48a7f70a501ed29d?a=0x7de3 5df54c506acc27c0550c36ceab0fec9fe2bc.

to $10.28 on unusually heavy trading, despite no apparent news being released concerning Paragon or PRG at the time. Unsurprisingly, over 96% of PRG trading during this period took place on the STEX virtual exchange. As noted, STEX is owned by Paragon's CFO and an obscure exchange and thus, the massive surge in PRG's trading price due to purported trades thereon is highly suspect in itself. This fact did not go unnoticed amongst commentators. For example, one article discussing PRG Token's improbably surge in value noted that:

> Interestingly for Paragon, all the activity emanated from one market, the little-known STEX crypto exchange. STEX ranks 72nd by CoinMarketCap by daily trading volume. In the last 24 hours, the exchange facilitated $4.4 million worth of trades. Of this, $3.9 million was Paragon, accounting for 88 percent of the entire trade volume.[22]

187. Interestingly, rather than respond to accusations from investors that it was manipulating PRG Token's price, Paragon's former forum moderators requested that all posts related to Paragon Coin made on a cryptocurrency forum *not* moderated by Paragon as well as articles discussing indications of manipulative trading in PRG be suspended. [23]

188. Importantly, the Paragon Defendants' express intention to manipulate the PRG Token price was explicitly set forth in the Paragon ICO's Prospectus/White Paper. More specifically, the White Paper stated that Paragon would maintain a "Controlled Reserve Fund" with "two core functions to keep PRG stable." As expounded in the White Paper, this fund would be used to "[r]elease PRG to the markets if PRG deflates too fast and pushes token prices up too rapidly" or "[b]uy PRG from the market if PRG price devalues too much." Paragon elaborated on the second "core function" by

---

[22] Steve Kaaru, *Weed Industry Crypto Paragon Coin Gains 9,690%, Growth Concentrated on One Market*, NULLTX (Jan. 1, 2019), https://nulltx.com/paragon-gains-9330/; *see also* Mike Dalton, *Cannabis Coin 'Paragon' Temporarily Skyrockets After Probable Price Manipulation*, UNHASHED (Jan. 2, 2019), https://unhashed.com/cryptocurrency-news/cannabis-coin-paragon-temporarily-skyrockets-after-probable-price-manipulation/; Steve Kaaru, *Ethereum based Paragon coin pump-and-dump despite SEC's scrutiny*, AMBCRYPTO (Jan. 4, 2019), https://ambcrypto.com/ethereum-based-paragon-coin-pump-and-dump-despite-secs-scrutiny/; Kai Sedgwick, *Pump and Dumps Are the Final Indignity for Dying Coins*, BITCOIN.COM (Jan. 1, 2019), https://news.bitcoin.com/pump-and-dumps-are-the-final-indignity-for-dying-coins/.

[23] Coach K (u/Crypto_edu), REDDIT (Jan. 1, 2019, 10:55 AM), https://www.reddit.com/r/ParagonCoin/comments/abj5v9/you_guys_seen_paragon_today_this_is_a_perfect/.

explaining that "PRG may become subject to excessive sell volume resulting in a significant drop in price. To counter this, the Reserve Fund can intervene by buying back PRG in an effort to stabilize the market price." In light of the fact that the White Paper stated that Paragon would actively manipulate PRG's trading price, it should come as no surprise that it did—but not to maintain a $2.50 trading price, but rather to delay its inevitable complete collapse long enough to secret away any remaining ICO Proceeds.

## V.   PRG TOKENS ARE INVESTMENT CONTRACT SECURITIES

189.   This Action alleges claims under Sections 12(a)(1) and 15(a) of the Securities Act [15 U.S.C. §§ 77l(a)(1), 77o(a)], and are based solely on allegations of strict liability.

190.   It is indisputable that Defendants offered and sold PRG Tokens. For example, as stated in the White Paper, during the Paragon ICO, the Company was offering "100,000,000 tokens **for sale** valued at $1.00 each at stage one." (emphasis added).

### A.   The Terms of the Paragon ICO Presented an Investment Offer

191.   The Paragon ICO was obviously an offer and sale of securities. Indeed, it is clear that investors were purchasing PRG Tokens with the expectation that PRG Tokens received would subsequently be worth more than virtual currency invested.

192.   While the White Paper claims that PRG Tokens were sold based on a value relative to USD, as noted, investors could only invest in the Paragon ICO using virtual currencies. Furthermore, contrary to the White Paper's claims, PRG Tokens were not sold for a consistent $1 for one PRG Token throughout the Paragon ICO. Rather, in order to entice early investments, dependent on the date in which the investment was made, the Paragon ICO involved the offer and sale of one PRG Token for $0.75–$2.50, payable in BTC, ETH, LTC, DASH, ZEC, XRP, XMR, ETC, WAVES, and other virtual currencies.

193.   In short, the terms of the Paragon ICO clearly evidence that Defendants' offer and sale of PRG Tokens was the offer and sale of unregistered securities in violation of the federal securities laws.

**B.    Investing in the Paragon ICO Subjected Plaintiffs and the Class to Financial Loss**

194.    In investing in the Paragon ICO, Plaintiffs and other investors were investing their assets and subjecting themselves to financial loss.  As stated in the White Paper's "RISKS" section:

- "You should carefully consider and evaluate each of the following risk factors . . . the trading price of PRG Tokens (in the case where they are listed on a cryptocurrency exchange) could decline due to any of these considerations, uncertainties or material risks, and you may lose all or part of your PRG Tokens."

- "[T]he Company cannot ensure that there will be any demand or market for PRG Tokens, or that the Purchase Price is indicative of the market price of PRG Tokens after they have been made available for trading on a cryptocurrency exchange."

- "Further sales or issuance of the PRG Tokens could materially and adversely affect the market price of the PRG Tokens."

- "[T]he development of the PARAGONCOIN platform and launch of the anticipated PARAGONCOIN future business lines may not be completed and there is no assurance that it will be launched at all.  As such, distributed PRG Tokens may hold little worth or value."

- "Any events or circumstances which adversely affect ParagonCoin, Inc. . . . would correspondingly have an impact on the utility, liquidity, and the trading price of the PRG Tokens."

195.    As is obvious, the "RISKS" were primarily tailored to discussing numerous ways in which Plaintiffs and the proposed Class could lose their investments due to the PRG Token's loss in value or lack of liquidity.  Thus, an investment of BTC or ETH in purchasing PRG Tokens clearly satisfies the requirement of potential financial loss, and thus the investment of money requirement, in the Ninth Circuit.

196.    In short, to participate in the Paragon ICO and receive PRG Tokens, participants were required to invest financial assets in the form of BTC, ETH, or other virtual currencies, and such investments subjected investors to the risk of financial loss.  Thus, the first element of the *Howey* test is plainly met.

**C.    The Economic Realities of Purchasing PRG Tokens**

197.    When determining whether a security has been offered and sold, the focus must be on the economic realities underlying the transaction.  Here, the economic realities are that Plaintiffs and the Class invested ETH, BTC, and various other virtual currencies in order to receive PRG Tokens,

which they were conditioned to expect would be worth more than their initial virtual currency investments.  Indeed, the White Paper is replete with statements that the PRG Tokens were expected to appreciate in value and were an investment opportunity.  For example, the White Paper stated that their organization and plans would "quickly strengthen the legalization movement and [was] expected to positively influence the demand for and respectively value of Paragon's cryptocurrency, PRG."

198.   Plaintiffs' and the Class' investments of ETH, BTC, LTC, and other virtual or fiat currencies constitute an investment of money in an investment contract.

199.   Plaintiffs and the Class were investing in a common enterprise with Defendants, as the Paragon ICO investments were pooled under the control of Paragon, the Founder Defendants, and the Executive Defendants.

200.   As explicitly provided in the White Paper:

The PARAGONCOIN platform is developed, operated, and maintained by ParagonCoin, Inc. Any events or circumstances which adversely affect ParagonCoin, Inc. or any of its successor operating entities (collectively referred to herein as "ParagonCoin, Inc.") may have a corresponding adverse effect on the PARAGONCOIN platform and any future business lines.  Such adverse effects would correspondingly have an impact on the utility, liquidity, and the trading price of the PRG Tokens.

201.   Additionally, the White Paper stated:

ParagonCoin, Inc. may be materially and adversely affected if it fails to effectively manage its business operations as its business develops and evolves, which would have a direct impact on its ability to maintain the PARAGONCOIN platform and/or launch any future business lines.

202.   Additionally, according to the White Paper, Paragon's "[f]ounders and team members" would be prohibited from "liquidating" more than 20% of their PRG Tokens in the first calendar year, as this would "keep a stable token price" and "**keep[] their interests aligned** with the Paragon community." (emphasis added).  The Founder Defendants, the Executive Defendants, and Taylor would qualify as Paragon's "[f]ounders" or "team members."

203.   Accordingly, it is obvious that any success from creating the PRG Token and future potential increases to the PRG Token's value was, and continues to be, entirely dependent on Defendants' actions.

204.    The value, and existence, of the PRG Tokens and the "PARAGON platform" have been at all times entirely dependent on Paragon's actions.  In fact, the White Paper explicitly stated:

The PARAGONCOIN platform is developed, operated, and maintained by ParagonCoin, Inc. Any events or circumstances which adversely affect ParagonCoin, Inc. or any of its successor operating entities (collectively referred to herein as "ParagonCoin, Inc.") may have a corresponding adverse effect on the PARAGONCOIN platform and any future business lines.  Such adverse effects would correspondingly have an impact on the utility, liquidity, and the trading price of the PRG Tokens.

205.    Similarly, the White Paper also stated that "[a]ny events or circumstances which adversely affect ParagonCoin, Inc . . . would correspondingly have an impact on the utility, liquidity, and the trading price of the PRG Tokens."  Accordingly, it is abundantly clear that the success of the Paragon platform tied the interests of the investors to those of the Paragon, the Founder Defendants, and the Executive Defendants, and was entirely reliant on their actions.

206.    Moreover, the success of Paragon's "business model"—and thus the value and profits stemming from the future valuation of PRG Tokens—aligned the interests of Paragon ICO investors and Defendants.  For example, when discussing Paragon's intention to purchase real estate with the ICO Proceeds, Lavrov stated, "we are hoping to profit on the value of PRG and not on the rent."

207.    With respect to the Promoter Defendants, their anticipated success at soliciting additional purchases of PRG Tokens was expected to increase the PRG Token's value.

208.    In short, the anticipated value of PRG Tokens was explicitly tied to, and dependent upon, the success of the Paragon business segments/platform, and thus the future potential increases to the PRG Token's value was at all times dependent on Defendants' actions.

209.    Additionally, Paragon routinely led Plaintiffs and the Class to expect profit from their purchase of PRG Tokens.  Indeed, the White Paper repeatedly stressed the profit potential from purchasing and owning PRG Tokens.  For example: "PRG is designed to appreciate in value as our solutions are adopted throughout the cannabis industry and around the world.  Our model incentivizes PRG owners to hold their tokens as long term [sic] growth assets . . . ."

210.    Furthermore, Paragon even stated they would create a separate fund of PRG Tokens that would be specifically earmarked for manipulating and artificially controlling the price of PRG Tokens.

Specifically, the White Paper stated that "40,000,000 [PRG] tokens [would be] allotted for Paragon controlled reserve to maintain price support of the PRG Tokens."

211. The "Controlled Reserve Fund" would have "two core functions to keep PRG stable." The "Controlled Reserve Fund" would be used to "[r]elease PRG to the markets if PRG deflates too fast and pushes token prices up too rapidly" or "[b]uy PRG from the market if PRG price devalues too much." Paragon elaborated on the second "core function" by explaining that "PRG may become subject to excessive sell volume resulting in a significant drop in price. To counter this, the Reserve Fund can intervene by buying back PRG in an effort to stabilize the market price."

212. Putting aside the illegality of a scheme to blatantly manipulate the market price of a security trading in the marketplace, this intention clearly exhibits Paragon, the Founder Defendants, and the Executive Defendants' message to prospective Paragon ICO investors that PRG Tokens would be appreciating in value—even if they had to manipulate its price upwards—and thus, represented an investment opportunity. In sum, the PRG Tokens are undoubtedly securities—specifically, "investment contracts"—under the *Howey* test, and the Paragon ICO thus constituted a sale of unregistered securities.

### D.    Purchasers Saw PRG Tokens as Investments

213. It is abundantly clear that PRG Token purchasers were conditioned to view their purchases as investments. For example, on September 2, 2017, another potential Paragon ICO investor sent the Company the following message via the Chat Function stating:

> Hello. I'm a personal investor in crypto currencies and considering investing during the upcoming Paragon ICO. I have a couple of general inquiries and was hoping you'd be willing to answer them.
>
> 1. Many recent ICO's have disallowed investments by U.S. residents. Will the upcoming Paragon ICO be opened to U.S. residents?
>
> 2. Has any due diligence been done to ensure the legality of investments by US investors? Most ICO's are disallowing investments because of expected SEC regulations.
>
> Thanks.

214. ████████████████████████████████



215.     Paragon received numerous inquiries via the Chat Function which plainly evince the fact that prospective and actual participants in the Paragon ICO viewed the opportunity as an investment. Following are a few examples of such messages from various interested parties:

- "[I]f I invest a couple of 100 dollars will I get it at 0.90?" (Aug. 19, 2017)

- "The Scope of our Contribution could be a combination of Advertising and Cash/ETH/BTC with a combined value of approx. USD 1 mill. Something in the o[r]der of WN Network advertising: USD 1 mill and CASH/ETH USD 100k. Subject to receiving a 50% discount for that investment" (Aug. 29, 2017)

- "I'm interested in your ico. Can you send me a prospectus?" (Sept. 2, 2017)

- "Hey I want to know what this is[.] [S]aw an article online and I want my mom to invest so I can have some collage [sic] money[.] [P]lease get Back to me asap." (Sept. 8, 2017)

216.     As noted, Plaintiffs' claims provide for strict liability and thus there is no scienter requirement. However, it should be noted that Paragon, the Founder Defendants, and the Executive Defendants have been fully aware that they have been selling investments since Paragon's inception. For example,

217.

218.

219.     Similarly, the Draft White Paper touted the Paragon ICO as follows:



220.

221.     Paragon and the Founder Defendants were fully aware of the fact that the Paragon ICO was a straightforward capital raise to fund the Company's operations (i.e., the solicitation of investment in a common enterprise).  For example,

222.   Perhaps most tellingly,

223.     Additionally, with respect to what Paragon's plan to actively manipulate the market price of PRG Tokens, the Draft White Paper stated:

224.   In light of such issues,

225.    In short, there is no question that all parties selling PRG Tokens and all parties purchasing PRG Tokens have at all times been fully aware that they were selling or purchasing investment opportunities.

## VI.    EACH OF THE DEFENDANTS WERE "SELLERS" OF PRG TOKENS

226.    As noted, each of the Plaintiffs were actively involved in researching Paragon and the Paragon ICO prior to purchasing their PRG Tokens.  Such research included reviewing virtual currency online forums, reading Paragon's publications, and viewing the Company's promotional videos. Accordingly, each of the solicitations outlined below were successful in soliciting Plaintiffs to purchase PRG Tokens.

227.    Each of the Defendants are considered "sellers" as each successfully solicited the purchase of PRG Tokens for their own or Paragon's financial benefit.

### A.    Paragon, the Founder Defendants and Black Rabbit

228.    It is indisputable that Paragon offered and sold PRG Tokens.  For example, as stated in the White Paper, during the Paragon ICO, the Company was offering "100,000,000 tokens **for sale** valued at $1.00 each at stage one."  (emphasis added).

229.    The facts are similarly indisputable that Paragon, the Founder Defendants and Black Rabbit participated in the offer and sale of PRG Tokens.  Specifically, the Founder Defendants and Black Rabbit created Paragon for the purpose of conducting the Paragon ICO and creating the "PARAGONCOIN platform."   "The PARAGONCOIN platform is developed, operated, and maintained by" Paragon.  Given that the Paragon ICO was conducted by Paragon, through its website, it is indisputable that the Founder Defendants and Black Rabbit, through Paragon, controlled and orchestrated Paragon's actions in conducting the Paragon ICO.

### Jessica VerSteeg

230.    VerSteeg was a key factor throughout Paragon's ICO, as she was the public face of the Company.  Additionally, VerSteeg was involved in every aspect of editing and revising the White Paper and oversaw most of the revisions to Paragon website.

231.    Indeed, VerSteeg was significantly involved in directing the design and content of Paragon's website and promotional materials.  For example, on August 14, 2017, VerSteeg emailed the

Company's web developer/marketing agency and stated, "About the presentation.[24]  Ill [sic] go page by page and I will re attach the presentation because I noticed you did not do the SEC compliant or the HIPPA compliment page and I wonder if it was left out of the version you got."   By the "SEC compliant" page, VerSteeg was referencing a slide in the Paragon ICO pitch deck which she was involved in drafting/editing:

# SEC Compliant


SEC ruling on TheDAO reaffirmed the Howey test
According to this test our ICO is NOT a security
We have legal opinions by two different US legal counsels confirming our compliance
We passed the test by Coinbase, also NOT a security

   

232.    As discussed *supra*, PRG Tokens are obviously securities under the *Howey* test, despite the purported "legal opinions by two different US legal counsels [sic]" stating the contrary.  Notably, neither of these two different US legal counsel or their "legal opinions" have been detailed publicly, nor have they been referenced at any point during the pendency of this Action.

233.    VerSteeg was also the point of contact for Taylor and directed his actions endorsing Paragon on numerous occasions.  For example, on August 7, 2017, VerSteeg emailed Taylor the following message:

> Good morning Game,
>
> Here is our pre announcement video and image
>
> Could you please post this image to IG [Instagram] today.
>
> You can just copy paste this for the text:

---

[24] In reference to Paragon ICO pitch deck that was released in conjunction with the White Paper.

A little pre-announce here with @Jessversteeg.  We are preparing a revolution in #cannabis with #blockchain.  We'll tell you more about our upcoming #ICO on August 15ᵗʰ. Go Follow @paragoncoin.

234.    As seen, VerSteeg even instructed Taylor as to the date, image, and precise words he should use when soliciting investors for the Paragon ICO.

235.    Given the fact that VerSteeg was intimately involved with drafting/editing the content in Paragon's promotional materials, Paragon's countless statements that PRG Token purchasers could expect profit from increases in value to their PRG Tokens are equally attributable to her.

236.    Additionally, VerSteeg also actively solicited investments in PRG Tokens from her personal Twitter Account.

**Egor Lavrov**

237.    Similarly, Lavrov also solicited investments in the Paragon ICO by drafting/editing Paragon's promotional materials and communicating directly with prospective, and actual, Paragon ICO investors.

238.    For example, on July 17, 2017, Lavrov circulated a draft Paragon ICO investor pitch deck to various parties, including VerSteeg and Bogorad, as an attachment to an email stating:

Dear Colleagues,

I believe this presentation contains all essential data about our project and serves as a main guideline for our white paper editor.

Please reply with your feedback and questions, I find it very important to have all feedback ready by the end of the day tomorrow (Pacific), so we can work full speed on the white paper.

Once white paper is done on our end (end of this week), we'll send it for your reviewal [sic] once again and make edits accordingly.

Thank you!

239.    Clearly, Lavrov was instrumentally involved in drafting the Paragon ICO's promotional materials and determining the contents of such.

240.    Lavrov communicated directly with prospective, and actual, Paragon ICO investors.  For example, on August 17, 2017, a potential investor used the Chat Function to inquire as to whether PRG Tokens would be listed on virtual currency exchanges.  Lavrov responded: "We have verbal agreements with Bittrex, [and] Liqui."  Both Bittrex and Liqui were popular cryptocurrency exchanges at the time.

241.    Similarly, on August 19, 2017, a different potential investor used the Chat Function to ask whether PRG Tokens would be listed on virtual currency exchanges.  Lavrov responded, "Bittrex."  Shortly thereafter, the same potential investor asked the following question: "[I]f I invest a couple of 100 dollars will I get it at 0.90?"  In response to this inquiry, Lavrov simply stated, ".95."  Following this, the investor stated that they "just sent $40, but will be sending more tomm. [sic] I am depositing more in my coinbase account," and Lavrov said "Thank you!"  This interaction exhibits a step-by-step interaction in which Lavrov successfully solicited the purchase of PRG Tokens.

242.    Furthermore, Lavrov personally instructed the Executive Defendants as to how they should respond to questions from potential investors.  For example, on September 2, 2017, a potential investor used the Chat Function to ask, *inter alia*, whether the Paragon ICO was compliant with SEC rules and regulations.  ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████  In short, Lavrov was plainly a "seller" of PRG Tokens.

243.    Based on the foregoing, it is indisputable that Paragon and the Founder Defendants were each "sellers" of unregistered securities (in the form of PRG Tokens) under the federal securities laws.

**B.      The Executive Defendants**

**Eugene "Chuck" Bogorad**

244.    Bogorad is Paragon's Chief Strategy Officer.  Bogorad directly or indirectly, and successfully, solicited investments from potential and actual PRG Token purchasers during the Paragon ICO.  Further, Bogorad personally distributed PRG Tokens to purchasers/partners during the Paragon ICO.  For example, Bogorad paid 18,000 PRG as compensation to a company that agreed to market the Paragon ICO.

245.    Additionally, Bogorad was significantly involved in marketing the Paragon ICO by negotiating and purchasing ad placements for the Paragon ICO with/from companies that operate virtual currency related websites, including, *inter alia*: coinschedule.com; foundico.com; ICOWatchList.com; ICOchecker.com; ico-list.com; icobazaar.com; whitenoise.ai; coindesk.com; cryptocompare.com; cointelegraph.com; cointraffic.com; coinmarketcap.com; and Bitcoinprbuzz.com.

246.   For example, on August 17, 2017, Bogorad sent an email to a representative from ico-list.com with the subject line "ads" and the message "we want to buy ads!"  The representative did not reply promptly and Bogorad sent a follow-up email stating: "Hello! We're ready to pay!  Please respond!"  Similarly, on August 30, 2017, Bogorad emailed coinmarketcap.com's representatives: "Is there a way to purchase the banner at the very top?"  Shortly thereafter, Bogorad followed up with: "Guys/gals! We've got money to burn :)"  Bogorad had dozens of similar communications with various companies; many of which proceeded to the point where Paragon purchased advertising space.

247.   Similarly, Bogorad engaged companies to draft promotional articles about the Paragon ICO.  For example, in August 2017, Bogorad commissioned the creation of a promotional article discussing the Paragon ICO.  The draft of this article was initially entitled, "Monetizing A Legalized Cannabis Industry—The Paragon Way."  The final version of this promotional article was retitled "Revolutionizing the Cannabis Industry: The Paragon Way" and published on icowatchlist.com.  This article concluded with: "Investors will be able to purchase ParagonCoin by exchanging various cryptocurrencies such as BTC, ETH, LTC, IOTA and a few others for it."

248.   Additionally, Bogorad frequently pitched opportunities to market the Paragon ICO to the Founder Defendants.

249.   For example, on August 27, 2017, Bogorad emailed VerSteeg, Lavrov, and Emelichev pitching the following marketing opportunity:

> I contacted an online wallet maker Coinomi, they have over 100,000 downloads on Android.  It is a wallet that can hold many different crypto-currencies and ERC20 tokens;

> Recently they started to run 'sponsored' offers (deeply integrated ads basically).  When someone sees their wallet he or she is presented with an offer to buy in to a crowd-sale.  It looks like this:



1

If you click the ad, you get this. . .



***

Attached is the offer from them.  When we spoke I offered them 5%+5%=10% in PRG (our standard commission).  They asked if we're willing to share part of the crypto collected via their wallet.  I told them I'm not authorized to discuss the financial details, it's up to our CEO. So they sent a more or less formal offer (see original mail)

Basically they want money for the deep integration ($40k), 8% in PRG, and 4% of all crypto collected via their wallet.

It is my understanding that they are prepared to negotiate . . . .

250.    Shortly thereafter, Lavrov approved of Bogorad's idea by responding "Let's do it."

251.    In short, Bogorad was plainly a "seller" of unregistered securities (in the form of PRG Tokens) under the federal securities laws.

**Alex Emelichev**

252.    Emelichev is one of Paragon's Chief Business Officer's for EMEA.  Emelichev directly or indirectly, and successfully, solicited investments from potential and actual PRG Token purchasers during the Paragon ICO.

253.    Emelichev was involved in the decision-making process relating to, *inter alia*, Paragon's decision to employ Taylor as a celebrity endorser and partnerships Paragon considered and/or engaged in.  Additionally, Emelichev participated in editing, and providing comments on, the White Paper and related promotional materials.  For example, Emelichev sent a draft investor presentation to VerSteeg on August 11, 2017, and a draft white paper to Lavrov on August 14, 2017.

254.    Additionally, Emelichev communicated directly with prospective and actual investors in the Paragon ICO.  For example, in early-September 2017, Emelichev exchanged a series of lengthy emails with a Paragon ICO investor who wanted a refund of his investment.  The investor believed that he, and other early-investors, were deceived into believing that they were getting the best deal by purchasing early, and in large quantities, but as the Paragon ICO progressed, the Company continued to offer various "bonuses" and "fixed rates" to entice additional investments, some of which were more beneficial than the offer for early-investors.  In response to the investor's concerns, Emelichev attempted to ease his concerns and offered him free PRG Tokens: "As a good gesture, we can add 10% of your current holdings = 1838 PRG."

255.    This investor was not satisfied with Emelichev's offer and responded, in part, with the following demand to rescind his purchase:

[Y]ou're very much missing the point.

1.    . . . Paragon are offering a higher discount for a lower buy-in, like some kind of market trader selling packets of lighters or something.  Paragon hasn't maintained the value of the token in relation to the buyers who have already invested, when its value was already prospectively set at $1 without confirmed sale value on the market.  To continue with the market trader analogy, Paragon have put up a price list and sold me the promise of the lighters at the ticket price, and then, right in front of me, given a better price to another bunch of customers for the same thing, even though neither of us has seen a lighter yet and I bought a wholesale quantity.

2.    . . . So Paragon are offering a higher discount during a later stage of the crowd-sale albeit for a limited time.  For all anyone knows, Paragon may have even bought back its own token, at a discounted rate determined internally, using the BTC and ETH accumulated in the ICO.  At best, its [sic] an affront to the existing buyers, and at worst its [sic] possibly something far more unscrupulous.

3.    The fact that I bought at the same rate as people who bought at the fixed rate is the problem [sic] . . . because Paragon defined the fixed rate, and Paragon defined the bonus[e]s for the crowd-sale, and Paragon defined the availability of the sale . . . .  Paragon . . . manufactured a discount compared to the market value, all by itself.  Effectively, this snubs anyone who has already invested in Paragon up

to that time, for the sake of attracting speculators and reducing the remaining available tokens . . . and your claims of supporting the market are very, very transparent."

4.   . . . The 2780 tokens I received for providing $15k worth of ETH during the sale is almost exactly the same as the bonus you calculate for backers during your sale, taking the opportunity to contribute ETH at your inflated rate after the market bombed.  Do you really not see any conflict of interests here?

What I'd like actually, is my $15k back, and before you say it, please don't try giving me a story about smart [] contracts and locked up funds.  This ICO was already stretching the limits of my support . . . .  Paragon have wholly mismanaged the ICO and its publicity to the point where the expected PRG start price will be completely unobtainable, probably for the rest of its existence.  One way or another, and I don't care how, Paragon can cancel my contract right now . . . .

Thanks,

256.   At this point, Emelichev reported the situation to Lavrov, who then told him to pay the investor back.  In short, Emelichev was plainly a "seller" of unregistered securities (in the form of PRG Tokens) under the federal securities laws.

**Gareth Rhodes**

257.   Rhodes is Paragon's second Chief Business Officer for EMEA.  Rhodes directly or indirectly, and successfully, solicited investments from potential and actual PRG Token purchasers during the Paragon ICO.  Rhodes played a significant role in drafting, editing, and providing comments to the White Paper.  Additionally, Rhodes assisted the Company's web developers with the Paragon website's design and language contained therein.  Further, Rhodes was involved in marketing the Paragon ICO by negotiating and purchasing ad placements for the Paragon ICO with/from companies that operate virtual currency related websites.  For example, on August 16, 2017, Rhodes emailed "The Merkle LLC," the following:

We're running a crowd-sale.  The company name is Paragon Coin.  We have an exciting story, an exceptional CEO, and a major celebrity on board (rapper The Game).

We need best possible exposure.  Please provide us with a quote for the best package you have to offer.  We would like weekly prices and discounted prices for a 2 month period.  Please also include details on your total impressions and average click through.

Regards,

Gareth Rhodes

258.    Additionally, Rhodes was significantly involved in drafting an editing the White Paper and content contained on Paragon's website.

259.    Further, Rhodes frequently communicated directly with prospective and actual PRG Token purchasers via the Chat Function.  For example, on August 22, 2017, a potential investor inquired whether PRG Tokens was already on a virtual currency exchange and would be listed on additional exchanges.  Rhodes responded: "Hitbtc [a virtual currency exchange] is already live—we are going to be on Bittrex . . . ."  Such statements were clear solicitations to purchase PRG Tokens as they indicated that PRG Tokens would increase in volume as they were listed on more virtual currency exchanges (due to increased trading volume).

260.    In short, Rhodes was plainly a "seller" of unregistered securities (in the form of PRG Tokens) under the federal securities laws.

**David Kalustov**

261.    Kalustov is Paragon's VP of Business Development.  The White Paper also states that he is employed by Lavrov's company, Peak Mediation, Inc., as its "CRO."  Kalustov was significantly involved in responding to questions submitted via the Paragon website's Chat Function.  During such communications, Kalustov aggressively solicited investments in the Paragon ICO by claiming that PRG Tokens would be listed on large virtual currency exchanges (thereby increasing its daily volume and thus value) and stressing PRG Token's profit potential.  For example, on August 19, 2018, a prospective Paragon ICO investor used the Chat Function to ask: "[W]hat are the projections on price per token after ICO?"  In response, Kalustov stated, "We are not sure if we will have tokens left by the beginning of the actual crowdsale . . . Regarding value, our coins are designed to appreciate in value to reward our early adopters.  We're expecting demand for the coins to grow and supply to decrease . . . ."

262.    Similarly, on August 17, 2017, Kalustov responded to questions via the Chat Function and touted the profit potential from owning PRG Tokens by stating: "I know many crowdsales [sic] pretending to go IPO and offer shares—they are scam.  We have real product that offers solutions for $100B industry.  If we will get 1% of that industry to accept our coin, what will happen to the value of PRG?  Do the math."

263.    Additionally, Kalustov frequently solicited investments via the Chat Function by touting that PRG Tokens would be listed on large virtual currency exchanges such as Bittrex.

264.    In short, Kalustov was plainly a "seller" of unregistered securities (in the form of PRG Tokens) under the federal securities laws.

## C.    Jayceon Terrell Taylor a/k/a "The Game"

265.    Taylor is a rapper; a well-known celebrity.  Taylor used his celebrity status to promote Paragon and the Paragon ICO.  Taylor promoted the Company and the Paragon ICO by encouraging the public to visit the Paragon website, join a "revolution" with Paragon, and purchase PRG Tokens in social media posts on Twitter and Instagram.

266.    For example, in August 2017, Taylor and Paragon posted a video of him and VerSteeg promoting Paragon.  In this video, Taylor states, "We are revolutionizing marijuana, cannabis, hey, the world!"  Similarly, in early-September 2017, Taylor posted a tweet from his Twitter account stating: "You see a correction,[25] me & @JessVerSteeg see a buying opportunity.  Let me welcome you to #Crypto with ParagonCoin.com @ParagonCoin."

267.    Further, Taylor's endorsement was used to solicit the purchase of PRG Tokens in dozens of banner advertisements placed on various websites, such as the following:



---

[25] This is a reference to a general dip in the overall market for virtual currencies around this time-period.

268.   As seen, Taylor clearly solicited investments in the Paragon ICO from the general public.  Based on the foregoing, it is clear that Taylor was a "seller" of unregistered securities (in the form of PRG Tokens) under the federal securities laws and California's securities laws.

## COUNT I

**Claim for Violation of Section 12(a)(1) of the Securities Act**
**Against All Defendants**

269.   Section 12(a)(1) grants Plaintiffs a private right of action against any person who offers or sells a security in violation of Section 5, and states that such person,

> [s]hall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

270.   From approximately July 15, 2017 through March 29, 2019, in connection with the Paragon Offering, Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered securities in direct violation of the Securities Act.  Among other things, Defendants used the Internet for these purposes.

271.   The Paragon Offering was a sale of unregistered securities under controlling federal law. PRG Tokens exhibit the following particular hallmarks of a security under the *Howey* test: (a) in order to receive any PRG Tokens an investment of money, in the form of ETH, BTC, and/or other virtual currencies, was required; (b) the investment of money was made into the common enterprise that is Paragon and its potential future "business lines"; and (c) the success of the investment and any potential returns stemming from the potential future increase in PRG Token's value was entirely reliant on Defendants' ability to create and launch the "PARAGONCOIN platform" and related business lines and/or successfully solicit investments in PRG Tokens from the general public.

272.   As such, Defendants have participated in an unregistered sale of securities in violation of the Securities Act and are therefore, liable to Plaintiffs and the Class for rescission and/or compensatory damages.

## COUNT II

### Claim for Violation of Section 12(a)(2) of the Securities Act
### Against the Paragon Defendants

273.    Section 12(a)(2) provides that any person who

offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

[s]hall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

274.    From approximately July 15, 2017 through November 16, 2018, in connection with the Paragon Offering, the Paragon Defendants unlawfully offered and sold securities through use of means or instruments of transportation or communication in interstate commerce or of the mails by means of a prospectus or oral communications containing numerous untrue statements and omitting material facts necessary to make statements, in light of the circumstances, not misleading. More specifically, the Paragon Defendants, through their creation and/or distribution of the Paragon ICO Prospectus/White Paper and solicitation materials and/or direct communications with investors, made untrue statements of material fact which: (1) falsely represented that investor funds were escrowed by an independent third party and (2) guaranteed investors a profit by Paragon as an innovative technology company with a viable business model—when in reality, Defendants sought funds to buy property and live lavish lifestyles.

275.    Plaintiffs and the Class have been harmed by the Paragon Defendants' materially false statements in the Paragon White Paper and in oral communications, as set forth herein.  Accordingly, the Paragon Defendants are liable to Plaintiffs for rescissory damages.

## COUNT III

### Claim for Violation of Section 15(a) of the Securities Act
### Against the Founder Defendants

276.   Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

277.   Due to their ownership interest in and/or role in managing Paragon and conducting its functions, the Founder Defendants and Black Rabbit acted as controlling persons of Paragon within the meaning of Section 15(a) of the Securities Act as alleged herein.  By virtue of their positions as officers and/or directors and participation in and/or awareness of Paragon's operations, they had the power to influence and control, and did influence and control, directly or indirectly, the decision making relating to the Paragon ICO, including the decision to engage in the sale of unregistered securities via the Paragon ICO.

278.   By virtue of the foregoing, the Founder Defendants are liable to Plaintiffs and the Class as control persons of Paragon under Section 15(a) of the Securities Act.

## COUNT IV

### Violation of Section 9(a)(1)-(2) of the Exchange Act
### Against Paragon, the Founder Defendants and Defendant Kurylovich

279.   Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

280.   Section 9(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, directly or indirectly, by the use of the mails or any means of instrumentality of interstate commerce . . .:

(1) For the purpose of creating a false or misleading appearance of active trading in any security, other than a government security, or a false or misleading appearance with respect to the market for any such security:

(A) to effect any transaction in such security, which involves no change in the beneficial ownership thereof, or

(B) to enter an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or

(C) to enter any order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties.

(2) To effect, alone or with 1 or more other persons, a series of transactions in any security . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others. . . .

281.    As set forth *infra*, over 93% of all PRG trading volume has purportedly taken place on Defendant Kurylovich's virtual currency exchange, STEX.   The fact that no independent virtual exchange has experienced demand for PRG and the few trades that have taken place on public blockchain records are likely wash trades, indicates that PRG Token's price has been propped up and manipulated by Paragon, the Founder Defendants and Kurylovich through the use of STEX and manipulative trading efforts.

## COUNT V

### Violation of Section 20(a) of the Exchange Act
### Against the Founder Defendants

282.    Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

283.    Due to their ownership interest in and/or role in managing Paragon and conducting its functions, the Founder Defendants acted as controlling persons of Paragon within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their positions as officers and/or directors and participation in and/or awareness of Paragon's operations, they had the power to influence and control, and did influence and control, directly or indirectly, the decision making relating to the PRG Offering, including the decision to engage in the sale of unregistered securities via the PRG Offering.

284.    By virtue of the foregoing, the Founder Defendants are liable to Plaintiffs and the Class as control persons of Paragon under Section 20(a) of the Exchange Act.

## COUNT VI

### Violation of Section 25110 Cal. Corp. Code
### Against the Paragon Defendants

285.    Section 25110 of the California Corporations Code provides that it shall be:

Unlawful for any person to offer or sell in this stat any security in an issuer transaction . . . unless such sale has been qualified under Section 25111, 25112 or 25113 . . . or unless such security or transaction is exempted or not subject to qualification under [California's securities laws].

286.     From approximately July 15, 2017 through March 29, 2019, in connection with the PRG Offering, the Paragon Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unqualified securities in direct violation of California's securities laws.  Among other things, Defendants used the Internet for these purposes.

287.     The PRG Offering was a sale of unqualified securities under controlling state law.  PRG Tokens exhibit the following particular hallmarks of a security under the *Howey* test: (a) in order to receive any PRG Tokens an investment of money, in the form of ETH, BTC, and/or other virtual currencies, was required; (b) the investment of money was made into the common enterprise that is Paragon and its potential future "business lines"; and (c) the success of the investment and any potential returns stemming from the potential future increase in PRG Token's value was entirely reliant on Defendants' ability to create and launch the "PARAGONCOIN platform" and related business lines and/or successfully solicit investments in PRG Tokens from the general public.

288.     As such, the Paragon Defendants have participated in an unqualified sale of securities in violation of Section 25110 of the California Corporations Code and are therefore, liable to Plaintiffs and the Class for rescission and/or compensatory damages.

## COUNT VII

### Violation of Section 17533.6(a) Cal. Bus. & Prof. Code
### Against the Paragon Defendants

289.     Section 17533.6(a) of the California Business and Professions Code prohibits "any person, firm, corporation, or association that is a nongovernmental entity to:

use a seal, emblem, insignia, trade or brand name, or other term, symbol or content that reasonable could be interpreted or construed as implying any federal, state, or local government, . . . connection, approval, or endorsement of any product or service, including, but not limited to, any financial product, goods, or services, by any means, including, but not limited to, a mailing, electronic message, Internet Web site . . . unless the nongovernmental entity has an expressed connection with, or the approval or endorsement of, a federal, state, or local government . . ..

290.    Here, the Paragon Defendants solicited purchases of PRG Tokens by falsely claiming that its token issuance was "SEC Compliant" and thus unlawfully implied that the SEC approved of, or endorsed, the PRG Offering.  Accordingly, the Paragon Defendants are liable to Plaintiffs and the Class for their violation of Section 17533.6(a).

### COUNT VIII

**Quasi-Contract [Unjust Enrichment] Claim Seeking Restitution**
**Against the Paragon Defendants**

291.    Based on Defendants enticement of Plaintiffs and the Class to purchase PRG Tokens through false and misleading statements, Plaintiffs further allege a quasi-contract claim seeking restitution.

292.    Under California law, unjust enrichment requires one who acquires a benefit which may not justly be retained, to return either the thing or its equivalent to the aggrieved party so as not to be unjustly enriched.

293.    Here, Defendants used fraudulent means to obtain Plaintiffs' and the Class's valuable cryptocurrency.  This cryptocurrency then surged in value and the Paragon Defendants liquidated or expended these assets during this surge to their significant financial benefit.  The Paragon Defendants unjustly received and retained these financial benefits at the expense of Plaintiffs and the Class.  Accordingly, the Paragon Defendants must return the benefits they obtained as a result of their fraudulent actions.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as the Class' representatives and their counsel as Class counsel;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Declaring that Defendants offered and sold unregistered securities in violation of the federal securities laws;

D.      Declaring Defendants are liable to Plaintiffs and the Class for monetary damages under the claims set forth herein;

E.      Enjoining Defendants from making further transfers or dissipations of the investments raised in connection with the Paragon ICO, or using such funds in any further purchases or transactions;

F.      Requiring an accounting of the remaining funds and assets raised from Plaintiffs and the Class in connection with the Paragon ICO;

G.      Imposing a constructive trust over the funds and assets rightfully belonging to Plaintiffs and the Class;

H.      Ordering rescission of the investments made by Plaintiffs and the Class relating to the Paragon ICO and/or rescissory damages;

I.      Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest;

J.      Awarding Plaintiffs the costs of this action, including reasonable allowance for Plaintiffs' attorneys' and experts' fees; and

K.      Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs respectfully request a trial by jury on all issues so triable

Dated: June 10, 2019                                **LEVI & KORSINSKY, LLP**

By:  _/s/ Donald J. Enright_
Donald J. Enright (admitted *pro hac vice*)
John A. Carriel (admitted *pro hac* vice)
1101 30th St., NW, Ste. 115
Washington, DC 20007
Telephone: (202) 524-4292
Facsimile: (202) 333-2121

Rosemary M. Rivas
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

Eduard Korsinsky (to be admitted *pro hac vice*)
**LEVI & KORSINSKY, LLP**
30 Broad Street, 24th Floor
New York, New York 10004

Telephone: (212) 363-7500
Facsimile: (212) 636-7171

*Attorneys for Lead Plaintiff Jon Holland and
Plaintiff Astley Davy*